**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **CROSS CANYON ENERGY CORP.,** | § | **CASE NO.   10-30747** |
| | § | |
| **Debtor.** | § | **(Chapter 11)** |
| | § | |
| | § | |
| | § | |

_____

**DECLARATION OF CARL A. CHASE IN SUPPORT OF VOLUNTARY PETITION,**
**FIRST DAY MOTIONS AND DESIGNATION AS COMPLEX BANKRUPTCY CASE**

Pursuant to 28 U.S.C. § 1746, Carl A. Chase declares as follows:

My name is Carl A. Chase.  I am the Chief Financial Officer of Cross Canyon Energy Corp. ("Cross Canyon" or the "Debtor").[1]

1.       I submit this Declaration based on personal knowledge in further support of (a) the voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") filed by Cross Canyon on January 29, 2010 (the "Petition Date"); (b) the Notice of Designation of this case as a complex bankruptcy case; and (c) the following motions:

   A.    EMERGENCY MOTION TO APPROVE (A) MAINTENANCE OF CERTAIN PREPETITION BANK ACCOUNTS AND CASH MANAGEMENT SYSTEM, (B) CONTINUED USE OF EXISTING CHECKS AND BUSINESS FORMS, (C) AUTHORIZING THE PAYMENT OF INTERCOMPANY EXPENSES IN THE ORDINARY COURSE, AND (D) RELATED RELIEF;

   B.    EMERGENCY MOTION FOR APPROVAL OF INTERIM AND FINAL USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION AND RELATED RELIEF;

---

[1] Cross Canyon Energy Corp.
  6630 Cypresswood Drive, Ste. 200
  Houston, TX  77379
  Tel.: 281.315.8880

C.      EMERGENCY MOTION FOR ENTRY OF AN INTERIM ORDER (A) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICES, (B) DETERMINING ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE UTILITY SERVICES, AND (C) ESTABLISHING PROCEDURES FOR DETERMINING REQUESTS FOR ADDITIONAL ADEQUATE ASSURANCE OF PAYMENT FOR POSTPETITION UTILITY SERVICES;

D.      EMERGENCY MOTION TO SCHEDULE HEARING DATE FOR (A) APPROVAL OF PREPETITION SOLICITATION, (B) CONFIRMATION OF PREPACKAGED PLAN OF REORGANIZATION, (C) APPROVAL OF ASSUMPTION OR REJECTION OF EXECUTORY CONTRACTS, AND (D) GRANTING RELATED RELIEF;

E.      EMERGENCY MOTION TO ESTABLISH BAR DATE FOR FILING PROOFS OF CLAIM AND INTERESTS;

F.      EMERGENCY APPLICATION TO EMPLOY THOMPSON & KNIGHT LLP AS COUNSEL TO DEBTOR AND DEBTOR-IN-POSSESSION;

G.      EMERGENCY MOTION TO ESTABLISH PROCEDURES FOR MONTHLY INTERIM COMPENSATION AND REIMBURSEMENT OF EXPENSES FOR CASE PROFESSIONALS; AND

H.      DEBTOR'S EMERGENCY APPLICATION FOR ENTRY OF ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF GRANT THORNTON LLP AS ITS FINANCIAL ADVISORS.

The foregoing are collectively the "First Day Motions."

2.      I further submit this Declaration to assist the Court and other interested parties-in-

interest in understanding the circumstances that compelled the commencement of this Chapter 11

Case.

## INTRODUCTION

3.      The relief sought in the First Day Motions should enable the Debtor to effectively administer its estate.  I have reviewed the First Day Motions, and I believe the requested relief is necessary to ensure the success of the Debtor's reorganization.  Except as otherwise indicated, all facts as set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtor.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.      On the Petition Date, the Debtor commenced this case (the "Case") by filing a voluntary petition under the Bankruptcy Code.  Since the Petition Date, the Debtor has continued to operate and manage its business as debtor-in-possession pursuant to §§ 1107 and 1108(a) of the Bankruptcy Code.

### A.      Background

5.    In May 2004, the Debtor was incorporated as ABC Funding, Inc., a Nevada corporation.

6.    On September 2, 2008, the Debtor acquired 100% of the capital stock of Voyager Gas Corporation ("Voyager"), and on March 24, 2009 the Debtor was renamed "Cross Canyon Energy Corp."

7.    Voyager's assets consist of the oil and gas lease blocks located on approximately 13,700 net acres in Duval County, Texas (the "Duval County Properties").  Voyager and CCEC Operating Company ("CCEC") are the Debtor's wholly owned subsidiaries.[2]

---

[2] The Debtor uses CCEC for banking, financial management and related business matters, although CCEC has no operating assets of its own.

8.     The Debtor's common stock presently is listed on the OTC Bulletin Board and is publicly traded under the ticker symbol "CCYE."

**B.     Ownership**

9.     The Duval County Properties have established production over a substantial acreage position with proved reserves from more than ten different horizons located at depths ranging from 4,000 to 7,500 feet.  The designated field name employed by the Railroad Commission of Texas is the Orcones (Frio Vicksburg Consolidated) Field.  The primary producing reservoirs are in the Frio, Vicksburg, Jackson and Yegua formations.  The acreage has exploratory potential in the Queen City and Wilcox formations.  As of June 30, 2009, the Duval County Properties had independently engineered proved reserves of 570 Mbo and 7,811 Mmcf, based upon that certain independent third party engineering report prepared by Ralph E. Davis Associates, Inc. located in Houston, Texas.  By category, this includes 81 Mbo and 1,772 Mmcf of proved developed producing, 253 Mbo and 2,417 Mmcf of proved developed non-producing reserves, and 236 Mbo and 3,621 Mmcf of proved undeveloped reserves.  Approximately 70% of total proved reserves are natural gas.

**C.     Events Preceding the Filing of Chapter 11**

10.     In order to finance the Voyager Acquisition, on September 2, 2008, the Debtor entered into the CIT First Lien Credit Agreement and the CIT Second Lien Credit Agreement (collectively, the "CIT Credit Agreements").  The balance due as of the date hereof with respect to the CIT First Lien Credit Agreement is $11,500,000, plus accrued interest, costs and fees and with respect to the CIT Second Credit Agreement at $22,000,000, plus accrued interest, costs and fees.

11.    On April 21, 2009, the Administrative Agent and the CIT Lenders agreed to waive the Debtor's failure to comply with certain covenants in the CIT Credit Agreements consisting of financial ratios, measured as of December 31, 2008, with respect to (a) the Debtor's ratio of earnings before interest, taxes, depreciation and amortization and exploration expenses ("EBITDAX") to interest expense and its ratio of total debt to EBITDAX under the CIT Revolving Loan, and (b) the Debtor's ratio of total reserve value to total debt under the CIT Term Loan.  Additionally, the Administrative Agents and the CIT Lenders waived compliance by the Debtor of such ratios for each quarterly fiscal period ending in 2009.  As a condition to these waivers, the Debtor agreed not to request or make any further loans or advances under the CIT Credit Agreements, unless and until the CIT Lenders, in their sole and absolute discretion, otherwise agree to in writing.  The current amounts outstanding on the CIT Revolving Loan and the CIT Term Loan are $11,500,000 and $22,000,000, respectively.

12.    As part of a semi-annual redetermination of the Debtor's borrowing base under the CIT First Lien Credit Agreement, on May 5, 2009, the Administrative Agent and CIT First Lien Lenders notified the Debtor that its borrowing base was being reduced to $1.0 million causing the Debtor's outstanding loans under the CIT Revolving Loan to exceed the new borrowing base by $10.5 million.  The CIT First Lien Credit Agreement provides that the Debtor repay such revolving loan amount in excess of the reduced borrowing base within sixty days of such notification.  The Debtor failed to repay or otherwise resolve the borrowing base deficiency, and, commencing July 19, 2009, outstanding loans under the CIT Revolving Loan began accruing interest at a default rate equal to the then applicable rate plus 3% per annum.  In addition to the default rate of interest, upon the expiration of the terms to which the Debtor had obtained Eurodollar loans, the Debtor's Eurodollar loans were converted to prime rate loans, effectively

increasing the Debtor's interest rate on the CIT Revolving Loan from 3.15% and 3.47%to 7.75% per annum.

13.   On September 4, 2009, the Debtor was required to pay interest on the CIT Revolving Loan and CIT Term Loan in the amounts of $125,650 and $320,711, respectively. Rather than making such payments, the Debtor determined it to be in the best interests of all of its stakeholders to use its available cash to obtain extensions with respect to impending drilling obligations on two significant key oil and gas leases on its Duval County Properties. The Debtor extended two leases on the Duval County Properties to preserve a significant portion of the Debtor's oil and natural gas assets and to provide for future growth potential. Payments of $203,194 for lease extensions and a new lease were made during the third quarter of calendar year 2009. The CIT Lenders consented to the payments. Under the CIT Credit Agreements, the Debtor's continued failure to pay interest constituted an Event of Default permitting the CIT Lenders to declare all loans outstanding under the CIT Credit Agreements, together with any accrued and unpaid interest thereon, immediately due and payable. In addition, the CIT Term Loan was converted from a Eurodollar loan to a base rate loan and began accruing interest at a rate per annum that was approximately 4.5% in excess of the rate otherwise applicable. The conversion to a base rate loan, coupled with the increased default interest margin, effectively increased the Debtor's interest rate on the CIT Term Loan from approximately 8.15% to approximately 12.75% per annum.

14.   In addition to the deficiency and resulting default under the Debtor's CIT Credit Agreements, since September 2008, oil and natural gas prices have been at their lowest levels since 2001, and although prices have recovered somewhat in recent months, the increase is not sufficient to solve the Debtor's continuing liquidity problem by increasing its borrowing base

and making it cost effective to drill additional wells on the Duval County Properties.  As a result, the operating revenues and stock prices of many publicly traded oil and gas exploration and production companies, similar to the Debtor, have fallen sharply.  When combined with the global credit crisis, it has become extremely difficult for below investment grade companies, including the Debtor to raise capital.  Due to the foregoing, the Debtor lacks sufficient capital to develop its properties and service its outstanding debt obligations.

        **D.**      <u>**Chapter 11 Bankruptcy Case**</u>

15.    The Debtor requires additional capital in order to survive.

16.    As the Debtor has received the commitment from the CIT First Lien Lenders and the CIT Second Lien Lenders (collectively, the "<u>CIT Lenders</u>") to support confirmation of the Plan, subject to the terms and conditions of the Plan Support Agreement, the Debtor does not expect the Chapter 11 Case to be protracted.  Thus, the Debtor anticipates requesting confirmation of the Plan at the earliest possible opportunity.  Specifically, the Debtor anticipates that the hearing to consider the adequacy of the Disclosure Statement and Confirmation of the Plan will occur on or before March 16, 2010.

17.    The Plan provides that the Effective Date of the Plan will be the Business Day on which all conditions precedent to the Plan's Confirmation and Effective Date have been satisfied or waived.  The Effective Date could be the same day as the Confirmation Hearing or as soon thereafter as is administratively practical.  There is a possibility, however, that this projected timetable cannot be achieved due to factors beyond the Debtor's control.

        **E.**      <u>**Valuation of Assets by Independent Advisor**</u>

18.    During the fourth quarter of calendar year 2009, the Debtor engaged the corporate advisory and restructuring services of Grant Thornton LLP ("<u>Grant Thornton</u>") to perform

various services, including a valuation of the Debtor's assets.  Attached as **<u>Exhibit A</u>** is the Valuation Report prepared by Grant Thornton, dated December 21, 2009, with respect to the Duval County Properties (the "<u>Valuation Report</u>"), assigning an approximate value of $12.3 to $18.9 million to such properties owned by Voyager, the wholly owned subsidiary of the Debtor. Grant Thornton also opined that the enterprise value of Debtor was approximately $25.4 million as of September 30, 2009.  Such valuation was based upon Grant Thornton's analysis of (a) oil and gas companies with similar characteristics, (b) the average market trading multiples of members of Voyager's peer group, and (c) a discounted cash flow, based upon a discount rate that incorporated the Debtor's inherent riskiness.  In performing this analysis, it is the Debtor's understanding that Grant Thornton utilized the Reserve Report, adjusted to take into account the operations that Debtor and Voyager could not perform due to lack of liquidity and also adjusted for somewhat higher prices in recent months.

F.      <u>Other</u>

19.    Debtor has a commitment under the Plan Support Agreement from the CIT First Lien Lenders to participate Pro Rata in the New Senior Secured Credit Facility subject to the terms and conditions of the Plan Support Agreement, to enable the Debtor to consummate the Plan, emerge from Chapter 11 as a reorganized entity, and fund operating expenses, including administrative costs of the Chapter 11.

20.    The security interests and liens securing repayment of the CIT Revolving Loan and the CIT Term Loan shall be released or assigned so that the New Senior Secured Credit Facility Lenders shall receive a first priority security interest and lien to secure the repayment of the New Senior Secured Credit Facility.

**FIRST DAY MOTIONS**

21.  I have reviewed the various First Day Motions filed contemporaneously herewith and discussed herein.[3]  The allegations contained in each of the First Day Motions are true and correct to the best of my knowledge, information, and belief.

> **G.**     **Emergency Motion to Approve (A) Maintenance of Certain Prepetition Bank Accounts and Cash Management System, (B) Continued Use of Existing Checks and Business Forms, (C) Authorizing the Payment of Intercompany Expenses in the Ordinary Course, and (D) Related Relief**

22.  Before commencing this Case, the Debtor managed its cash receivables and payables through a cash management system (the "Cash Management System") maintained by Amegy Bank of Texas ("Amegy").  The Debtor maintains two bank accounts at Amegy – (a) xxxx121 (the "Operating Account"), and (b) xxxx8566 (the "Money Market Account").  As of January 27, 2010, the Operating Account had a balance of $10,460.38 and the Money Market Account had a balance of $635,210.46.  The Debtor's subsidiary, CCEC, maintains two accounts at Amegy – (a) xxxxx075 (the "CCEC Operating Account"), and (b) xxxx083 (the "CCEC Revenue Account," and collectively with the Operating Account, the Money Market Account and the CCEC Operating Account, the "Accounts").  A flowchart illustrating the foregoing is attached as **Exhibit B.**

23.  Proceeds from the sale of hydrocarbons received by Voyager related to its oil and gas operations are wire transferred by the purchasers of production into the CCEC Revenue Account.  Requiring a change of wiring instructions to the purchasers of production would likely entail a loss of revenue for a period of time, to the Debtor's great detriment.  Funds in the CCEC Revenue Account are transferred periodically to the CCEC Operating Account, Money Market

---

[3] All capitalized terms not defined herein shall have the meaning ascribed to them in their respective First Day Motions.

Account, and/or the Operating Account as directed.  Upon receipt of proceeds of oil and gas sales, Voyager calculates the amount owed to royalty interest owners and the Comptroller of the State of Texas for severance taxes resulting from the sale of natural gas and makes payment with the balance transferred to the Money Market Account, Operating Account or CCEC Operating Account.  The CCEC Revenue Account is designed to have a zero balance once the monthly revenues and natural gas severance taxes are allocated between royalty (attributable to royalty owners) and Voyager revenue (attributable to Voyager).  The CCEC Revenue Account is designed to have a zero balance except for royalty interests that are not in "pay" status.  Royalty that is not in "pay" status is in "suspense," and those funds remain in the CCEC Revenue Account.  Royalty that is in "suspense" will ultimately be paid to the appropriate royalty owners once they are in "pay" status or else will escheat to the state in accordance with applicable law.

24.    Proceeds from the Debtor's commodity hedge contracts and all other miscellaneous receivables are deposited into the Operating Account.  The Operating Account is used to pay all of the Debtor's normal business expenses.  Voyager's operating expenses are paid from the CCEC Operating Account.  The Debtor pays payroll from the Operating Account.

25.    Having to replace the current Cash Management System would be costly and disruptive of the orderly collection of revenues by the Debtor, resulting in a significant adverse effect on the Debtor's reorganization efforts.  To ensure that all transfers and transactions will be documented in its books and records, the Debtor will continue to maintain records of all transfers within the Cash Management System.

26.    The Debtor has an inventory of check stock and business forms that would go to waste if new checks were to be ordered and used.  Moreover, requiring the Debtor to obtain new

checks, which bear the designation "Debtor-in-Possession," would cause the Debtor to incur undue expense.

**H.      Emergency Motion for Approval of Interim and Final Use of Cash Collateral and Granting Adequate Protection and Related Relief**

27.    The Debtor has an immediate need to use cash collateral (the "Cash Collateral") to continue the operation of its business.  Without such funds, the Debtor will not be able to pay costs and expenses, including but not limited to wages, salaries, rent, professional fees, general and administrative operating expenses, lease operating expenses, drilling costs, oil lease operations, and maintenance costs that arise in administration of this Case and in the ordinary course of the Debtor's business.

28.    Absent the ability to use the Cash Collateral, the Debtor will be forced to shut down its operations abruptly, which will negatively impact the value of its assets and reduce or eliminate any prospect for a successful reorganization and confirmation of the Debtor's prepackaged Plan.  An abrupt shut down will result in a severe and dramatic loss of asset value. Accordingly, the Debtor is requesting interim authority to use the Cash Collateral as set forth in an interim budget until a final order granting the use of the Cash Collateral can be entered.  The Debtor is without sufficient funds, other than the Cash Collateral, to operate for 15 or more days until a final hearing.  The Debtor's inability to timely pay the ongoing costs and expenses will result in immediate and irreparable harm to the estate.  The request for interim authorization seeks only that amount of Cash Collateral necessary to avoid immediate and irreparable harm to the Debtor's assets pending a final hearing.

**I.      Emergency Motion for Entry of an Interim Order (A) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (B) Determining Adequate Assurance of Payment for Future Utility Services, and (C) Establishing Procedures for Determining Requests for Additional Adequate Assurance of Payment for Postpetition Utility Services**

29.    Various utility companies provide the Debtor with traditional utility services (the "Utility Companies"), such as telephone and communication services, electricity, water, gas and other similar services that are necessary for the continued operation of the Debtor's day-to-day operations.  A list of all identified utility companies for the debtor is attached as **Exhibit C** (the "Utility Service List").   As of the Petition Date, there are no defaults or arrearages with any Utility Company.  On average, the Debtors' aggregate monthly utility usage is approximately $1,270.

30.    Uninterrupted utility service is critical to the Debtor's ability to operate and maintain the value of its business and to maximize value for the benefit of the creditors.  The Debtor cannot operate its business without utility service.  Should any utility company refuse or discontinue service, the Debtor would be forced to cease or limit operations.   Such an interruption would substantially disrupt operations and result in loss of revenues, which could irreparably harm and jeopardize the reorganization efforts or other objectives of the Debtor.

**J.      Emergency Motion to Schedule Hearing Date for (A) Approval of Prepetition Solicitation, (B) Confirmation of Prepackaged Plan of Reorganization, (C) Approval of Assumption or Rejection of Executory Contracts, and (D) Granting Related Relief**

31.    The Debtor needs a hearing on the confirmation of the Plan as soon as possible. As the Debtor intends to assume all of the executory contracts listed in the schedules, it also requests that its motion to assume executory contracts be heard at the same time as the Plan. Accordingly, the Debtors are requesting that this Court schedule this hearing for March 11, 2010, or as soon as is practicable.

32.     The Debtor also seeks relief from compliance with certain requirements in the Bankruptcy Rules and Bankruptcy Code.  Specifically, relying upon Bankruptcy Code § 341(e), the Debtor requests that this Court enter an order directing the Office of the United States Trustee not to convene a meeting of creditors or equity holders.  The Debtor believes that a waiver of the meeting of creditors and equity security holders is justified because the Debtor has filed a plan that proposes paying all unsecured creditors in full (100%), has commitments for exit financing sufficient to make these payments, and has sufficient votes from impaired classes to confirm its Plan. Consequently, the Debtor is requesting a confirmation hearing for March 11, 2010, or as soon thereafter as practicable, obviating the need for a meeting of creditors.

**K.     Emergency Motion to Establish Bar Date for Filing Proofs of Claim and Interests**

33.     The Debtor requests entry of an order pursuant to Bankruptcy Rule 3003(c)(3) establishing a date by which proofs of claim or interest must be filed or be forever barred (the "Claims Bar Date") and a governmental claims bar date (the "Governmental Claims Bar Date") applicable to governmental units (as defined in Section 101(27) of the Bankruptcy Code).  The Debtor requests that the Court: (a) establish March 1, 2010 as the Claims Bar Date; (b) establish July 31, 2010 as the Governmental Claims Bar Date; and (c) order that the Claims Bar Date and Governmental Claims Bar Date be set forth on the Notice of Commencement of Case that will be served on all creditors and parties-in-interest in this Case.

34.     An expedited hearing on this Motion is necessary to immediately establish the Claims Bar Date and Governmental Claims Bar Date and to allow the Debtor to proceed with confirmation of the Plan on an expedited basis.

**L.    Emergency Application to Employ Thompson & Knight LLP as Counsel to Debtor and Debtor-in-Possession**

35.    The Debtor requests that this Court enter an interim order (the "T&K Interim Order"), pending entry of a final order or the Interim Order becoming a final order (a) employing and retaining Thompson & Knight LLP ("T&K")as attorneys to represent the Debtor in connection with various matters, including the prosecution of the Case, and (b) scheduling a final hearing on this Motion within 21 days of entry of the Interim Order (the "Final Hearing"). Pursuant to Bankruptcy Code Section 328(a), the Debtor requests that this Court authorize the retention of T&K under a general retainer in accordance with T&K's normal hourly rates.

36.    Obtaining approval to employ and retain counsel as expeditiously as possible, and on an interim basis pending final approval, is necessary to avoid the irreparable harm that Debtor would inevitably face if required to proceed in this case unrepresented.[4]

37.    Relief should be granted under the current circumstances pursuant to Bankruptcy Rule 6003, as the Debtor would face irreparable harm if required to proceed for any amount of time without legal counsel.  The Debtor therefore respectfully requests that this Court consider the Application and grant the relief requested herein immediately on an interim basis and, thereafter, on a final basis, unless an objection thereto is filed with this Court within 20 days after entry of the Interim Order.  If such an objection is timely filed, the Debtor requests that this Court hold a final hearing on this Application.  The Debtor requests that the Interim Order remain in effect, notwithstanding any objection to this Application, until further order of this Court.

---

[4] *See In re First NLC Fin. Serv., LLC,* Case No. 08-10632-2008 Bankr. LEXIS 14466 (S.D. Fla. Jan. 28, 2008) (finding that interim approval of an application to employ counsel was proper under Bankruptcy Rule 6003 upon the debtor's demonstration that while lacking counsel pending a final hearing, an order could be entered that could have "devastating" effects on the debtor's estate).

38.     The Debtor has chosen T&K because of its extensive experience, knowledge and an established reputation regarding the reorganization and debt restructuring of energy companies under chapter 11 of the Bankruptcy Code.

39.     Moreover, T&K has extensive expertise, experience and knowledge in the field of business reorganizations pursuant to chapter 11 of the Bankruptcy Code.  T&K has expertise, experience and knowledge practicing before bankruptcy courts and has represented debtors, lenders, committees, investors, shareholders, and purchasers with regard to financially distressed entities.  Additionally, T&K is a full service legal firm with experience and expertise in other legal areas that will be implicated during this reorganization case, including corporate law. Finally, over the past five months, T&K has assisted the Debtor in exploring restructuring alternatives and preparing for the filing of this case.  T&K is also familiar with the Debtor's business operations and financial affairs as it has represented the Debtor in general corporate and SEC matters since March 2008.  If the Debtor is required to retain counsel other than T&K, it will incur additional expense and the administration of the Case will suffer undue delay.  Thus, the Debtor believes that T&K possesses the requisite resources and is highly qualified and uniquely able to represent the Debtor's interests in this Case.

**M.     <u>Emergency Motion to Establish Procedures for Monthly Interim Compensation and Reimbursement of Expenses for Case Professionals</u>**

40.     The Debtor requests authorization to make payments to professionals on a monthly basis pursuant to certain procedures to protect the rights of all creditors and parties in interest.

N.    **Debtor's Emergency Application for Entry of Order Authorizing the Employment and Retention of Grant Thornton LLP as its Financial Advisors**

41.    The Debtor requests authorization to employ and retain Grant Thornton as its financial advisors in this Chapter 11 case effective as of the Filing Date.  Specifically, the Debtor respectfully requests entry of an order pursuant to § 327(a) of the Bankruptcy Code, authorizing Grant Thornton to perform those accounting and financial advisory services that will be necessary during this Chapter 11 case as more fully described below.

42.    The Debtor has selected Grant Thornton as its financial advisors because of the firm's diverse experience and extensive knowledge in the fields of accounting, taxation and bankruptcy.

43.    Preceding the Petition Date, the Debtor employed Grant Thornton as financial advisors beginning in October, 2009.  By virtue of its prior engagement, Grant Thornton is familiar with financial information and other data maintained by the Debtor and is qualified to continue to provide financial advisory services to the Debtor.  As such, retaining Grant Thornton is an efficient and cost effective manner in which the Debtor may obtain the requisite services.

44.    The Debtor needs assistance in collecting, analyzing and presenting accounting, financial and other information in relation to this Chapter 11 case to facilitate the timely confirmation of the Plan.  Grant Thornton has considerable experience with rendering such services to debtors and other parties in numerous Chapter 11 cases.  As such, Grant Thornton is well qualified to perform the work required in this case.

## CONCLUSION

45.     Approval of the First Day Motions is in the best interest of the Estate.


46.     I have reviewed this Declaration and hereby declare under penalty of perjury that

the foregoing is true and correct and within my own personal knowledge.


**Executed this 1st day of February, 2010.**



_/s/ Carl A. Chase_
Carl A. Chase
Chief Financial Officer