IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| CROSS CANYON ENERGY CORP., | § | CASE NO.  10-30747 |
| | § | |
| Debtor. | § | (Chapter 11) |
| | § | |
| | § | |

_____

**DISCLOSURE STATEMENT WITH RESPECT TO PREPACKAGED PLAN OF
REORGANIZATION OF CROSS CANYON ENERGY CORP. PURSUANT TO
<u>CHAPTER 11 OF THE BANKRUPTCY CODE</u>**

RHETT G. CAMPBELL
Texas State Bar No.03714500
**THOMPSON & KNIGHT LLP**
333 Clay Street, Suite 3300
Houston, Texas  77002
Telephone:  713.654.8111
*and*
IRA L. HERMAN
Texas State Bar No. 24063314
JENNIFER A. CHRISTIAN
**THOMPSON & KNIGHT LLP**
919 Third Avenue, 39th Floor
New York, New York  10022-3915
Telephone:  212.751.3001
ATTORNEYS FOR CROSS CANYON ENERGY CORP.

DATED:  January 28, 2010.

# TABLE OF CONTENTS

PAGE

ARTICLE I PLAN OVERVIEW ...................................................................................4

    1.1    Post-Confirmation Funding. .................................................................4

    1.2    Classes 1, 2, 3, 5, 6, 7 and 9. ..............................................................4

    1.3    Classes 4(a) and 4(b). ..........................................................................5

    1.4    Class 10. ...............................................................................................5

    1.5    Class 11. ...............................................................................................5

    1.6    Class 12. ...............................................................................................5

    1.7    Additional Information Regarding New Securities. ...............................6

ARTICLE II INTRODUCTION ....................................................................................6

    2.1    Purpose of Disclosure Statement. ........................................................6

    2.2    Explanation of Chapter 11. ..................................................................6

    2.3    Procedure for Filing Proofs of Claim and Proofs of Interest.................7

    2.4    Voting Procedures and Requirements. ..................................................8

ARTICLE III HISTORY OF THE DEBTOR .............................................................11

    3.1    Overview. ............................................................................................11

    3.2    The Debtor's Ownership. ....................................................................12

ARTICLE IV THE REORGANIZATION CASE ........................................................13

    4.1    The Debtor and the Reorganization Case. ...........................................13

    4.2    Sources of Information. .......................................................................17

    4.3    Liquidation Analysis. ..........................................................................17

    4.4    Other Financial Information. ...............................................................18

    4.5    Insurance Policies and Indemnification. ..............................................18

    4.6    Preference Analysis. ............................................................................18

ARTICLE V DESCRIPTION OF THE PLAN .............................................................18

    5.1    Structure of the Plan. ..........................................................................19

    5.2    Classification, Estimated Amount and Treatment of Claims and Interests.19

    5.3    Means for Implementation of the Plan. ...............................................22

    5.4    Treatment of Executory Contracts and Unexpired Leases. ....................27

    5.5    Conditions Precedent to the Plan's Confirmation and Consummation. ....31

    5.6    Modification; Withdrawal. ..................................................................33

    5.7    Retention of Jurisdiction......................................................................33

**DISCLOSURE STATEMENT WITH RESPECT TO PREPACKAGED PLAN OF REORGANIZATION
OF CROSS CANYON ENERGY CORP. PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE – PAGE i**

513854 000004 DALLAS 2563267.8

5.8     Binding Effect and Discharge of the Debtor. ............................................34

ARTICLE VI CERTAIN RISK FACTORS TO BE CONSIDERED...........................................36

6.1     Risks Related to the Bankruptcy Case.............................................37

6.2     Risks Related to Financial Condition of Reorganized Debtor. ...............37

6.3     Risks Related to the Reorganized Debtor's Assets and Projected Operations. ..................................................................................................................39

6.4     Payments and Insolvency Risks Related to the New Common Stock, New Senior Preferred Stock and New Junior Preferred Stock. ........................45

ARTICLE VII FINANCIAL INFORMATION AND FEASIBILITY .......................................46

7.1     Financial Information. ........................................................................46

7.2     Feasibility of the Plan. .......................................................................46

ARTICLE VIII LIQUIDATION ANALYSIS .......................................................................47

8.1     Liquidation Analysis. ........................................................................47

ARTICLE IX POST CONFIRMATION MANAGEMENT .....................................................48

9.1     Officers and Directors. ......................................................................48

9.2     Board Observation. ............................................................................48

ARTICLE X DISTRIBUTIONS AND CLAIMS RESOLUTION .............................................48

10.1    Delivery of Distributions; Undeliverable or Unclaimed Distributions. ....48

ARTICLE XI FEDERAL INCOME TAX CONSEQUENCES .................................................50

11.1    General. ..............................................................................................50

11.2    Tax Consequences to the Debtor.........................................................52

11.3    Tax Consequences to Holders of Allowed Class 4(a), 4(b), and 10 Claims. 56

11.4    Tax Consequences of Holding New Senior Secured Credit Facility. ......62

11.5    Tax Consequences of Holding New Senior Preferred Stock, New Junior Preferred Stock, and New Common Stock................................................65

11.6    Information Reporting and Backup Withholding....................................68

11.7    Importance of Obtaining Professional Tax Assistance. ..........................68

ARTICLE XII REQUIREMENTS FOR CONFIRMATION ....................................................69

12.1    Solicitation and Voting Requirements..................................................69

12.2    Best Interests Test..............................................................................70

12.3    Confirmation Without Acceptance of All Impaired Classes - "Cramdown".70

ARTICLE XIII ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN.................................................................................................................71

ARTICLE XIV OTHER MATTERS ..................................................................................72

**DISCLOSURE STATEMENT WITH RESPECT TO PREPACKAGED PLAN OF REORGANIZATION**
**OF CROSS CANYON ENERGY CORP. PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE – PAGE ii**

513854 000004 DALLAS 2563267.8

Exhibits:

| | |
|---|---|
| Exhibit A | Plan of Reorganization dated January 28, 2010 of Cross Canyon Energy Corp. Pursuant to Chapter 11 of the Bankruptcy Code |
| Exhibit B | Evaluation Summary for Cross Canyon Energy Corp. of Ralph E. Davis Associates, Inc., Petroleum Consultants, Reserve Report dated August 10, 2009 (proved reserves only) |
| Exhibit C | Glossary of Oil and Gas Terminology |
| Exhibit D | Intentionally Omitted |
| Exhibit E | Cross Canyon Energy Corp. Valuation and Liquidation Analysis prepared by Grant Thornton LLP, Corporate Advisory & Restructuring Services |
| Exhibit F | Reorganized Debtor Securities Allocation Table |
| Exhibit G | Reorganized Debtor *pro forma* Financial Projections |
| Exhibit H | Financial Statements and Financial Statement Schedules of Cross Canyon Energy Corp. for the fiscal year ended December 31, 2008, as filed with the Securities and Exchange Commission on Form 10-K |
| Exhibit I | Quarterly Report of Cross Canyon Energy Corp., for the period ending September 30, 2009, as filed with the Securities and Exchange Commission on Form 10-Q |
| Exhibit J | Schedule of Insurance Policies |
| Exhibit K | List of Executory Contracts and Unexpired Leases |
| Exhibit L | Form of New Senior Secured Credit Facility |
| Exhibit M | Form of New Senior Preferred Stock – Certificate of Designation, dated as of [_____, 2010] |
| Exhibit N | Form of New Junior Preferred Stock – Certificate of Designation, dated as of [_____, 2010] |
| Exhibit O | Intentionally Omitted |
| Exhibit P | Form of Certificate of Incorporation of Cross Canyon Energy Corp., dated as of [_____, 2010] |
| Exhibit Q | Form of Amended and Restated Bylaws of Cross Canyon Energy Corp., dated as of [_____, 2010] |
| Exhibit R | Board Observation Agreement, dated as of [_____, 2010] |
| Exhibit S | Plan Support and Lock-Up Agreement Regarding Cross Canyon Energy Corp., among Cross Canyon Energy Corp. and CIT Capital USA, Inc., dated as of January 28, 2010 |

―――――――――――

(\*)    Available for review only on a confidential basis unless and until the commencement of the Chapter 11 Case.

THE BOARD OF DIRECTORS OF CROSS CANYON ENERGY CORP. ("CROSS CANYON" OR THE "DEBTOR") BELIEVES THAT ITS PREPACKAGED PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE DATED JANUARY 27, 2010 (THE "PLAN") IS IN THE BEST INTERESTS OF CREDITORS.  HOLDERS OF PREPETITION CLASS 4(a) AND CLASS 4(b) CLAIMS AND CLASS 10 INTEREST ARE IMPAIRED UNDER THE PLAN AND ARE BEING SOLICITED FOR ACCEPTANCES AND REJECTIONS OF THE PLAN.  CLASS 4(a) AND 4(b) CREDITORS AND CLASS 10 INTEREST HOLDERS ARE URGED TO VOTE IN FAVOR OF THE PLAN.  CLASS 11 EQUITY SECURITIES HOLDERS MAY RECEIVE A DISTRIBUTION UNDER THE PLAN AND THEIR INTERESTS ARE IMPAIRED BY THE PLAN WITHIN THE MEANING OF THE BANKRUPTCY CODE, BUT ARE NOT BEING SOLICITED FOR ACCEPTANCES AND REJECTIONS OF THE PLAN, AS MORE FULLY EXPLAINED BELOW.

THE SOLICITATION OF VOTES IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE PLAN *BEFORE* THE FILING OF A VOLUNTARY REORGANIZATION CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE.  THIS DISCLOSURE STATEMENT AND THE ACCOMPANYING BALLOT HAVE NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE AS THIS IS A SOLICITATION IN ADVANCE OF A CHAPTER 11 FILING. FOLLOWING THE COMMENCEMENT OF ITS CASE, THE DEBTOR EXPECTS PROMPTLY TO SEEK AN ORDER OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, APPROVING ITS SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126(b) OF THE BANKRUPTCY CODE, AND CONFIRMING THE PLAN.

SECURITIES TO BE ISSUED UNDER THE PLAN AND DESCRIBED HEREIN HAVE NOT BEEN REGISTERED WITH, RECOMMENDED BY OR APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY OTHER U.S. (STATE OR FEDERAL) OR NON-U.S. FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY.  NEITHER THE SEC NOR ANY SUCH STATE, FEDERAL OR FOREIGN SECURITIES COMMISSION OR AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SECURITIES TO BE ISSUED UNDER THE PLAN TO CLASS 4(a) AND 4(b) CREDITORS, AND CLASS 10 AND CLASS 11 INTEREST HOLDERS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE UNDER THE APPLICABLE SECURITIES LAWS AND RULES AND AS SET FORTH IN THE SEVERAL AGREEMENTS GOVERNING THE ISSUANCE OF THE NEW SENIOR PREFERRED STOCK, THE NEW JUNIOR PREFERRED STOCK AND NEW COMMON STOCK, AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SUCH RESTRICTIONS, AND EXCEPT AS PERMITTED UNDER THE APPLICABLE SECURITIES LAWS AND RULES PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.  CLASS

**4(a) AND 4(b) CREDITORS AND CLASS 10 AND 11 INTEREST HOLDERS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS INDEFINITELY OF ANY DEEMED INVESTMENT IN THE SECURITIES BY REASON OF THEIR ACCEPTANCE OF THE PLAN.**

The summary of the Plan and other documents described in this Disclosure Statement are qualified by reference to documents themselves and the exhibits thereto.  **Capitalized terms not otherwise defined in this Disclosure Statement shall have the meanings ascribed to them in the Plan.  In the event of any conflict between the provisions of this Disclosure Statement and the Plan, the provisions of the Plan shall control.**

## PRELIMINARY STATEMENT

On or before January 31, 2010 Cross Canyon intends to commence a Chapter 11 case by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code, as amended, in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division, subject to receiving in advance, the  requisite acceptances of the Debtor's Plan from holders of the Class 4(a) CIT First Lien Lender Claims, the Class 4(b) CIT Second Lien Lender Claims and Class 10 Class C Preferred Stock Interests.  If the petition is filed, the Debtor will seek confirmation of the Plan on or before March 16, 2010.

Cross Canyon hereby transmits this Disclosure Statement for use concerning solicitation of acceptances or rejections of the Plan.  This Disclosure Statement has been prepared in accordance with Section 1125 of the Bankruptcy Code and Bankruptcy Rules 3016(c) and 3018.  A copy of the Plan is attached to this Disclosure Statement as <u>Exhibit A</u>.  This Disclosure Statement, among other things, (a) contains certain information regarding the Debtor's prepetition history, (b) describes the Plan, the effects of confirmation of the Plan, including the treatment of claims and interests and distributions under the Plan, and (c) discusses the confirmation process and voting procedures that Class 4(a), Class 4(b), and Class 10 must follow for their votes to be counted.  The holders of Class 4(a), 4(b) and 10 Claims are the only Claims Impaired under the Plan being solicited to vote to accept or reject the Plan.  The Debtor has elected not to solicit Class 11 Interest Holders, although they are Impaired, but they may receive a distribution under the Plan, as discussed below.

Holders of Claims and Interests in Class 4(a), 4(b) and 10 are urged to read the Disclosure Statement and the Plan in full.  **The board of directors of Cross Canyon believes that the Plan is in the best interests of creditors and urges holders of Claims in Class 4(a), 4(b) and 10 to vote in favor of the Plan.**

The statements in this Disclosure Statement are made as of the date hereof.  Neither the Disclosure Statement's distribution, nor the Plan's consummation will, under any circumstance, create any implication that the information herein is correct at any time after the date hereof.  All summaries herein are qualified by reference to the Plan as a whole.  In any contested matter or adversary proceeding, this Disclosure Statement shall not constitute an admission of any fact or liability but shall be deemed a statement made in settlement negotiations.  Unless otherwise indicated, the Debtor's management has provided the factual information in this Disclosure Statement.  The Debtor's management believes that the information herein is accurate but is unable to warrant that it is without any inaccuracy or omission.

In making a decision in connection with the Plan, holders of Class 4(a) and 4(b) Claims and Class 10 Interests must rely on their own review of the terms of the Plan, including the merits and risks involved and should not construe the contents of this Disclosure Statement as providing any legal, business, financial, or tax advice.  Members of such Classes should consult their own advisors with respect to those matters and related aspects of their acceptance or rejection of the Plan and any deemed investment in any securities issued by the Reorganized Debtor under the Plan.

No person has been authorized to give any information or to make any representations other than those contained in the Solicitation Package (as defined herein) and, if given or made, such information and representations must not be relied upon as having been authorized.  Neither the delivery of this Solicitation Package nor any deemed offer of any securities to be issued by the Reorganized Debtor under the Plan as a result thereof, under any circumstances, shall create the implication that there has been no change in the Debtor's affairs since the date of this Disclosure Statement or that the information contained therein is correct as of any time subsequent to its date.

This Disclosure Statement contains summaries, believed to be accurate, of some of the terms of specific documents incorporated herein by reference.  All summaries are qualified in their entirety by such reference and holders of Class 4(a) and 4(b) Claims and Class 10 Interests should read the actual documents, copies of which are attached as exhibits to this Disclosure Statement or which will be made available by the Debtor and its counsel, on request, for the complete information contained in such documents.

## U.S. FEDERAL SECURITIES LAW MATTERS

The Debtor, to the extent necessary and appropriate, is relying on Section 1145(a)(1) of the Bankruptcy Code to exempt the exchange, issuance and distribution of any securities to be issued by the Reorganized Debtor under the Plan from the provisions of the Securities Act of 1933, as amended (the "Securities Act"), and other U.S. and non-U.S. federal and state securities and "blue sky" laws insofar as:  the securities will be issued by a debtor, an affiliate of a debtor, or a successor to a debtor under a plan approved by a Bankruptcy Court; the recipients of the securities hold a claim against, an interest in, or a claim for an administrative expense in a case concerning the debtor or such affiliate; and the securities are issued entirely in exchange for the recipient's claim against or interest in the debtor, or are issued "principally" in such exchange and "partly" in exchange for cash or property.

The solicitation of acceptances and rejections from Class 4(a) and 4(b) Creditors and Class 10 Interest Holders and the deemed offer of the securities (including to Class 11) to be issued by the Reorganized Debtor under the Plan as a result thereof are being made on the basis of the Solicitation Package and in reliance upon one or more exemptions from the registration requirements of the Securities Act and any U.S. and non-U.S. state or local laws requiring registration, including Section 4(2) of the Securities Act and/or Regulation D, Rule 144A or Regulation S thereof, as applicable, with respect to transactions not involving a public offering and with accredited investors, qualified institutional buyers or non-U.S. persons, and also, in part, upon the truth and accuracy of the certifications made by the Class 4(a) and  4(b) Creditors and Class 10 Interest Holders in the Ballot.

## FORWARD-LOOKING STATEMENTS

The information presented in this Disclosure Statement includes forward-looking statements in addition to historical information.  These statements involve known and unknown risks and relate to future events, the Debtor's and the Reorganized Debtor's future financial performance or the Debtor's and the Reorganized Debtor's projected business results.  In some cases, you can identify forward-looking statements by terminology such as "may," "will," "should," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "targets," "potential" or "continue" or the negative of these terms or other comparable terminology.  Forward-looking statements are only predictions.  Actual events or results may differ materially from any forward-looking statement as a result of various factors, including those contained in the section entitled "Risk Factors" and other sections of this Disclosure Statement, including the documents incorporated by reference herein.  Although the Debtor believes that the expectations reflected in the forward-looking statements are reasonable, the Debtor cannot guarantee future results, events, levels of activity, performance or achievements.  The Debtor expressly disclaims a duty to update any of the forward-looking statements.

## ARTICLE I

## PLAN OVERVIEW

The following summarizes the classification and treatment under the Plan of the Claims against and Interests in the Debtor.  The summary contained herein is qualified in its entirety by reference to the provisions of the Plan, a copy of which is attached hereto as Exhibit A, and by this Disclosure Statement.  The Plan places all Claims and Interests into Classes.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion thereof qualifies within the description of a different Class.  Claims against or Interests in the Debtor are grouped pursuant to Section 1122(a) of the Bankruptcy Code.  The classification and treatment for all Claims and Interests are described in more detail elsewhere in this Disclosure Statement.  *See* Section 5.2 "Classification and Treatment of Claims and Interests."

### 1.1     Post-Confirmation Funding.

The Debtor has negotiated a New Senior Secured Credit Facility with the CIT First Lien Lenders to be used for operations and to make payments to holders of Claims, as set forth in the Plan.  The New Senior Secured Credit Facility is described in more detail in Section 5.3(A) "New Senior Secured Credit Facility" below.

### 1.2     Classes 1, 2, 3, 5, 6, 7 and 9.

The Reorganized Debtor proposes to pay the holders of Allowed Claims in Classes 1, 2, 3, 6, 7 and 9 out of its operating funds in full, in Cash, as soon as practicable on the later of (a) the Effective Date and (b) the date on which such Claims become Allowed Claims payable under applicable law or any agreement relating thereto. In the case of Class 5 (Royalty Claims), each holder of a Class 5 Claim shall be paid in full, in Cash, from a segregated account, and on the later of (i) the Effective Date and (ii) the date when such Royalty Claim (A) becomes an Allowed Claim payable under applicable law or any agreement relating thereto and (B) is in Pay

Status.  Claims in Classes 1, 2, 3, 5, 6, 7, 8 and 9 are not Impaired, are deemed to have accepted the Plan and therefore are not entitled to vote to accept or reject the Plan.

### 1.3    Classes 4(a) and 4(b).

Class 4(a).    *CIT First Lien Lender Claims*.  Class 4(a) Claims are Impaired.  The CIT First Lien Lender Claims shall receive the (a) obligation to be evidenced by the New Senior Secured Credit Facility (in the principal amount of $10 million), and (b) shares of New Senior Preferred Stock in an amount sufficient to liquidate the balance of the Class 4(a) Claims (based on the liquidation preference of the entire New Senior Preferred Stock issue of $23.5 million), in full satisfaction of the CIT First Lien Lender Claims.  As Class 4(a) is Impaired, it is entitled to vote to accept or reject the Plan.

Class 4(b).    *CIT Second Lien Lender Claims*.  Class 4(b) Claims are Impaired.  The CIT Second Lien Lender Claims shall receive (a) shares of New Senior Preferred Stock, with a liquidation preference equal to $23.5 million, less the share of the New Senior Preferred Stock allocated to Class 4(a), and (b) 95% of the New Common Stock in full satisfaction of the CIT Second Lien Lender Claims; provided, however, that if the Bankruptcy Court determines that the Debtor is or was required to solicit Class 11 with respect to acceptances and rejections of the Plan, on account of their Interests, then the CIT Second Lien Lender Claims shall receive 100% of the New Common Stock, plus the New Senior Preferred Stock as set forth above.  As Class 4(b) is Impaired, it is entitled to vote to accept or reject the Plan.

### 1.4    Class 10.

*Class C Preferred Stock Interests*.  Class 10 Interests are Impaired.  The Class 10 Interest holder shall receive the New Junior Preferred Stock in full satisfaction of the Class C Preferred Stock Interests.  As Class 10 is Impaired, it is entitled to vote to accept or reject the Plan.

### 1.5    Class 11.

*Common Stock Interests*.  Class 11 Interests are Impaired.  Holders of the Common Stock of the Debtor shall receive their Pro Rata share of 5% of the New Common Stock.  The Debtor has elected not to solicit Class 11, and, as a result, the Debtor has deemed Class 11 to have rejected the Plan.  Should the Bankruptcy Court determine that the Debtor is or was required to solicit Class 11 Common Stock Interest Holders with respect to acceptances and rejections of the Plan, on account of their Interests, then Class 11 shall receive no distribution under the Plan and 100% of the New Common Stock shall be distributed to the Holders of Class 4(b) Claims.

### 1.6    Class 12.

*Common Stock Option Interests*.  Class 12 Interests are Impaired.  Each Holder of an allowed Class 12 Interest shall receive no distribution under the Plan.  As Class 12 is deemed to reject the Plan by operation of law, it is not entitled to vote to accept or reject the Plan.

**1.7**     **Additional Information Regarding New Securities.**

For a more detailed description of the securities to be issued to holders of Classes 4(a), 4(b), 10 and 11, *see* "Description of Securities to be Issued Under the Plan" of Section 5.3 "Means for Implementation of Plan" below.

**ARTICLE II**

**INTRODUCTION**

**2.1**     **Purpose of Disclosure Statement.**

The purpose of this Disclosure Statement is to provide adequate information about the Debtor and about the treatment of Claims and Interests under the Plan, including a description of the securities to be issued under the Plan in satisfaction of certain Claims and Interests, to enable the holders of Impaired Claims and Interests to make an informed decision with respect to acceptance or rejection of the Plan. **Each holder of a Claim or Interest is urged to carefully consider the Plan and this Disclosure Statement in their entirety and consult with legal or other available counsel, if necessary, to understand the Plan and its effects, including possible tax consequences.**

**2.2**     **Explanation of Chapter 11.**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  Upon the commencement of a chapter 11 case, Section 362 of the Bankruptcy Code provides for an automatic stay of all actions to collect, or otherwise enforce, claims against a debtor that arose prior to a bankruptcy filing.  Generally speaking, the automatic stay prohibits interference with a debtor's property and business affairs.  The Debtor herein is Cross Canyon.

Under chapter 11, a debtor attempts to reorganize.  Confirmation of a plan of reorganization is the primary goal of a reorganization case under chapter 11 of the Bankruptcy Code.  A plan of reorganization sets forth the means for satisfying claims against, and interests in, a debtor.  Generally, a claim against a debtor arises as the result of an extension of credit, including loan transactions and trade credit relationships, but may also arise from other contractual agreements or from alleged torts.  An interest in a debtor is held by a party that owns the debtor, such as a shareholder.

A chapter 11 case is a "prepackaged chapter 11 case" when a debtor transmits its solicitation materials to holders of claims or interests whose acceptances and rejections of the Plan are sought *before* the Debtor files its chapter 11 case.  Section 1126(b) of the Bankruptcy Code governs acceptances and rejections of plans obtained by parties entitled to vote, before the commencement of a chapter 11 case.  Section 1126(b) counts a prepetition acceptance or rejection toward the required amounts and number of acceptances only if solicitation was in compliance with any applicable non-bankruptcy law or rule or such acceptance was solicited after disclosure of adequate information as defined in Section 1125(a) of the Bankruptcy Code.

Section 1125 of the Bankruptcy Code requires that a plan proponent fully disclose adequate information about the debtor, its assets, liabilities, claims and the plan from voting

creditors and interest holders before soliciting acceptances and rejections of that plan.  This Disclosure Statement is being provided to the Class 4(a) and Class 4(b) Creditors and Class 10 Interest Holders to satisfy the requirements of Section 1125 of the Bankruptcy Code.

The Bankruptcy Code does not require that each claimant or shareholder vote in favor of a plan in order for the court to confirm a plan.  Rather, a plan must be accepted by each class of claims and interests (subject to the "cramdown" exception discussed below).  A class of claims accepts the plan if, of the claimants in the class who actually vote on the plan, such claimants holding at least two-thirds in dollar amount and more than one-half in number of allowed claims vote to accept the plan.  For example, if a hypothetical class has twenty-five creditors that vote and the total dollar amount of those ten creditors' claims is $1,000,000, then for such class to have accepted a plan, thirteen or more of those creditors must have voted to accept the plan (a simple majority) *and* the claims of the creditors voting to accept the plan must total at least $666,667 (a two-thirds majority).  A class of interest holders accepts a plan if, of the holders in such class who actually vote on such plan, at least two-thirds in amount vote to accept the Plan.

The Bankruptcy Court may confirm a Plan even though fewer than all classes of Claims and Interests vote to accept the Plan.  In this instance, the Plan must be accepted by at least one "Impaired" class of Claims, without including any acceptance of the Plan by certain disqualified parties that actually vote on the Plan (as defined in the Bankruptcy Code).  Section 1124 of the Bankruptcy Code defines "impairment" and generally provides that a claim as to which legal, equitable or contractual rights are altered under a plan is deemed to be "impaired."  Under the Plan, Classes 4(a), 4(b), 10, 11 and 12 are impaired.

The Debtor has been advised that the CIT First Lien Lenders and the CIT Second Lien Lenders, holders of 100% in number and amount of Claims in Classes 4(a) and 4(b), respectively, intend to vote to accept the Plan, subject to the terms and conditions of the Plan Support and Lock-Up Agreement Regarding Cross Canyon Energy Corp. dated as of January 27, 2010, (the "Plan Support Agreement").  If Classes 4(a) and 4(b) accept the Plan, the Debtor will have at least one Impaired Class of Claims voting to accept the Plan and will seek confirmation of the Plan under the "cramdown" provisions, over the dissenting votes of holders of Class 11 and 12 Interests.  Class 11 and 12 Interests are deemed to have rejected the Plan by the Debtor and/or by operation of law.  Class 10 is impaired by the Plan.  Debtor's management anticipates that the sole holder of a Class 10 Interest will vote to accept the Plan.

Independent of the acceptance of the Plan by holders of Claims and Interests as described above, in order to confirm the Plan, the Bankruptcy Court must determine that the requirements of Section 1129(a) of the Bankruptcy Code have been satisfied.  *See* Section 12.3 "Confirmation Without Acceptance of All Impaired Classes – 'Cramdown'" below, for a discussion of the Section 1129(a) requirements for confirmation of a plan of reorganization.

The Debtor believes that the Plan satisfies the confirmation requirements of the Bankruptcy Code.  Confirmation of the Plan will bind the Debtor, the Reorganized Debtor, all holders of Claims and Interests, and other parties in interest with regard to the Debtor, irrespective of whether such parties have filed proofs of claim, proofs of interest, or voted to accept the Plan.

**2.3     Procedure for Filing Proofs of Claim and Proofs of Interest.**

A.      **Bar Date for Filing of All Proofs of Claim (Other Than Administrative Claims) and Proofs of Interest.**

To participate in the payments and other distributions under the Plan, a holder of a Claim or Interest must have such Claim or Interest Allowed.  The first step in the allowance process is generally to file a proof of claim or proof of interest.

In a Chapter 11 case, a proof of claim or proof of interest is deemed filed for any Claim or Interest listed in the schedules of assets and liabilities, except a Claim or Interest listed as disputed, contingent, unliquidated or in an unknown amount.  If the holder of a Claim or Interest agrees with the amount of the Claim or Interest as listed by the Debtor, and that Claim or Interest is not listed in the schedules as being disputed, contingent, or unliquidated, it is not necessary that a separate proof of claim or proof of interest be filed. Claims or Interests that are unscheduled, or scheduled as disputed, contingent, or unliquidated will be recognized and allowed only if a proof of claim or proof of interest is timely filed.  If your Claim or Interest is scheduled in a finite amount and you believe it was understated, you are required to file a proof of claim or interest for the larger amount or be required to accept the amount for which it is scheduled.

The Debtor and the Reorganized Debtor reserve the right, consistent with Article XI Section A of the Plan, to object to Claims and Interests.

B.      **Effect of Amendments to Schedules.**

If, prior to the Confirmation Date, the Debtor reduces the amount of any Claim or Interest shown on the schedules, the affected holder of such Claim or Interest will be notified and will be given 30 calendar days from the date of the mailing of notice to file a proof of claim or proof of interest.

C.      **Executory Contracts and Unexpired Leases.**

See discussion at Section 5.4 below.

**2.4     Voting Procedures and Requirements.**

A.      **Persons Entitled to Vote.**

Only the holders of Claims in Classes 4(a) and 4(b) and Interests in Class 10 are entitled to vote on the Plan.  The holders of Claims classified in Classes 1, 2, 3, 5, 6, 7, 8 and 9 are not entitled to vote under the Plan, as such holders are either receiving their statutory treatment under the Bankruptcy Code or are not Impaired under the Plan.  Interests in Class 12 are receiving no consideration under the Plan, are therefore deemed to reject the Plan, and are not entitled to vote. Class 11 Common Stock Interests are impaired.  Holders of the Common Stock of the Debtor shall receive their Pro Rata share of 5% of the New Common Stock.  The Debtor has elected not to solicit Class 11, and, as a result, the Debtor has deemed Class 11 to have rejected the Plan. Should the Bankruptcy Court determine that the Debtor is or was required to solicit Class 11 Common Stock Interest Holders with respect to acceptances and rejections of the Plan, on

account of such Interests, then Class 11 shall receive no distribution under the Plan and 100% of the New Common Stock shall be distributed to the Holders of Class 4(b) Claims.

Any Claim as to which an objection is filed before voting has commenced is not entitled to vote unless the Bankruptcy Court, upon motion of the holder whose Claim has been objected to or the motion of another party in interest, temporarily allows the Claim in an amount the Bankruptcy Court deems proper for the purpose of voting to accept or reject the Plan.

### B.      Notice to Holders of Claims and Interests.

The primary purpose of this Disclosure Statement is to provide adequate information to enable members of Class 4(a) and 4(b) Claims and Class 10 Interests to make a reasonably informed decision with respect to the Plan prior to exercising their right to vote to accept or to reject the Plan.  Upon commencing the Chapter 11 Case, the Debtor will request that the Bankruptcy Court approve this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable the holders of Class 4(a), 4(b) and 10 Claims to make an informed judgment about the merits of the Plan.  The Debtor simultaneously will request that the Bankruptcy Court confirm the Plan.

**WHEN AND IF CONFIRMED BY THE COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR, WHETHER OR NOT THEY ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN.  IN PARTICULAR, HOLDERS OF CLASS 4(a), 4(b) AND 10 CLAIMS AND INTERESTS WHO ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS TO THE PLAN AND DISCLOSURE STATEMENT CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR TO REJECT THE PLAN.**

**THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  NO SOLICITATION OF VOTES MAY BE MADE UNTIL DISTRIBUTION OF THIS DISCLOSURE STATEMENT, AND NO PERSON HAS BEEN AUTHORIZED TO DISTRIBUTE ANY INFORMATION CONCERNING THE DEBTOR OTHER THAN THE INFORMATION CONTAINED HEREIN.**

### C.      Voting Instructions, Ballots and Voting Deadline.

Accompanying this Disclosure Statement and forming a part of the solicitation package are copies of (a) the Plan (Exhibit A to this Disclosure Statement), (b) information concerning the Debtor (*see* Exhibits B, D, E and H-K of this Disclosure Statement), (c) information concerning the Reorganized Debtor and its securities issuable under the Plan (*see* Exhibits F, G and L-R of this Disclosure Statement), and (d) for holders of Class 4(a), 4(b) and 10 Claims and Interests who are entitled to vote on the Plan, one or more ballots (the "Ballot" or "Ballots") (together, the Plan, the Disclosure Statement and all other exhibits thereto and the Ballots shall be referred to as the "Solicitation Package").  If you did not receive a Ballot in your Solicitation Package and believe you are entitled to vote on the Plan, please contact the Debtor's counsel at the addresses and telephone numbers set forth on the cover of this Disclosure Statement and

below, or alternatively, contact the Debtor's counsel through Jennifer A. Christian, Thompson & Knight, LLP, (Tel.) 212.751.3001 or Jennifer.Christian@tklaw.com.

After carefully reviewing the Plan, this Disclosure Statement, and the instructions on the enclosed Ballot, each holder of (a) Class 4(a) and 4(b) Claims and (b) Class 10 Interest may indicate its acceptance or rejection of the Plan.  As part of the Ballot, each holder shall make those certifications contained in the Ballot with respect to applicable U.S. federal and state securities laws.

IF YOU ARE A HOLDER OF A CLASS 4(a) or 4(b) CLAIM OR A CLASS 10 INTEREST, FOR YOUR VOTE TO BE COUNTED, YOU MUST PROPERLY COMPLETE AND DELIVER YOUR BALLOT SO THAT YOUR VOTE IS ACTUALLY **RECEIVED** BY THE VOTING AGENT NO LATER THAN **THE VOTING DEADLINE.**  IN ORDER TO PROMPTLY TRANSMIT YOUR BALLOT, YOU MUST **SEND IT VIA FAX OR EMAIL, TOGETHER WITH AN ORIGINAL SIGNED COPY OF THE BALLOT SENT BY OVERNIGHT DELIVERY,** TO THE FOLLOWING PERSON:

>Ira L. Herman, Esq.
>Thompson & Knight LLP
>919 Third Avenue, 39th Floor
>New York, NY  10022-3915
>Fax:    212-999-9139
>Email:  Ira.Herman@tklaw.com

**Ballots that are not executed, not timely delivered or otherwise deficient will not be counted.  The Debtor reserves the right to challenge the validity of all Ballots submitted.**

### D.    Confirmation Hearing and Deadline for Objections.

As noted above, the Debtor will ask the Bankruptcy Court to consider the adequacy of this Disclosure Statement and to confirm the Plan on or before **March 16, 2010**, subject to the Bankruptcy Court's calendar.  At the Confirmation Hearing, the Debtor will request Confirmation of the Plan, as it may be modified from time to time, under Section 1129(b) of the Bankruptcy Code.  *See* Section 12.3 "Confirmation Without Acceptance of All Impaired Classes – 'Cramdown'" below.

The Debtor may modify the Plan, to the extent acceptable to the CIT First Lien Lenders and CIT Second Lien Lenders, in accordance with the Plan Support Agreement and as may be permitted by Section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019.

Notice of the anticipated Confirmation Hearing and the time to present objections will be provided to holders of all Known Claims and Interests.  Objections, if any, to Confirmation of the Plan must be presented to the Bankruptcy Court at the Confirmation Hearing.  Any written objections must also be served so that they are RECEIVED not less that ten (10) calendar days before the Confirmation Hearing by:

**Counsel to the Debtor:**

Rhett G. Campbell, Esq.
Thompson & Knight LLP
333 Clay Street, Suite 3300
Houston, Texas  77002
Fax:    713.654.1871
Email: Rhett.Campbell@tklaw.com

AND

Ira L. Herman, Esq.
Thompson & Knight LLP
919 Third Avenue, 39th Floor
New York, NY  10022-3915
Fax:    212.751.3113
Email: Ira.Herman@tklaw.com

**After filing of the Chapter 11 Case, the Bankruptcy Court will schedule a Confirmation Hearing, together with a date by which objections, if any, must be presented. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.**

## ARTICLE III

## HISTORY OF THE DEBTOR

**3.1    Overview.**

The Debtor was incorporated as a Nevada corporation in May 2004 as "ABC Funding, Inc." On March 24, 2009, the Debtor changed its name to "Cross Canyon Energy Corp."  The Debtor's corporate offices are located in Spring, Texas.

On September 2, 2008, Cross Canyon purchased all of the outstanding capital stock of Voyager Gas Corporation ("Voyager") from its sole stockholder, Voyager Gas Holdings, LP, (the "Voyager Acquisition").  Voyager presently is a wholly owned subsidiary of the Debtor. Voyager's oil and natural gas assets consist of the oil and gas lease blocks located on approximately 13,700 net acres located in Duval County, Texas (the "Duval County Properties").

The Duval County Properties have established production over a substantial acreage position with proved reserves from over ten different horizons located at depths ranging from 4,000 to 7,500 feet.  The designated field name by the Railroad Commission of Texas is the Orcones (Frio Vicksburg Consolidated) Field.  The primary producing reservoirs are the Frio, Vicksburg, Jackson and Yegua formations.  The acreage has exploratory potential in the Queen City and Wilcox formations.  The Debtor currently has approximately 13,700 net acres.  As of June 30, 2009, the Duval County Properties had independently engineered proved reserves of 570 mbo and 7,811 Mmcf, based upon that independent third party engineering report prepared by Ralph E. Davis Associates, Inc. located in Houston, Texas (the "Reserve Report").  A

summary of the Reserve Report is attached hereto as <u>Exhibit B</u>.  By category, this includes 81 mbo and 1,772 Mmcf of proved developed producing, 253 mbo and 2,417 Mmcf of proved developed non-producing reserves, and 236 mbo and 3,621 Mmcf of proved undeveloped reserves.  Approximately 70% of total proved reserves are natural gas.

### *Additional Corporate History.*

On April 28, 2006, Energy Venture, Inc., a privately-held Delaware corporation ("<u>Energy Venture</u>") consummated its acquisition of shares of the Debtor's common stock in accordance with the terms of a stock purchase agreement among Energy Venture and certain selling stockholders named therein.  Under the stock purchase agreement, Energy Venture acquired a total of 8,200,000 shares of the Debtor's common stock, constituting, in the aggregate, 82% of the then-issued and outstanding shares of common stock.

On May 26, 2006, the Debtor and its wholly-owned subsidiary, EVI Acquisition Corp., a newly-formed Nevada corporation, entered into, and consummated, an agreement and plan of merger with Energy Venture.  Pursuant to the merger agreement, Energy Venture merged with and into EVI Acquisition Corp. and, in return: (a) each share of common stock of Energy Venture, par value $.0001 per share, then issued and outstanding was exchanged for one share of the Debtor's common stock; (b) each outstanding option to purchase shares of common stock of Energy Venture was exchanged for an option to purchase, at the same exercise price, an equal number of shares of the Debtor's common stock; and (c) all of the obligations and liabilities of Energy Venture were assumed by the Debtor.  As part of the merger, EVI Acquisition Corp. amended its Articles of Incorporation to change its name to "Energy Venture, Inc."  As a result of the merger, the former stockholders of Energy Venture became controlling stockholders of the Debtor.  Effective March 24, 2009, Energy Venture, Inc. amended its Articles of Incorporation to change its name to CCEC Operating Company ("<u>CCEC</u>").  Since the Debtor had no substantial assets immediately prior to the merger, the transaction was treated for accounting purposes as a reverse acquisition and was accounted for as a recapitalization of Energy Venture rather than a business combination.  Consequently, the historical financial statements of Energy Venture became the historical financial statements of the Debtor.  CCEC presently is a wholly owned subsidiary of the Debtor.  CCEC does not own any operating assets.

### 3.2    The Debtor's Ownership.

The Debtor is a publicly-traded company incorporated under the laws of the State of Nevada, whose common stock presently is quoted on the OTC Bulletin Board under the symbol "CCYE."

On December 31, 2009, the Debtor had 149 million shares of common stock authorized under its charter documents of which 47,524,990 shares of common stock are issued and outstanding.  As of December 31, 2009, there were 169 holders of record of the Debtor's common stock.  An additional 101,475,010 shares of common stock are authorized and may be issued upon the exercise or conversion, as applicable of outstanding options or warrants.

As of December 31, 2009, there are 1,000 shares of the Debtor's Series C Preferred Stock, out of 1,000,000 authorized shares issued and outstanding.  All issued and outstanding

shares of the Debtor's Series C Preferred Stock are held by Alan D. Gaines, a director of the Debtor.

**ARTICLE IV**

**THE REORGANIZATION CASE**

**4.1     The Debtor and the Reorganization Case.**

> **A.     Timing of the Chapter 11 Case.**

Subject to receiving the requisite acceptances on the Plan from the holders of Class 4(a) and 4(b) Claims and Class 10 Interests, the Debtor intends to commence its Chapter 11 Case on or before January 31, 2010.

As the Debtor has received the commitment from the CIT First Lien Lenders and the CIT Second Lien Lenders (collectively, the "CIT Lenders") to support confirmation of the Plan, subject to the terms and conditions of the Plan Support Agreement, the Debtor does not expect the Chapter 11 Case to be protracted.  Thus, the Debtor anticipates requesting confirmation of the Plan at the earliest possible opportunity.  Specifically, the Debtor anticipates requesting that the hearing to consider the adequacy of the Disclosure Statement and Confirmation of the Plan will occur on or before March 16, 2010.

The Plan provides that the Effective Date of the Plan will be the Business Day on which all conditions precedent to the Plan's Confirmation and Effective Date have been satisfied or waived (as provided in Article VII of the Plan).  *See also* Section 5.5 "Conditions Precedent to the Plan's Confirmation and Consummation."  The Effective Date could be the same day as the Confirmation Hearing or as soon thereafter as is administratively practical.  There is a possibility, however, that this projected timetable cannot be achieved due to factors beyond the Debtor's control.

The Debtor believes that the length of its stay in Chapter 11 must be as short as possible to preserve the value of its assets and to avoid the unnecessary costs that could be associated with obtaining debtor-in-possession financing that likely would be needed to finance a protracted Chapter 11 Case and pay professional fees and other administrative expenses that would accrue.

> **B.     Events Leading to the Chapter 11 Filing and the Plan.**

In order to finance the Voyager Acquisition, on September 2, 2008, the Debtor entered into the CIT First Lien Credit Agreement and the CIT Second Lien Credit Agreement (collectively, the "CIT Credit Agreements").  The balance due as of the date hereof with respect to the CIT First Lien Credit Agreement is $11,500,000, plus accrued interest, costs and fees and with respect to the CIT Second Credit Agreement at $22,000,000, plus accrued interest, costs and fees.

On April 21, 2009, the Administrative Agent and the CIT Lenders agreed to waive the Debtor's failure to comply with certain covenants in the CIT Credit Agreements consisting of financial ratios, measured as of December 31, 2008, with respect to (a) the Debtor's ratio of

earnings before interest, taxes, depreciation and amortization and exploration expenses ("EBITDAX") to interest expense and its ratio of total debt to EBITDAX under the CIT Revolving Loan, and (b) the Debtor's ratio of total reserve value to total debt under the CIT Term Loan. Additionally, the Administrative Agents and the CIT Lenders waived compliance by the Debtor of such ratios for each quarterly fiscal period ending in 2009. As a condition to these waivers, the Debtor agreed not to request or make any further loans or advances under the CIT Credit Agreements, unless and until the CIT Lenders, in their sole and absolute discretion, otherwise agree to in writing. The current amounts outstanding on the CIT Revolving Loan and the CIT Term Loan are $11,500,000 and $22,000,000, respectively.

As part of a semi-annual redetermination of the Debtor's borrowing base under the CIT First Lien Credit Agreement, on May 5, 2009, the Administrative Agent and CIT First Lien Lenders notified the Debtor that its borrowing base was being reduced to $1.0 million causing the Debtor's outstanding loans under the CIT Revolving Loan to exceed the new borrowing base by $10.5 million. The CIT First Lien Credit Agreement provides that the Debtor repay such revolving loan amount in excess of the reduced borrowing base within sixty days of such notification. The Debtor failed to repay or otherwise resolve the borrowing base deficiency, and, commencing July 19, 2009, outstanding loans under the CIT Revolving Loan began accruing interest at a default rate equal to the then applicable rate plus 3% per annum. In addition to the default rate of interest, upon the expiration of the terms to which the Debtor had obtained Eurodollar loans, the Debtor's Eurodollar loans were converted to prime rate loans, effectively increasing the Debtor's interest rate on the CIT Revolving Loan from 3.15% and 3.47%to 7.75% per annum.

On September 4, 2009, the Debtor was required to pay interest on the CIT Revolving Loan and CIT Term Loan in the amounts of $125,650 and $320,711, respectively. Rather than making such payments, the Debtor determined it to be in the best interests of all of its stakeholders to use its available cash to obtain extensions with respect to impending drilling obligations on two significant key oil and gas leases on its Duval County Properties. The Debtor extended two leases on the Duval County Properties to preserve a significant portion of the Debtor's oil and natural gas assets and to provide for future growth potential. Payments of $203,194 for lease extensions and a new lease were made during the third quarter of calendar year 2009. The CIT Lenders consented to the payments. Under the CIT Credit Agreements, the Debtor's continued failure to pay interest constituted an Event of Default permitting the CIT Lenders to declare all loans outstanding under the CIT Credit Agreements, together with any accrued and unpaid interest thereon, immediately due and payable. In addition, the CIT Term Loan was converted from a Eurodollar loan to a base rate loan and began accruing interest at a rate per annum that was 4% in excess of the rate otherwise applicable. The conversion to a base rate loan, coupled with the increased default interest margin, effectively increased the Debtor's interest rate on the CIT Term Loan from approximately 8.15% to approximately 12.75% per annum.

In addition to the deficiency and resulting default under the Debtor's CIT Credit Agreements, since September 2008, oil and natural gas prices have been at their lowest levels since 2001, and although prices have recovered somewhat in recent months, the increase is not sufficient to solve the Debtor's continuing liquidity problem by increasing its borrowing base and making it cost effective to drill additional wells on the Duval County Properties. As a result, the operating revenues and stock prices of many publicly traded oil and gas exploration and

production companies, similar to the Debtor, have fallen sharply.  When combined with the global credit crisis, it has become extremely difficult for below investment grade companies, including the Debtor to raise capital.  Due to the foregoing, the Debtor lacks sufficient capital to develop its properties and service its outstanding debt obligations.

### C.    Description of the Debtor's Assets and their Value.

#### i.    Natural Gas and Oil Reserves.

The following tables summarize in comparative form the reports of Ralph E. Davis Associates, Inc.'s estimates of reserves, future production and income attributable to the Debtor's Duval County Properties as of June 30, 2009 and December 31, 2008:

| Reserve category | As of June 30, 2009 | | As of December 31, 2008 | |
| --- | --- | --- | --- | --- |
| | Oil (MBbls) | Gas (Mmcf) | Oil (MBbls) | Gas (Mmcf) |
| Proved producing | 80.96 | 1,772.36 | 68.81 | 1,974.26 |
| Proved non-producing | 253.12 | 2,417.00 | 229.32 | 2,545.55 |
| Proved undeveloped | 235.68 | 3,621.48 | 228.64 | 3,702.85 |
| **Total proved reserves** | **569.76** | **7,810.84** | **526.77** | **8,222.66** |

| | Oil ($ per Bbl) | Gas ($ per Mcf) | Oil ($ per Bbl) | Gas ($ per Mcf) |
| --- | --- | --- | --- | --- |
| Period end prices | $  66.50 | $   3.35 | $  43.66 | $   5.11 |

| Reserve category (dollars in thousands) | As of June 30, 2009 | | As of December 31, 2008 | |
| --- | --- | --- | --- | --- |
| | Future Net Income Undiscounted | Future Net Income Discounted at 10% (PV10) | Future Net Income Undiscounted | Future Net Income Discounted at 10% (PV10) |
| Proved producing | $   6,807.92 | $   5,527.70 | $   8,466.60 | $ 6,571.55 |
| Proved non-producing | 17,412.41 | 7,100.19 | 14,832.82 | 6,334.73 |
| Proved undeveloped | 17,231.29 | 11,360.65 | 15,903.89 | 8,516.93 |
| **Total proved reserves** | **$41,451.62** | **$23,988.54** | **$39,203.31** | **$21,423.21** |

To date, the Debtor has performed recompletions and/or remedial workovers on nine of the wells acquired in the Voyager Acquisition.  Three of the wells acquired were not producing on the date of acquisition and two of these wells have been successfully recompleted to new formations and returned to a productive status.  Attempts to return the third well to a productive status were unsuccessful and the well has been converted to a salt water disposal well.  The

Debtor has reduced its salt water disposal costs, a significant component of the Debtor's lease operating expenses, by approximately $40,000 per month.  Of the remaining six wells, two of the recompletion attempts were unsuccessful and four were successful.

The Debtor is performing 3-D seismic analysis of its acquired proprietary seismic database and other modern technologies and production techniques to enhance its production and returns, and, although seismic indications of hydrocarbon saturation are generally not reliable indicators of productive reservoir rock and other modern technologies such as well logs are not always reliable indicators of hydrocarbon productivity, the Debtor believes use of such technologies and production techniques in exploring for, developing and exploiting oil and natural gas properties will help it reduce drilling risks, lower finding costs and provide for more efficient production of oil and natural gas from its properties.  This proprietary 3-D seismic data has been reprocessed by the Debtor and has improved the subsurface imaging over its acreage position.

### ii.      Valuation of Assets by Independent Advisor.

During the fourth quarter of calendar year 2009, the Debtor engaged the corporate advisory and restructuring services of Grant Thornton LLP ("Grant Thornton") to perform various services, including a valuation of the Debtor's assets.  Attached as Exhibit E is the Valuation Report prepared by Grant Thornton dated December 21, 2009, with respect to the Duval County Properties (the "Valuation Report"), assigning an approximate value of $12.3 $18.9 million to such properties owned by Voyager, the wholly owned subsidiary of the Debtor.  Grant Thornton also opined that the enterprise value of Debtor was approximately $25.4 million as of September 30, 2009.  Such valuation was based upon Grant Thornton's analysis of (a) oil and gas companies with similar characteristics, (b) the average market trading multiples of members of Voyager's peer group, and (c) a discounted cash flow, based upon a discount rate that incorporated the Debtor's inherent riskiness.  In performing this analysis, it is the Debtor's understanding that Grant Thornton utilized the Reserve Report, adjusted to take into account the operations that Debtor and Voyager could not perform due to lack of liquidity and also adjusted for somewhat higher prices in recent months.

### D.      The Reorganized Debtor.

After Confirmation, 95% of the outstanding capital stock of the Reorganized Debtor will be owned by the CIT Second Lien Lenders and 5% owned by holders of the Debtor's Common Stock Interests, subject to confirmation of the Plan and approval by the Bankruptcy Court of the solicitation of acceptances and rejections by the Debtor as described herein.  The Reorganized Debtor shall emerge from Chapter 11 as a privately-held company, reincorporated under the laws of the State of Delaware.  Voyager will be a wholly owned subsidiary of the reorganized Debtor and will continue to own and operate the Duval County Properties.

Attached as Exhibit G is a *pro forma* set of financial projections of the intended business operations of the Reorganized Debtor (the "Projections").  The Projections reflect the Debtor's reasonable judgments as to the cash flow of the Reorganized Debtor and Voyager, as the Debtor's wholly owned subsidiary.  All references to the Reorganized Debtor with regard to the valuation of the Reorganized Debtor, based on context, shall include the value of Voyager's assets.  However, there can be no assurance that any of the various assumptions on which the

Projections are based will prove to be accurate, that any of the forecasted expenses will not exceed assumptions or that the projected results will be realized any time in the future or at all. Actual results will be impacted by a number of factors, including, without limitation, general economic and business conditions, successful implementation of business plans, third-party contractual relationships, sufficient working capital and available sources of funding, as well as other conditions which affect the capital markets and the oil and natural gas industry, all of which can be materially adverse to the Reorganized Debtor.

**4.2     Sources of Information.**

The descriptions contained in this Disclosure Statement of the Debtor's history, capitalization, assets, operations, and financial condition primarily are based upon public reports filed by the Debtor pursuant to the Securities Exchange Act of 1934, as amended (the "Exchange Act"), in the form of current reports on Forms 8-K and periodic reports on Forms 10-K and 10-Q, including (a) the Debtor's audited financial statements for the year ended December 31, 2008, contained in its annual report on Form 10-K filed with the SEC on May 20, 2009, and (b) the Debtor's quarterly report for the quarter ended September 30, 2009, on Form 10-Q filed with the SEC on November 16, 2009, attached hereto as Exhibits H and I, respectively.  Reports and any other documents filed by the Debtor with the SEC are available for reading and copying at the SEC's public reference room at 100 F Street N.E., Washington, D.C. 20549 (tel. 1-800-SEC-0330 for further information), as well as available for retrieval on the SEC's website at www.sec.gov.

The asset and enterprise valuation, including the liquidation analysis, was prepared by Grant Thornton with the assistance of the Debtor's management and is attached as Exhibit E. Information pertaining to the Debtor's assets was also taken from the Ralph E. Davis Associates, Inc. Reserve Report dated August 10, 2009, as of June 30, 2009, attached as Exhibit B.

The Projections attached as Exhibit G were compiled by the Debtor's management.

Some of the ownership information concerning the greater than 5% beneficial owners of the Debtor was obtained from third-party reports on Schedules 13D and 13G and Forms 3 and 4 filed with the SEC by such parties in accordance with Section 13 of the Exchange Act.

**4.3     Liquidation Analysis.**

As indicated in the liquidation analysis contained in the Valuation Report prepared by Grant Thornton, Attachment 2 to Exhibit E, the assets of the Debtor would generate between $12.3 million and $18.9 million of net cash proceeds for distribution to creditors in the event of liquidation (the "Liquidation Analysis").  The Liquidation Analysis, accompanied by assumptions prepared by Grant Thornton is discussed in more detail in "Liquidation Analysis" below.  The liquidation values demonstrate that Class 4(a) and Class 4(b) would be the only classes to benefit from a liquidation, with estimated recoveries ranging 80% to 100% for Class 4(a) and up to 33% for Class 4(b).  The remaining Classes would not receive a distribution on account of their Allowed Claims or Interests if the Debtor were to be liquidated.

**4.4    Other Financial Information.**

The most recent unaudited financial statements of the Debtor for the quarter ended September 30, 2009, are contained in the Debtor's quarterly report on Form 10-Q filed with the SEC on November 16, 2009, and attached hereto as <u>Exhibit I</u>.  Audited financial statements of the Debtor for the year ended December 31, 2008, are contained in the Debtor's annual report on Form 10-K filed with the SEC on May 20, 2009, which financial statements are attached hereto as <u>Exhibit H</u>.

**4.5    Insurance Policies and Indemnification.**

The Debtor maintains insurance coverage with respect to its employees and its assets. The insurance policies include coverage for workers' compensation, general liability, commercial auto, umbrella claims, operator's extra expense, equipment, and property claims.  In addition, the Debtor carries directors and officers liability, as well as additional directors and officers liability insurance.  A schedule of the Debtor's insurance policies is attached hereto as <u>Exhibit J</u>.

**4.6    Preference Analysis.**

The Debtor will be disclosing payments to third parties made within 90 calendar days and within one year of the Petition Date in its Statement of Financial Affairs, which the Debtor will file on the Petition Date.  The Debtor has not made a formal determination as to whether any such payments constitute a preference or fraudulent conveyance under applicable law, but the Debtor currently is of the view that all such payments were made in the ordinary course of its business and for reasonably equivalent value.  The Debtor does not currently intend to pursue the recovery of any preferential payment and does not believe any such recoveries would be material to creditors or interest owners.

**ARTICLE V**

**DESCRIPTION OF THE PLAN**

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN.  IT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, ATTACHED TO THIS DISCLOSURE STATEMENT AS <u>EXHIBIT A</u>.

THE SUMMARY OF THE PLAN AND OF OTHER DOCUMENTS REFERRED TO HEREIN DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THOSE DOCUMENTS, AND REFERENCE IS MADE TO THE PLAN AND SUCH OTHER DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF THEIR TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND, UPON THE EFFECTIVE DATE, WILL BE BINDING UPON ALL HOLDERS OF CLAIMS,

INTERESTS AND OTHER PARTIES IN INTEREST, IF ANY.  IN THE EVENT OF ANY
CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY
OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN OR THE OTHER
OPERATIVE DOCUMENT SHALL CONTROL.

**5.1    Structure of the Plan.**

Under the Plan, Claims against and Interests in the Debtor are divided into Classes
according to the payment priority set forth in the Bankruptcy Code. If the Plan is confirmed by
the Bankruptcy Court and consummated, each Class of Claims and Interests shall receive a
distribution as set forth in the Plan.

**5.2    Classification, Estimated Amount and Treatment of Claims and Interests.**

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must classify
the claims and interests.  In accordance with Section 1123, the Plan divides Claims and Interests
into 12 Classes and sets forth the treatment to be provided to each such Class.  Section 1122 of
the Bankruptcy Code requires the Debtor to classify Claims and Interests into Classes containing
Claims and Interests substantially similar to the other Claims and Interests in each such Class.

The Debtor believes the Plan has classified Claims and Interests in compliance with the
provisions of Section 1122; however, a holder of a Claim or Interest may challenge the Debtor's
classification of Claims and Interests, and the Bankruptcy Court may find that a different
classification is required for the Plan to be confirmed.  In that event, the Debtor intends, to the
extent permitted by the Bankruptcy Code, the Plan and the Bankruptcy Court, to make such
reasonable modifications of the classifications under the Plan to permit confirmation and to use
the Plan acceptances received in this solicitation for purposes of obtaining the approval of the
reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a
member.  Any such reclassification could adversely affect the Class in which such holder
initially was a member, or any other Class under the Plan, by changing the composition of such
Class and the vote required of that Class for approval of the Plan.  Furthermore, a reclassification
of a Claim or Interest after approval of the Plan could necessitate a redistribution of the
Disclosure Statement and re-solicitations of acceptances under the Plan.

Class 1.        **Administrative Claims.**  Class 1 Claims are not Impaired and
need not be classified, but are classified herein for administrative convenience.  Each
holder of an Allowed Administrative Claim shall be paid in full, in Cash, as soon as
reasonably practicable on the later of (a) the Effective Date and (b) the date on which
such Administrative Claim becomes an Allowed Claim payable under applicable law or
any agreement relating thereto.  Class 1 is deemed to have accepted the Plan and
therefore is not entitled to vote to accept or reject the Plan.  The Debtor estimates that the
Administrative Claims will be less than $250,000.

Class 2.        **Priority Tax Claims.**  Class 2 Claims are not Impaired.  Each
holder of an Allowed Priority Tax Claim shall be paid in full, in Cash, as soon as
reasonably practicable on the later of (a) the Effective Date and (b) the date on which
such Priority Tax Claim becomes an Allowed Claim payable under applicable law or any
agreement relating thereto.  Class 2 is deemed to have accepted the Plan and therefore is

not entitled to vote to accept or reject the Plan.  The Debtor estimates that there are no Priority Tax Claims.

Class 3.        **Other Priority Claims.**  Class 3 Claims are not Impaired.  Class 3 shall include all Priority Claims not included in Classes 1 and 2.  Each holder of an Allowed Class 3 Claim shall be paid in full, in Cash, as soon as reasonably practicable on the later of (a) the Effective Date and (b) the date on which such Other Priority Claim becomes an Allowed Claim payable under applicable law or any agreement relating thereto.  Class 3 is deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.  The Debtor estimates that there are no Other Priority Claims.

Class 4(a).     **CIT First Lien Lender Claims**.  Class 4(a) Claims are Impaired. The CIT First Lien Lender Claims shall receive the (a) obligation to be evidenced by the New Senior Secured Credit Facility (in the principal amount of $10 million), and (b) shares of New Senior Preferred Stock in an amount sufficient to liquidate the balance of the Class 4(a) Claims (based on the liquidation preference of the entire New Senior Preferred Stock issue of $23.5 million), in full satisfaction of the CIT First Lien Lender Claims.  As Class 4(a) is Impaired, it is entitled to vote to accept or reject the Plan.

Class 4(b).     **CIT Second Lien Lender Claims**.  Class 4(b) Claims are Impaired.  The CIT Second Lien Lender Claims shall receive (a) shares of New Senior Preferred Stock, with a liquidation preference equal to $23.5 million, less the share of the New Senior Preferred Stock allocated to Class 4(a), and (b) 95% of the New Common Stock in full satisfaction of the CIT Second Lien Lender Claims; provided, however, that if the Bankruptcy Court determines that the Debtor is or was required to solicit Class 11 with respect to acceptances and rejections of the Plan, on account of their Interests, then the CIT Second Lien Lender Claims shall receive 100% of the New Common Stock, plus the New Senior Preferred Stock as set forth above.  As Class 4(b) is Impaired, it is entitled to vote to accept or reject the Plan.

Class 5.        **Royalty Claims.**  Class 5 Claims are not Impaired.  Each holder of an Allowed Class 5 Claim shall be paid in full, in Cash, as soon as reasonably practicable on the later of (a) the Effective Date and (b) the date when such Royalty Claim (i) becomes an Allowed Claim payable under applicable law or any agreement relating thereto, and (ii) is in Pay Status.  Class 5 is deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.  The Debtor estimates that there are no Royalty Claims.

Class 6.        **Other Secured Claims.**  Class 6 Claims are not Impaired.  Class 6 shall include all Secured Claims other than Class 4 and Class 5 Claims.  Each holder of an Allowed Class 6 Claim shall be paid in full, in Cash, as soon as reasonably practicable on the later of (a) the Effective Date and (b) the date on which such Other Secured Claim becomes an Allowed Claim payable under applicable law or any agreement relating thereto.  Class 6 is deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

Class 7.        **General Unsecured Claims.**  Class 7 Claims are not Impaired. Each holder of an Allowed Class 7 Claim shall be paid in full, in Cash, as soon as

reasonably practicable on the later of (a) the Effective Date and (b) the date on which such General Unsecured Claim becomes an Allowed Claim payable under applicable law or any agreement relating thereto.  Class 7 is deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the plan.  The Debtor estimates that Unsecured Claims will be less than $100,000.

Class 8.        **Subordinated Unsecured Claims.**  Class 8 Claims are not Impaired.  Each holder of an Allowed Class 8 Claim shall be paid in full, in Cash, as soon as reasonably practicable on the later of (a) the Effective Date and (b) the date on which such Subordinated Unsecured Claim becomes an Allowed Claim payable under applicable law or any agreement relating thereto.  Class 8 is deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the plan.  The Debtor estimates that there are no Subordinated Unsecured Claims.

Class 9.        **Intercompany Claims**.  Class 9 Claims are not Impaired.  Each holder of an Allowed Class 9 Claim shall be paid in full, in Cash, as soon as reasonably practicable on the later of (a) the Effective Date and (b) the date on which such Subordinated Unsecured Claim becomes an Allowed Claim payable under applicable law or any agreement relating thereto.  Class 9 is deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the plan.  The Debtor estimates that there are no Intercompany Claims.

Class 10.       **Class C Preferred Stock Interests.**  Class 10 Interests are Impaired.  The Class 10 Interest holder shall receive the New Junior Preferred Stock in full satisfaction of the Class C Preferred Stock Interests.  As Class 10 is Impaired, it is entitled to vote to accept or reject the Plan.  The Debtor has one Class C Preferred Stock Interest holder.

Class 11.       **Common Stock Interests.**  Class 11 Interests are Impaired.  Holders of the Common Stock of the Debtor shall receive their Pro Rata share of 5% of the New Common Stock.  The Debtor has elected not to solicit Class 11, and, as a result, the Debtor has deemed Class 11 to have rejected the Plan.  Should the Bankruptcy Court determine that the Debtor is or was required to solicit Class 11 Common Stock Interest Holders with respect to acceptances and rejections of the Plan, on account of their Interests, then Class 11 shall receive no distribution under the Plan and 100% of the New Common Stock shall be distributed to the Holders of Class 4(b) Claims.  The Debtor has approximately 170 Common Stock Interest Holders.

Class 12.       **Common Stock Option Interests.**  Class 12 Interests are Impaired.  Each Holder of an allowed Class 12 Interest shall receive no distribution under the Plan.  Class 12 is deemed to reject the Plan by operation of law and is not entitled to vote to accept or reject the Plan.  The Debtor has 17 Common Stock Option Interest Holders.

**5.3    Means for Implementation of the Plan.**

**A.    New Senior Secured Credit Facility.**

The Debtor has a commitment under the Plan Support Agreement from the CIT First Lien Lenders to participate <u>Pro</u> <u>Rata</u> in the New Senior Secured Credit Facility subject to the terms and conditions of the Plan Support Agreement, to enable the Debtor to consummate the Plan, emerge from Chapter 11 as a reorganized entity, and fund operating expenses, including administrative costs of the Chapter 11.

The security interests and liens securing repayment of the CIT Revolving Loan and the CIT Term Loan shall be released or assigned so that the New Senior Secured Credit Facility Lenders shall receive a first priority security interest and lien to secure the repayment of the New Senior Secured Credit Facility.

**B.    Satisfaction of Allowed Claims.**

The holders of Allowed Claims in Classes 1 through 9 and Allowed Interests in Classes 10 and 11 shall be satisfied in accordance with the terms of this Plan.

**C.    Cancellation of Interests; Issuance of New Common Stock.**

All Interests of the Debtor shall be cancelled and annulled on the Effective Date.  The Reorganized Debtor shall issue the New Senior Preferred Stock, New Junior Preferred Stock and New Common Stock and distribute same in accordance with the Plan.

**D.    Restructuring Transactions.**

On the Effective Date, and pursuant to the Plan or the applicable Plan Supplement, the Debtor or Reorganized Debtor shall enter into the restructuring transactions contemplated herein (the "<u>Restructuring Transactions</u>"), and shall take any actions as may be reasonably necessary or appropriate to effect a restructuring of its respective businesses or the overall organizational structure of the Debtor.  The actions to be taken by the Debtor and Reorganized Debtor to effect the Restructuring Transactions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition or transfer containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation or reincorporation, including the Certificate of Incorporation and the Certificate of Designations, limited partnership, or formation, merger or consolidation pursuant to applicable state law; and (d) all other actions determined to be reasonably necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions.  The Plan Supplement evidencing the Restructuring Transactions shall be filed with the Bankruptcy Court at least five (5) Business Days prior to the Confirmation Hearing.  The chairman of the board of directors, president, chief executive officer, chief

financial officer, any executive vice president or senior vice president, or any other appropriate officer, manager or managing partner of each of Debtor or Reorganized Debtor, as appropriate, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, agreements or other documents, and take such other actions, as may be reasonably necessary or appropriate, to give effect to and further evidence the terms of this Plan. The secretary or assistant secretary of the Debtor or the Reorganized Debtor, as appropriate, shall be authorized to certify or attest to any of the foregoing actions.

### E.    Continued Corporate Existence; Certificates of Incorporation and By-laws.

The Reorganized Debtor shall continue to exist as a separate legal entity, and it shall be converted from a Nevada corporation to a Delaware corporation under the laws of the State of Delaware. On the Effective Date, the Reorganized Debtor shall file: (a) the Certificate of Conversion with the Secretary of State of the State of Delaware; (b) the Certificate of Incorporation in substantially the form attached to the Disclosure Statement as <u>Exhibit P</u> with the Secretary of State of the State of Delaware (the "<u>Certificate of Incorporation</u>") and; (c) adopt amended and restated bylaws in substantially the form attached to the Disclosure Statement as <u>Exhibit Q</u>. The Certificate of Incorporation shall, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity securities.

The Certificate of Incorporation shall authorize the Reorganized Debtor to issue the New Senior Preferred Stock, New Junior Preferred Stock and New Common Stock. The holders of New Common Stock will vote as a single class, and each share of New Common Stock will be entitled to one vote in all matters to be voted on by the holders of the New Common Stock; provided, however, that the holders of the shares of New Senior Preferred Stock and New Junior Preferred Stock shall be entitled to vote with the holders of New Common Stock (as a single class) on all matters submitted to a vote of the stockholders of the Reorganized Debtor.

### F.    Description of Debt and Securities to be Issued Pursuant to the Plan.

#### (i)    New Senior Secured Credit Facility.

The Reorganized Debtor will enter into the New Senior Secured Credit Facility with the New Senior Secured Credit Facility Lenders, in substantially the form of <u>Exhibit L</u> hereto to satisfy in part the claims of Class 4(a). The New Senior Secured Credit Facility will be a revolving facility with lender commitments of $10 million. The lender's commitment will terminate, and any outstanding loans will become due and payable, thirty six (36) months following the Effective Date (or earlier, if terminated or prepaid by the Reorganized Debtor or if terminated or accelerated by the lender if an event of default occurs). At any time, the outstanding loans under the New Senior Secured Credit Facility may equal the lesser of the lender's commitment or the borrowing base, in each case in effect at such time. The borrowing base initially will be $10,000,000, but will be recalculated periodically in good faith by the administrative agent under the New Senior Secured Credit Facility based on updated reserve reports and other information. Increases in the borrowing base will be subject to lender consent. Loans under the New Senior Secured Credit Facility will bear interest, in most circumstances at the option of the Reorganized Debtor, at a rate per annum equal to either (a) LIBOR for the applicable interest period (adjusted for reserve requirements), plus 3%, or (b) (i) the highest of

(A) the prime rate then in effect, as announced by a bank specified in the New Senior Secured Credit Facility, (B) the federal funds rate, plus 0.50% and (C) one-month LIBOR (adjusted for reserve requirements), plus 1%, plus (ii) 2%.  In no event shall LIBOR be less than 2.5%.  While an event of default has occurred and is continuing and during certain other circumstances, interest will accrue at a rate per annum that is 3% higher than the rate that would otherwise be applicable.  The New Senior Secured Credit Facility also has provisions permitting the issuance of letters of credit with an aggregate face amount at any time outstanding of $500,000.  Contingent reimbursement obligations under outstanding letters of credit will reduce the principal amount of loans that may be drawn under the New Senior Secured Credit Facility and reimbursement obligations in respect of drawn letters of credit will payable under the New Senior Secured Credit Facility.  All borrowings under the New Senior Secured Credit Facility will be secured by a first lien on substantially all assets of the Reorganized Debtor and its wholly owned subsidiaries, pursuant to the New Security Agreement, in substantially the form of Exhibit L hereto.

The New Senior Secured Credit Facility will contain various restrictive covenants, including financial covenants stating that the Reorganized Debtor will not: (a) as of the last day of any fiscal quarter beginning June 30, 2010, permit its ratio of annualized EBITDAX to annualized interest expense (in each case calculated as provided in the New Senior Secured Credit Facility in respect of such fiscal quarter) such period to be less than 2.0 to 1.0; (b) at any time after June 30, 2010, permit its ratio of Debt as of such time to annualized EBITDAX on the last day of the fiscal quarter immediately preceding the date of determination for which financial statements are available (calculated as provided in the New Senior Secured Credit Facility) to be greater than (i) 16.0 to 1.0 if such fiscal quarter ends on June 30, 2010, (ii) 6.0 to 1.0 if such fiscal quarter ends on September 30, 2010, (iii) 4.0 to 1.0 if such fiscal quarter ends on December 31, 2010, (iv) 2.5 to 1.0 if such fiscal quarter ends on March 31, 2011, (v) 1.5 to 1.0 if such fiscal quarter ends June 30, 2011 or September 30, 2011 and (vi) 1.25 to 1.0 for each fiscal quarter thereafter; and (c) as of the last day of any fiscal quarter, permit its ratio of consolidated current assets (including the unused amount of the total commitments under the New Senior Secured Credit Facility, but excluding non-cash assets under FASB ASC 815-15) to consolidated current liabilities (excluding non-cash obligations under FASB ASC 815-15 and current maturities under the New Senior Secured Credit Facility) to be less than 1.0 to 1.0.

### (ii)    New Senior Preferred Stock.

In addition to the New Senior Secured Credit Facility, the Reorganized Debtor will issue New Senior Preferred Stock to Class 4(a) and Class 4(b).  The New Senior Preferred Stock shall be issued pursuant to a series designation by the Board of Directors of the Reorganized Debtor (the "Board") set forth in a Certificate of Designations, substantially in the form of Exhibit M hereto, to be filed by the Reorganized Debtor.  The New Senior Preferred Stock will have an initial liquidation preference of $1,000.00 per share, for an initial aggregate liquidation preference of $23.5 million.  With respect to dividend rights, rights upon liquidation, winding up and dissolution, the New Senior Preferred Stock shall rank senior to the New Common Stock and the New Junior Preferred Stock.  Dividends on the New Senior Preferred Stock will accrue at the rate of six percent (6%) per annum, payable quarterly in additional shares of New Senior Preferred Stock.  Each share of New Senior Preferred Stock will be redeemable (a) on a mandatory basis, 60 months after the Effective Date, (b) at the option of the Reorganized Debtor, at any time prior to the redemption date in clause (a) hereof, (c) on a mandatory basis, upon the

refinancing or the payment in full of the obligations under the New Senior Secured Credit Facility, or (d) on a mandatory basis, upon the occurrence of an event of default under the New Senior Secured Credit Facility, in each case under clauses (a), (b), (c) and (d), for a cash redemption price equal to the liquidation preference applicable to such share of New Senior Preferred Stock; provided, however, that any partial redemptions shall be made pro rata among the holders of the New Senior Preferred Stock.

Without the prior written approval of holders of at least 66 2/3% of the New Senior Preferred Stock outstanding, the Reorganized Debtor may not: (1) engage in certain transactions (i.e., mergers or asset sales, etc.), (2) change the rights, privileges or preferences of the New Senior Preferred Stock, (3) incur any secured or unsecured indebtedness; provided, that with respect to unsecured indebtedness, no such approval shall be required to the extent that such unsecured indebtedness is, in the aggregate, less than $500,000, (4) issue any additional securities that would rank senior to or pari passu with the New Senior Preferred Stock as to liquidation preference or as to priority of distributions, (5) make any distributions on or redemptions of any of the New Common Stock (other than (i) those expressly permitted under the Certificate of Designations and (ii) certain exceptions such as repurchases under employee benefit plans or employment agreements, etc.), (6) designate additional directors upon a Triggering Event as set forth in the Certificate of Designations.

### (iii)   New Junior Preferred Stock.

The Reorganized Debtor will issue New Junior Preferred Stock to Class 10.  The New Junior Preferred Stock shall be issued pursuant to a series designation by the Board of Directors of the Reorganized Debtor (the "Board") set forth in a Certificate of Designations, substantially in the form of Exhibit N hereto, to be filed by the Reorganized Debtor.  The New Junior Preferred Stock will have an initial liquidation preference of $1,000.00 per share, for an initial aggregate liquidation preference of $0.1 million.  With respect to dividend rights, rights upon liquidation, winding up and dissolution, the New Junior Preferred Stock shall rank junior to the New Senior Preferred Stock and senior to the New Common Stock.  Dividends on the New Junior Preferred Stock will accrue at the rate of six percent (6%) per annum, payable quarterly in additional shares of New Junior Preferred Stock.  Each share of New Junior Preferred Stock will be redeemable (a) on a mandatory basis, 60 months after the Effective Date or (b) at the option of the Reorganized Debtor, at any time prior to the redemption date in clause (a) hereof, for a cash redemption price equal to the liquidation preference applicable to such share of New Junior Preferred Stock; provided, however, that any partial redemptions shall be made pro rata among the holders of the New Junior Preferred Stock.

### (iv)   New Common Stock.

The Certificate of Incorporation will authorize the Reorganized Debtor to issue up to 3 million (3,000,000) shares of New Common Stock, par value $0.001 per share, of which the Reorganized Debtor will issue 95% of such New Common Stock to Class 4(b) and 5% of such New Common Stock to Class 10, subject to confirmation of the Plan and approval by the Bankruptcy Court of the solicitation of acceptances and rejections by the Debtor as described herein.  The Reorganized Debtor shall emerge from Chapter 11 as a privately-held company, reincorporated under the laws of the State of Delaware.

### G.    Authority.

Until the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Debtor, its assets and operations.

### H.    Substantial Consummation.

On the Effective Date, unless otherwise provided by the Confirmation Order, the following shall occur, be deemed to have occurred simultaneously, and constitute substantial consummation of the Plan: (a) new corporate documents shall be authorized, approved and effective in all respects without further action under applicable law, regulation, order, or rule, including, without express or implied limitation, any action by the stockholders or directors of the Debtor or the Reorganized Debtor; except that the new organizational documents of the Reorganized Debtor shall be filed as may be appropriate with the applicable Secretary of State as soon as reasonably practicable on or after the Effective Date; (b) the Debtor's property deemed transferred to the Reorganized Debtor shall automatically vest in the Reorganized Debtor without further action on the part of the Debtor or any other Person; (c) all documents evidencing the New Senior Secured Credit Facility shall have been duly authorized, fully executed and delivered, and (d) the New Senior Preferred Stock, New Junior Preferred Stock and New Common Stock shall have been duly authorized, issued and delivered as provided herein.

### I.    Cancellation of Instruments and Agreements.

On the Effective Date, except as otherwise provided herein or in the Confirmation Order, instruments, indentures, notes, warrants, options, share certificates, or other documents (other than any insurance policy of a Debtor) evidencing, giving rise to, or governing any Claim or Interest shall be deemed canceled and annulled without further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtor under such agreements, instruments, indentures, notes, warrants, options, share certificates, or other documents shall be discharged.

### J.    Directors and Officers.

On the Effective Date, the officers of the Reorganized Debtor shall be Robert P. Munn, Carl A. Chase and James B. Davis, and the directors of the Reorganized Debtors shall be identified at or prior to the Confirmation Hearing.

### K.    Releases.

On the Effective Date, except for Causes of Action arising under the Plan (a) the Administrative Agent, the CIT First Lien Lenders, the CIT Second Lien Lenders and the New Senior Secured Credit Facility Lenders shall forever waive, release, and discharge any and all Causes of Action against the Debtor based, whether in whole or in part, upon any act, omission, event, condition, or thing in existence or that occurred, whether in whole or in part, prior to the Effective Date of the Plan and (b) in exchange for the preceding release and the valuable consideration being provided by the Administrative Agent, the CIT First Lien Lenders and the CIT Second Lien Lenders, in the form of significant compromise and reduction of their Secured Claims, the Debtor shall forever waive, release, and discharge any and all Causes of Action

against the CIT First Lien Lenders, CIT Second Lien Lenders and the New Senior Credit Facility Lenders based, whether in whole or in part, upon any act, omission, event, condition, or thing in existence or that occurred, whether in whole or in part, prior to the Effective Date of the Plan. For the purpose of the Releases granted by this section, the CIT First Lien Lenders, CIT Second Lien Lenders, and the New Senior Secured Credit Facility Lenders.  For purposes of this Section J, the terms "Debtor," "Administrative Agents," "CIT First Lien Lenders" and "CIT Second Lien Lenders" shall include their respective officers, directors, employees, agents, partners, subsidiaries, affiliates, advisors, attorneys, and successors-in-interest.

### L.    Certain Retained Causes of Action.

Except as otherwise provided in this Plan or the Confirmation Order, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall receive by transfer from the Debtor and shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights, Causes of Action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its Estate may hold against any Person and that arose prior to the Effective Date or relates to a Claim.  The Reorganized Debtor may pursue or abandon such retained claims, rights, Causes of Action, suits, or proceedings as appropriate, in accordance with the best interests of the Estate.

### M.    Exemption from Certain Transfer Taxes.

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers or mortgages from or by the Debtor to the Reorganized Debtor or any other Person or entity pursuant to the Plan, including, without limitation, any filings made in connection with the New Senior Secured Credit Facility, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## 5.4    Treatment of Executory Contracts and Unexpired Leases.

### A.    Assumption/Rejection.

The Debtor anticipates filing on the Petition Date, motions to (a) assume, and (b) reject certain executory contracts and unexpired leases, as provided pursuant to Section 365 of the Bankruptcy Code.  To the extent that any executory contract or unexpired lease is not included in either such motion, then such executory contract and unexpired lease shall be deemed rejected on the Effective Date.  If the Debtor is a party to any oil and gas leases (which the Debtor believes it is not) and if such lease are found to be executory contracts (which the Debtor believes they are not), then, only in those events, Debtor intends to assume its interest in such leases.

B.      **Pass-Through.**

Any rights or arrangements necessary or useful to the operation of the Debtor's business but not otherwise addressed as a Claim or Interest, bonding arrangements including non-exclusive or exclusive patent, trademark, copyright, maskwork or other intellectual property licenses, operating licenses with the Texas Railroad Commission or other such regulatory authority, and other executory contracts not assumable under section 365(c) of the Bankruptcy Code, shall, in the absence of any other treatment under the Plan or Confirmation Order, be passed through the Chapter 11 Case for the benefit of the Reorganized Debtor and the counterparty or counterparties to such rights or arrangements and left unaltered and unaffected by the Chapter 11 Case.

C.      **Oil and Gas Leases.**

Oil and Gas Leases in the State of Texas do not constitute executory contracts or unexpired leases of real property under section 365 of the Bankruptcy Code.  The following discussion is informational only, as the Debtor does not believe it is a party to any oil and gas leases.[1]

Except for (a) the defaults of a kind specified in sections 365(b)(2) and 541(c)(1) of the Bankruptcy Code (which defaults the Debtor and Reorganized Debtor will not be required to cure) or (b) as otherwise provided herein, the legal, equitable and contractual rights of the counterparties to Oil and Gas Leases shall be unaltered by the Plan.  To the extent a failure by the Debtor or Reorganized Debtor to pay or perform an obligation under an Oil and Gas Lease is a default under any applicable Oil and Gas Lease, such default shall be cured for all purposes by the payments provided for herein or the Reorganized Debtor's subsequent performance of such obligation with such applicable Oil and Gas Lease deemed to be, or otherwise remaining, in full force and effect for the benefit of the Reorganized Debtor.  To the extent such payment is due and owing on the Effective Date, such payment shall be made, in Cash, on the Effective Date, or upon such other terms as may be agreed to by the Debtor or Reorganized Debtor and the Person to whom such payment is due.  To the extent such payment is not due and owing on the Effective Date, such payment (x) will be made, in Cash, in accordance with the terms of the Oil and Gas Lease (or other agreement) between the parties, or as such payment becomes due and owing under (i) applicable non-bankruptcy law, or (ii) in the ordinary course of business of the Reorganized Debtor or (y) will be made upon other terms as may be agreed upon by the Reorganized Debtor and the Person to whom such payment is due.  To the extent it is impossible for the Reorganized Debtor to cure a default arising from any failure to perform a non-monetary obligation, such default shall be deemed cured by future performance by the Reorganized Debtor in accordance with the terms of the applicable Oil and Gas Lease with the applicable Oil and Gas Lease deemed to be, or otherwise remaining, in full force and effect for the benefit of the Reorganized Debtor.  If there is a dispute as to any cure obligation (including cure payments) between the Debtor/Reorganized Debtor and the lessor of an Oil and Gas Lease, the Reorganized Debtor shall only have to pay or perform as herein, provided the non-disputed cure obligation

---

[1] The value of the Debtor is based on its 100% ownership interest in Voyager which is a party to oil and gas leases that constitute the Duval County Properties.

with the balance of the cure payment or cure performance to be made or performed after resolution of such dispute either by (i) agreement of the parties or (ii) resolution by the Bankruptcy Court by a Final Order.

### D.    Assumed Executory Contracts and Unexpired Leases.

Each executory contract and unexpired lease that is assumed shall include each term set forth in all (a) amendments, modifications, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, and (b) rights appurtenant to property, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other equity interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court or is the subject of a motion to reject filed on or before the Effective Date.

Amendments, modifications, supplements, and restatements to prepetition executory contracts and unexpired leases that are executed by the Debtor while its Chapter 11 Case is pending, shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any claims that may arise in connection therewith.

### E.    Preexisting Obligations to the Debtor Under Executory Contracts and Unexpired Leases.

Rejection or repudiation of any executory contract or unexpired lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtor under such contracts or leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtor expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtor or Reorganized Debtor, as applicable, from counterparties to rejected or repudiated executory contracts or unexpired leases.

### F.    Assumed Contracts and Leases.

Contracts and leases assumed by the Debtor may be performed by the Reorganized Debtor in the ordinary course of business.

### G. Reservation of Rights.

Neither the exclusion nor inclusion of any contract or lease in any pleading, exhibit or otherwise filed in the Chapter 11 Case, nor anything contained in the Plan, shall constitute an admission by the Debtor or the Reorganized Debtor that any such contract or lease is in fact an executory contract or unexpired lease or that the Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Reorganized Debtor shall have thirty days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### H. Nonoccurrence of Effective Date.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request by the Debtors to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### I. Additional Cure Provisions

Except as otherwise provided in this Article V, such Cure payments shall be effected, or otherwise satisfied, by prompt payment by the Reorganized Debtor as contemplated by Section 365(b)(1)(A) of the Bankruptcy Code.  If there is a dispute regarding (a) the timing of any payment required in order to meet the promptness requirement of 365(b)(1), (b) the nature, extent or amount of any cure requirement, (c) the Reorganized Debtor's ability to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (d) any other matter pertaining to assumption, cure will occur following the entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment, as the case may be.

### J. Claims Based on Rejection of Executory Contracts and Unexpired Leases.

Unless otherwise provided by a Bankruptcy Court order, any proofs of claim asserting Claims arising from the rejection of the Debtor's executory contracts and unexpired leases pursuant to the Plan or otherwise must be filed no later than the later of twenty (20) days after the Effective Date, or twenty (20) days after the entry of an order providing for the rejection of an executory contract or unexpired lease.  Any proofs of claim arising from the rejection of the Debtor's executory contracts or unexpired leases that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against the Debtor, its Estate or the Reorganized Debtor, as applicable, without the need for any objection by the Debtor, its Estate or the Reorganized Debtor, as applicable, or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the executory contract or unexpired lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a proof of claim to the contrary.  All Allowed Claims arising from the rejection of the Debtor's executory contracts and unexpired leases shall be classified as General Unsecured Claims and shall be treated in accordance with the relevant provisions of the Plan; provided, however, if the holder of an Allowed Claim for rejection damages has a properly perfected security interest in any Collateral to secure obligations under such rejected executory contract or unexpired lease, the allowed claim for rejection damages

shall be treated as an Other Secured Claim to the extent of the value of such holder's interest in the Collateral, with the deficiency, if any, treated as a General Unsecured Claim.

### K.     Compensation, Benefit, and Pension Programs.

With the sole exception of the Retained Plans, all employee compensation, benefit and pension plans, and employment agreements or settlements reached thereunder of the Debtors, including benefit plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as if they were, terminated executory contracts. Each Retained Plan will be treated as if it were an executory contract assumed hereunder, and the Debtor's respective obligations under each such Retained Plan shall survive Confirmation of this Plan and become obligations of the Reorganized Debtor.

### L.     Indemnification Obligations.

Except as otherwise specifically provided herein, any obligations or rights of any Debtor to indemnify, defend or advance expenses to its present and former directors, officers, employees, agents or representatives under its certificate of incorporation, by-laws, employee-indemnification policy, or under state law, or any agreement with respect to any claim, demand, suit, cause of action, or proceeding, shall survive Confirmation of this Plan and become obligations of the Reorganized Debtor. The employees of the Debtor who become employed by the Reorganized Debtor shall receive indemnification by the Reorganized Debtor in the ordinary course of its business. Claims against the Debtor for indemnification shall be classified under this Plan as General Unsecured Claims and are payable as Class 7 Claims.

### M.     Treatment of Change of Control Provisions.

The entry of the Confirmation Order, consummation of the Plan, and/or any other acts taken to implement the Plan shall not constitute a "change of control" under any provision of any contract, agreement or other document which provides for the occurrence of any event, the granting of any right, or any other change in the then-existing relationship between the parties upon a change in control.

### 5.5     Conditions Precedent to the Plan's Confirmation and Consummation.

### A.     Conditions Precedent to Confirmation.

The Plan's Confirmation is subject to the satisfaction or written waiver of each of the following conditions precedent:

(i)     the Bankruptcy Court finding the prepetition solicitation and the Disclosure Statement to have been adequate and not in violation of law;

(ii)     the timely and affirmative election by the New Senior Secured Credit Facility Lenders that they will provide the New Senior Secured Credit Facility;

(iii)     the assumption and assignment of all executory contracts and unexpired leases that are not expressly rejected which the Debtor may seek to assume and assign under the Plan;

(iv)    approval of the mutual releases as set forth in Article III, Section J.;

(v)    approval of the release of parties as set forth in Article X, Section C. and the injunction against prosecution as provided in Article X, Section E.;

(vi)    the Findings and Conclusions be in form and substance and contain findings and conclusions in support of confirmation of the Plan that are reasonably satisfactory to the Debtor and the CIT First Lien Lenders, the CIT Second Lien Lenders and the New Senior Secured Credit Facility Lenders; and

(vii)    entry of the Confirmation Order on or before March 16, 2010.

## B.    Conditions Precedent to Effective Date.

Effectiveness of the Plan is subject to the satisfaction or written waiver of each of the following conditions precedent:

(a)    the Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Debtor and the Administrative Agent, the CIT First Lien Lenders, the CIT Second Lien Lenders and the New Senior Secured Credit Facility Lenders, confirming the Plan, as the same may have been modified;

(b)    the Confirmation Order shall have been entered, no timely appeal shall have been taken from the Confirmation Order, and the Confirmation Order shall have become a Final Order;

(c)    the execution and delivery of the New Senior Secured Credit Facility and of all documents related to the New Senior Secured Credit Facility, as requested by the New Senior Secured Credit Facility Lenders;

(d)    the Debtor and/or Reorganized Debtor shall have executed and delivered all documents necessary to effectuate the issuance of the New Senior Preferred Stock, the New Junior Preferred Stock and the New Common Stock as set forth in the Plan;

(e)    all necessary and material consents, authorizations, and approvals shall have been given or waived for the transfers and transactions described in the Plan, including, without limitation, the transfers of property and the payments described in the Plan, as applicable;

(f)    all conditions to the consummation of the transactions contemplated by the Plan shall have been satisfied or waived;

(g)    delivery of the Plan Implementation Certificate to the Administrative Agent, the CIT First Lien Lenders, the CIT Second Lien Lenders and the New Senior Secured Credit Facility Lenders;

(h)    delivery of a written consent from the Administrative Agent, the CIT First Lien Lenders, the CIT Second Lien Lenders and the New Senior Secured Credit Facility Lenders to the Debtor, providing that the Plan Implementation Certificate is in a form and substance that is acceptable to such parties; and

**DISCLOSURE STATEMENT WITH RESPECT TO PREPACKAGED PLAN OF REORGANIZATION OF CROSS CANYON ENERGY CORP. PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE – PAGE 32**

513854 000004 DALLAS 2563267.8

(i)        delivery by the Administrative Agent, the CIT First Lien Lenders, the CIT Second Lien Lenders and the New Senior Secured Credit Facility Lenders, in their sole discretion, of a written consent to the effectiveness of the Plan.

**C.        Waiver of Conditions.**

The conditions set forth in sections A and B above can be waived in writing, in whole or in part, jointly by (a) the Debtor and (b) the Administrative Agent, the CIT First Lien Lenders, the CIT Second Lien Lenders and the New Senior Secured Credit Facility Lenders, at any time without an order of the Bankruptcy Court.  Unless waived, the failure to satisfy any condition precedent to the Effective Date will preclude the Effective Date's occurrence, regardless of the circumstances giving rise thereto (including any action or inaction by the Debtor or the Reorganized Debtor).  The waiver of any condition to Confirmation or to the Effective Date shall not constitute or be deemed a waiver of any other condition.

**5.6        Modification; Withdrawal.**

The Debtor reserves the right to modify the Plan in a manner that is acceptable in writing to the New Senior Secured Credit Facility Lenders, either before or after Confirmation, to the fullest extent permitted under section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  The Debtor may withdraw the Plan at any time before the Effective Date.

**5.7        Retention of Jurisdiction.**

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of or related to the Chapter 11 Case and the Plan, to the fullest extent permitted by law, including jurisdiction to:

(a)        enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(b)        hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan and all contracts, instruments, and other agreements executed in connection with the Plan;

(c)        hear and determine any request to modify the Plan or to cure any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court;

(d)        issue and enforce injunctions or other orders, or take any other action that may be necessary or appropriate to restrain any interference with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

(e)        enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(f)      hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(g)      enforce all orders, judgments, injunctions, releases, exculpations, and rulings entered in connection with the Chapter 11 Case;

(h)      hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code;

(i)      to hear and determine matters relating to the allowance, disallowance, estimation, and liquidation of Claims against the Debtor and to enter or enforce any order requiring the filing of any such Claim before a particular date;

(j)      to determine all applications, Claims, adversary proceedings, and contested matters pending on the Effective Date; and

(k)      enter a final decree closing the Chapter 11 Case.

**5.8      Binding Effect and Discharge of the Debtor.**

The Plan shall be binding upon and inure to the benefit of the Debtor, all present and former holders of Claims and Interests, and their respective successors and assigns, and all other parties-in-interest in this Chapter 11 Case.  All consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against, or Interests in, the Debtor or any of its assets or properties, and, except as otherwise provided herein or in the Confirmation Order, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, upon the Effective Date, the Debtor shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims and Interests, including, but not limited to, any conduct of the Debtor and any and all demands and liabilities that arose before the Confirmation Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of the Debtor prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not the holder of a Claim based upon such debt accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all liabilities of the Debtor, subject to the Effective Date occurring.

**A.      Vesting.**

Except as otherwise provided in the Plan or in the Confirmation Order, on the Effective Date, the Reorganized Debtor shall be vested with all of the property of the Estate free and clear of all Claims, Liens, encumbrances, charges and Interests, and shall thereafter hold, dispose or otherwise deal with such property and operate its business free of any restrictions imposed by the

Bankruptcy Code or by the Bankruptcy Court.  Prosecution of Causes of Action shall be the exclusive responsibility of the Reorganized Debtor, which shall have sole and absolute discretion over whether to prosecute or settle such Causes of Action.

### B.      Exculpation and Limitation of Liability

Notwithstanding any other provision of this Plan, no holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, shall have any claim or right of action, whether in law or equity, whether for breach of contract, statute, or tort claim, against the Debtor, the Estate, the Reorganized Debtor, the Administrative Agent, the CIT First Lien Lenders, CIT Secured Lien Lenders, the New Senior Secured Credit Facility Lenders or any of their respective affiliates, representatives, present or former members, officers, directors, employees, advisors, attorneys, or agents, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the pursuit of Confirmation of the Plan, consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or gross negligence.

### C.      Good Faith.

As of the Confirmation Date, the Debtor shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Debtor and the New Senior Secured Credit Facility Lenders have participated in good faith and in compliance with section 1125(e) of the Bankruptcy Code in the offer and issuance of the New Senior Preferred Stock, New Junior Preferred Stock and New Common Stock under the Plan, and therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of the New Senior Preferred Stock, New Junior Preferred Stock and New Common Stock under the Plan.

### D.      Injunction.

Except as otherwise provided in the Plan, from and after the Confirmation Date, all Persons who have held, hold, or may hold Claims against or Interests in the Debtor prior to the Effective Date are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor, the New Senior Secured Credit Facility Lenders and the Estate on account of any such Claims or Interests: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of this Plan.

### E.      Objections to Claims.

Objections to Claims as to which no objection is pending as of the Confirmation Date may be filed solely by the Debtor or the Reorganized Debtor. All Objections to Claims shall be filed no later than sixty (60) calendar days after the Claims Bar Date and Governmental Claims Bar Date, respectively; provided, however, that objections to Claims of a "governmental unit" (which for the purpose hereof shall have the meaning ascribed to it in section 502(b)(9) of the Bankruptcy Code) shall be filed no later than 240 calendar days after the Petition Date. The Reorganized Debtor shall be permitted and shall have the authority to seek one or more extensions of such deadlines from the Bankruptcy Court.

**F.      Payment of Statutory Fees.**

All fees payable under section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date. All such fees that arise after the Effective Date but before the closing of the Chapter 11 Case shall be paid from funds otherwise available for distribution hereunder.

**G.      Severability of Plan Provisions.**

If, before Confirmation, the Bankruptcy Court holds that any provision of the Plan is invalid, void or unenforceable, the Debtor, at its option and if acceptable to the New Senior Secured Credit Facility Lenders, may amend or modify the Plan to correct the defect, by amending or deleting the offending provision or otherwise, or may withdraw the Plan. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been amended or modified in accordance with the foregoing, is valid and enforceable.

**H.      Successors and Assigns.**

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of that Person.

**I.      Term of Injunctions or Stays.**

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case, either by virtue of sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, shall remain in full force and effect until all distributions contemplated by this Plan have been made and the Bankruptcy Court has entered an order closing the Chapter 11 Case. The injunctive provisions of section 524 and 1141 of the Bankruptcy Code and those contained in Article X are permanent and shall not be affected by this provision.

## ARTICLE VI

## CERTAIN RISK FACTORS TO BE CONSIDERED

Holders of Class 4(a) and 4(b) Claims and Class 10 Interests should read and carefully consider the following factors, as well as the other information set forth in this Disclosure

Statement (and the documents delivered together herewith and/or incorporated by reference herein), including those items discussed in the Projections, before deciding whether to vote to accept or to reject the Plan.  No other Classes described in the Plan are being solicited for acceptances and rejections of the Plan.

## 6.1    Risks Related to the Bankruptcy Case.

***The Plan may fail to be confirmed or not be submitted, which may result in the Debtor being liquidated inside or outside of Bankruptcy.***

The most likely alternative to confirmation of the Plan is either a foreclosure by the CIT Lenders or a sale process under § 363 of the Bankruptcy Code by which some or all of the assets of the Debtor would be sold to the highest bidder.  The Debtor has no reason to believe that such a process would yield a return to creditors and holders of Interests higher than the Plan, and, in fact, based on the liquidation analysis contained in <u>Exhibit E, Attachment 2</u>, the Debtor believes there is a high likelihood that the outcome would be dramatically less.  For a further discussion, *see* Article VIII "Liquidation Analysis" and Article XIII "Alternatives to Confirmation and Consummation of the Plan."

***The Chapter 11 proceedings may adversely affect the Debtor.***

While the Debtor will seek to make its stay in chapter 11 as brief as possible to minimize any potential disruption to its operations, it is possible that despite the belief and intent of the Debtor, the commencement of the Chapter 11 Case could materially adversely affect relationships among Voyager, as the Debtor's wholly owned subsidiary, and Voyager's royalty owners, Voyager's joint interest owners, investors, employees, and suppliers.

***The Plan is based upon the Projections, which are inherently uncertain.***

The Projections set forth in the Disclosure Statement and underlying the Plan are based on numerous assumptions, including the timing, confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtor, general business and economic conditions, and other matters, many of which are beyond the control of the Reorganized Debtor and some or all of which may not materialize.  Additionally, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of the Reorganized Debtor's operations.  As the actual results achieved throughout the periods covered by the Projections can be expected to vary from the projected results, the Projections should not be relied upon as a guaranty, representation, or other assurance that the actual results will occur.

## 6.2    Risks Related to Financial Condition of Reorganized Debtor.

***The Reorganized Debtor will continue to have substantial capital requirements that, if not met, may hinder operations and cause it to go out of business.***

The implementation of the Reorganized Debtor's plan will require the Reorganized Debtor to make significant capital expenditures in order for its business to replace current production and find and develop new oil and gas reserves.  Additionally, substantial capital is

needed to operate and grow the business of the Reorganized Debtor through exploration and development, as well as the acquisition of additional properties and drilling programs.  As there is no requirement that additional capital be provided under the New Senior Secured Credit Facility, operational revenue will initially represent the Reorganized Debtor's only source of funding for ongoing operations and its capital program.  Without adequate capital resources or funding on acceptable terms, the Reorganized Debtor may be forced to limit its oil and natural gas acquisition and development activities.  This limitation may adversely affect production rates and the ultimate value of the Debtor's business.

***The Reorganized Debtor's leverage and debt service obligations may adversely affect the Reorganized Debtor's cash flow.***

The Reorganized Debtor will have $10 million of secured debt when it emerges from Chapter 11 pursuant to the New Senior Secured Credit Facility.  The Reorganized Debtor's level of indebtedness could have consequences, including the following:

- it may make it difficult for the Reorganized Debtor to satisfy its obligations under its indebtedness and contractual and commercial commitments;

- the Reorganized Debtor's ability to obtain additional debt financing in the future for working capital, capital expenditures, acquisitions or general corporate purposes may be limited;

- the Reorganized Debtor's flexibility in reacting to changes in the industry may be limited and the Reorganized Debtor could be more vulnerable to adverse changes in its business or economic conditions in general; and

- the Reorganized Debtor may be at a competitive disadvantage to those of its competitors who operate on a less leveraged basis.

Additionally, the New Senior Secured Credit Facility will contain covenants limiting the Reorganized Debtor's ability to engage in certain activities that may be in the Reorganized Debtor's long-term best interests.  The Reorganized Debtor's failure to comply with such restrictions would result in an event of default under the New Senior Secured Credit Facility which, if not cured or waived, could result in the acceleration of all of its indebtedness and have a material adverse effect on its liquidity, financial condition and results of operations.

***Natural gas and oil prices are highly volatile, and lower prices negatively affect the Reorganized Debtor's financial results.***

The Reorganized Debtor's revenue, profitability, cash flow, oil and natural gas reserves value, future growth, and ability to borrow funds or obtain additional capital, as well as the carrying value of its properties, are substantially dependent on prevailing prices of natural gas and oil.  Historically, the markets for natural gas and oil have been volatile, and those markets are likely to continue to be volatile in the future.  Predicting future natural gas and oil price movements with certainty is impossible.  Prices for natural gas and oil are subject to wide fluctuations in response to relatively minor changes in the supply of and demand for natural gas and oil, market uncertainty, and a variety of additional factors beyond the Reorganized Debtor's

control.  These factors include:

- the level of consumer energy product demand;

- the domestic and foreign supply of oil and natural gas;

- overall economic conditions;

- weather conditions;

- domestic and foreign governmental regulations and taxes;

- the price and availability of alternative fuels;

- political conditions in or affecting oil and natural gas producing regions;

- the level and price of foreign imports of oil and liquefied natural gas; and

- the ability of the members of the Organization of Petroleum Exporting Countries and other state controlled oil companies to agree upon and maintain oil price and production controls.

Declines in natural gas and oil prices may materially adversely affect the Reorganized Debtor's and Voyager's financial condition, liquidity, and ability to finance planned capital expenditures and results of operations and may reduce the amount of oil and natural gas that it can produce economically.

***Future hedge transactions may result in the Reorganized Debtor and Voyager failing to benefit, to the fullest extent possible, from increases in prices for natural gas and oil.***

Because natural gas and oil prices are unstable, from time to time the Reorganized Debtor may enter into price-risk-management transactions such as swaps, collars, futures, and options to reduce its exposure to price declines associated with a portion of its natural gas and oil production and thereby to achieve a more predictable cash flow.  Any use of these arrangements may limit the Reorganized Debtor's and Voyager's ability to benefit from increases in the prices of natural gas and oil.  Hedging arrangements may also apply to only a portion of the Reorganized Debtor's production, thereby providing only partial protection against declines in natural gas and oil prices.  These arrangements could expose the Reorganized Debtor and Voyager to the risk of financial loss in certain circumstances, including instances in which production is less than expected, customers fail to purchase contracted quantities of natural gas and oil, or a sudden, unexpected event that materially impacts natural gas or oil prices.

**6.3    Risks Related to the Reorganized Debtor's Assets and Projected Operations.**

***A substantial percentage of the Reorganized Debtor's and Voyager's proved reserves consist of undeveloped reserves.***

As of June 30, 2009, approximately 45% of the Debtor's proved reserves were classified as proved undeveloped reserves.  These reserves may not ultimately be developed or produced, or quantities developed and produced may be smaller than expected, which in turn may have a

material adverse effect on the Reorganized Debtor's results of operations after the Effective Date.

***Drilling for and producing oil and natural gas are high risk activities with many uncertainties that could adversely affect the Reorganized Debtor's and Voyager's business, financial condition or results of operations.***

The Reorganized Debtor's success largely depends on the success of its exploitation, exploration, development and production activities. The Reorganized Debtor's oil and natural gas exploration and production activities are subject to numerous risks beyond its control, including the risk that drilling will not result in commercially viable oil or natural gas production. The Reorganized Debtor's decisions to purchase, explore, develop or otherwise exploit prospects or properties will depend in part on the evaluation of data obtained through geophysical and geological analyses, production data and engineering studies, the results of which are often inconclusive or subject to varying interpretations. The Reorganized Debtor's costs of drilling, completing and operating wells are often uncertain before drilling commences. Overruns in budgeted expenditures are a common risk that can make a particular project uneconomical. Further, many factors may curtail, delay or cancel drilling operations, including the following:

- delays imposed by or resulting from compliance with regulatory requirements;

- pressure or irregularities in geological formations;

- shortages of or delays in obtaining equipment and qualified personnel;

- equipment failures or accidents;

- adverse weather conditions;

- reductions in oil and natural gas prices; and

- oil and natural gas property title problems.

***Reserve estimates depend on many assumptions that may turn out to be inaccurate. Any material inaccuracies in these reserve estimates or underlying assumptions will materially affect the quantities and present value of the Reorganized Debtor's and Voyager's reserves.***

The process of estimating oil and natural gas reserves is complex, and it requires interpretations of available technical data and many assumptions, including assumptions relating to economic factors. Any significant inaccuracies in these interpretations or assumptions could materially affect the estimated quantities and present value of the Reorganized Debtor's and Voyager's reported reserves. In order to prepare the Reorganized Debtor's and Voyager's estimates, it must project production rates and the timing of development expenditures. The Reorganized Debtor and Voyager must also analyze available geological, geophysical, production and engineering data. The extent, quality and reliability of this data can vary. The process also requires that economic assumptions be made about matters such as oil and natural gas prices, drilling and operating expenses, capital expenditures, taxes, and availability of funds. Therefore, estimates of oil and natural gas reserves are inherently imprecise. Actual future

production, oil and natural gas prices received, revenues, taxes, development expenditures, operating expenses and quantities of recoverable oil and natural gas reserves most likely will vary from the Reorganized Debtor's and Voyager's estimates.  Any significant variance could materially affect the estimated quantities and present value of the Reorganized Debtor's and Voyager's reported reserves.  In addition, the Reorganized Debtor and Voyager may adjust estimates of proved reserves to reflect production history, results of exploration and development, prevailing oil and natural gas prices and other factors, many of which are beyond the Reorganized Debtor's and Voyager's control.

***Seismic studies do not guarantee that hydrocarbons are present or if present will be produced in economic quantities.***

The Reorganized Debtor and Voyager rely on seismic studies to assist it with assessing prospective drilling opportunities on its properties, as well as on properties that it may acquire. Such seismic studies are merely an interpretive tool and do not necessarily guarantee that hydrocarbons are present or if present will be produced in economic quantities.

***The Reorganized Debtor and Voyager depend on successful exploration, development and acquisitions to maintain revenue in the future.***

Generally, the volume of production from natural gas and oil properties declines as reserves are depleted, with the rate of decline depending on reservoir characteristics.  Except to the extent that the Reorganized Debtor and Voyager conducts successful exploration and development activities or acquires properties containing proved reserves, or both, its proved reserves will decline as reserves are produced.  To the extent that the Debtor and Voyager have insufficient developmental opportunities within its existing acreage positions, the Reorganized Debtor's and Voyager's future natural gas and oil production will therefore be highly dependent on its level of success in finding or acquiring additional reserves.

As explained above, the business of exploring for, developing, or acquiring reserves is capital intensive.  Recovery of the Reorganized Debtor's and Voyager's reserves, particularly undeveloped reserves, will require significant additional capital expenditures and successful drilling operations.  Operational revenue and proceeds from commodity hedges of the Reorganized Debtor will initially represent its only source of funding for ongoing operations.  To the extent cash flow from operations is lower or the operations of Voyager are lower than anticipated due to low commodity prices, the Reorganized Debtor's ability to make the necessary capital investment to maintain or expand its asset base of natural gas and oil reserves may be impaired unless other external sources of capital become available.  Hereafter, references to the "Debtor," "Reorganized Debtor," "Debtor's," or the "Reorganized Debtor's" shall include "Voyager" or "Voyager's" depending on context as Voyager is the wholly owned subsidiary of the Debtor which operates the Duval County Properties and shall be the wholly owned subsidiary of the Reorganized Debtor.  In addition, the Reorganized Debtor may be required to find partners for any future exploratory activity.  To the extent that others in the industry do not have the financial resources or choose not to participate in the Reorganized Debtor's exploration activities, the Reorganized Debtor could be adversely affected.

***Market conditions or operational impediments may hinder the Reorganized Debtor's access to oil and natural gas markets or delay its production.***

Unexpected and depressed market conditions or the unavailability of satisfactory oil and natural gas transportation arrangements may hinder the Reorganized Debtor's access to oil and natural gas markets or delay its production.  The availability of a ready market for the Reorganized Debtor's oil and natural gas production depends on a number of factors, including the demand for and supply of oil and natural gas and the proximity of reserves to pipelines and terminal facilities.  The Reorganized Debtor's ability to market its production depends in substantial part on the availability and capacity of gathering systems, pipelines and processing facilities owned and operated by third parties.  The Reorganized Debtor's failure to obtain such services on acceptable terms could materially harm its business.  Its productive properties may be located in areas with limited or no access to pipelines, thereby necessitating delivery by other means, such as trucking, or requiring compression facilities.  Such restrictions on the Reorganized Debtor's ability to sell its oil or natural gas have several adverse affects, including higher transportation costs, fewer potential purchasers (thereby potentially resulting in a lower selling price) or, in the event it is unable to market and sustain production from a particular lease for an extended time, possibly causing it to lose a lease due to lack of production.

The Reorganized Debtor generally delivers natural gas through gas gathering systems and gas pipelines that it does not own under interruptible or short-term transportation agreements.  Under the interruptible transportation agreements, the transportation of the Reorganized Debtor's gas may be interrupted due to capacity constraints on the applicable system, due to maintenance or repair of the system, or for other reasons as dictated by the particular agreements.  The Reorganized Debtor's ability to produce and market natural gas on a commercial basis could be harmed by any significant change in the cost or availability of such markets, systems or pipelines.

***The Reorganized Debtor may not be able to keep pace with technological developments in its industry.***

The natural gas and oil industry is characterized by rapid and significant technological advancements and introduction of new products and services which utilize new technologies.  As others use or develop new technologies, the Reorganized Debtor may be placed at a competitive disadvantage or competitive pressures may force it to implement those new technologies at substantial costs.  In addition, other natural gas and oil companies may have greater financial, technical, and personnel resources that allow them to enjoy technological advantages and may in the future allow them to implement new technologies before the Reorganized Debtor is able to implement such technologies.  The Reorganized Debtor may not be able to respond to these competitive pressures and implement new technologies on a timely basis or at an acceptable cost.  If one or more of the technologies the Reorganized Debtor uses now or in the future were to become obsolete or if it were unable to use the most advanced commercially available technology, the Reorganized Debtor's business, financial condition, and results of operations could be materially adversely affected.

***The Reorganized Debtor faces strong competition from other natural gas and oil companies.***

The Reorganized Debtor encounters competition from other natural gas and oil companies in all areas of its operations, including the acquisition of exploratory prospects and proved properties.  The Reorganized Debtor's competitors include major integrated natural gas and oil companies and numerous independent natural gas and oil companies, individuals, and

drilling and income programs. Many of these competitors are large, well-established companies that have been engaged in the natural gas and oil business much longer than the Reorganized Debtor has and possess substantially larger operating staffs and greater capital resources than the Reorganized Debtor does. These companies may be able to pay more for exploratory projects and productive natural gas and oil properties and may be able to define, evaluate, bid for, and purchase a greater number of properties and prospects than the Reorganized Debtor's financial or human resources permit. In addition, these companies may be able to expend greater resources on the existing and changing technologies that the Reorganized Debtor believes are and will be increasingly important to attaining success in the industry. The Reorganized Debtor may not be able to conduct its operations, evaluate, and select suitable properties and consummate transactions successfully in this highly competitive environment.

***The Reorganized Debtor is subject to complex laws that can affect the cost, manner or feasibility of doing business.***

The exploration, development, production and sale of oil and natural gas is subject to extensive federal, state, local and international regulation. The Reorganized Debtor may be required to make large expenditures to comply with such governmental regulations. Matters subject to regulation include:

-       permits for operations;

-       drilling and plugging bonds;

-       reports concerning operations;

-       the spacing and density of wells;

-       unitization and pooling of properties;

-       environmental maintenance and cleanup of drill sites and surface facilities; and

-       protection of human health.

From time to time, regulatory agencies have also imposed price controls and limitations on production by restricting the rate of flow of natural gas and oil wells below actual production capacity in order to conserve supplies of natural gas and oil. Under these laws, the Reorganized Debtor could be liable for personal injuries, property damage and other damages. Failure to comply with these laws also may result in the suspension or termination of the Reorganized Debtor's operations and subject it to administrative, civil and criminal penalties. Moreover, these laws could change in ways that substantially increase the Reorganized Debtor's costs. Any such liabilities, penalties, suspensions, terminations or regulatory changes could materially adversely affect the Reorganized Debtor's financial condition and results of operations.

***The Reorganized Debtor's operations may cause it to incur substantial liabilities for failure to comply with environmental laws and regulations.***

The Reorganized Debtor's oil and natural gas operations are subject to stringent federal, state and local laws and regulations relating to the release or disposal of materials into the

environment or otherwise relating to environmental protection.  These laws and regulations may require the acquisition of a permit or other authorizations before drilling commences, restrict the types, quantities and concentration of substances that can be released into the environment in connection with drilling and production activities, require permitting or authorization for release of pollutants into the environment, limit or prohibit drilling activities on certain lands lying within wilderness, wetlands, areas inhabited by endangered or threatened species, and other protected areas, and impose substantial liabilities for pollution resulting from historical and current operations.  Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal penalties, incurrence of investigatory or remedial obligations or the imposition of injunctive relief.  Changes in environmental laws and regulations occur frequently, and any changes that result in more stringent or costly waste handling, storage, transport, disposal or cleanup requirements could require the Reorganized Debtor to make significant expenditures to maintain compliance, and may otherwise have a material adverse effect on its results of operations, competitive position or financial condition as well as on the industry in general.  Under these environmental laws and regulations, the Reorganized Debtor could be held strictly liable for the removal or remediation of previously released materials or property contamination regardless of whether it was responsible for the release or if its operations were standard in the industry at the time they were performed.

***The Reorganized Debtor may not have enough insurance to cover all of the risks that it faces, and operators of prospects in which it participates may not maintain or may fail to obtain adequate insurance.***

In accordance with customary industry practices, the Reorganized Debtor maintains insurance coverage against some, but not all, potential losses in order to protect against the risks it faces.  The Reorganized Debtor does not carry business interruption insurance.  The Reorganized Debtor may elect not to carry insurance if its management believes that the cost of available insurance is excessive relative to the risks presented.  In addition, the Reorganized Debtor cannot insure fully against pollution and environmental risks.  The occurrence of an event not fully covered by insurance could have a material adverse effect on the Reorganized Debtor's financial condition and results of operations.  The impact of Hurricanes Katrina and Rita has resulted in escalating insurance costs and less favorable coverage terms.

Oil and natural gas operations are subject to particular hazards incident to the drilling and production of oil and natural gas, such as blowouts, cratering, explosions, uncontrollable flows of oil, natural gas or well fluids, fires and pollution and other environmental risks.  These hazards can cause personal injury and loss of life, severe damage to and destruction of property and equipment, pollution or environmental damage and suspension of operation.  The Reorganized Debtor does not operate all of the properties in which it has an interest.  In the projects in which the Reorganized Debtor owns a non-operated interest directly or owns an equity interest in a limited partnership which in turn owns a non-operated interest, the operator for the prospect maintains insurance of various types to cover the Reorganized Debtor's share of the cost of operations with policy limits and retention liability customary in the industry.  The Reorganized Debtor believes the coverage and types of insurance are adequate.  The occurrence of a significant adverse event that is not fully covered by insurance could result in the loss of the Reorganized Debtor's total investment in a particular prospect which could have a material adverse effect on its financial condition and results of operations.

**6.4    Payments and Insolvency Risks Related to the New Common Stock, New Senior Preferred Stock and New Junior Preferred Stock.**

On the Effective Date, the New Common Stock will be subordinated to the shares of New Senior Preferred Stock and New Junior Preferred Stock of the Reorganized Debtor having liquidation preferences in the principal amount of $23.5 million and $0.1 million, respectively. Such amounts may increase with the passing of time due to additional accruals. As a result, upon any distribution in a bankruptcy, liquidation, reorganization or similar proceeding relating to the property of the Reorganized Debtor, all of the Reorganized Debtor's secured and unsecured creditors, the holders of the Senior Preferred Stock and the holder of the Junior Preferred Stock, will have the right to be paid in full, and in cash, before any distribution is made with respect to the New Common Stock.

*The Reorganized Debtor may issue securities that could dilute ownership of the New Common Stock.*

The Reorganized Debtor may raise additional capital through a public or private debt or equity financing transaction. If the Reorganized Debtor raises funds by issuing equity securities (with the consent of the holders of senior equity and debt), the percentage ownership of holders of the New Common Stock at the Effective Date may be reduced, and the new equity securities may have rights prior to those of the New Common Stock.

*As the New Senior Preferred Stock, New Junior Preferred Stock and New Common Stock are subject to restrictions on transferability and there is no established trading market for these equity securities, holders may not be able to sell. The price of any sale may be subject to fluctuations and volatility.*

The shares of the New Senior Preferred Stock, New Junior Preferred Stock and New Common Stock are restricted securities and are not subject to resale absent registration under the Securities Act, or pursuant to an applicable exemption from registration under the Securities Act and applicable state securities laws. Additionally, there is no established trading market for these equity securities, and the Reorganized Debtor does not presently intend to apply for the New Common Stock to be listed on any security exchange or take any other action to register such securities.

*The Reorganized Debtor may not be able to pay dividends on its new equity securities and does not anticipate doing so for the foreseeable future.*

Under the Delaware General Corporation Law, cash dividends on capital stock may not be paid if, after giving effect to any such dividend, a corporation would not be able to pay its debts as they become due in the ordinary course of business or its total assets would be less than the sum of its total liabilities, plus any amount needed to satisfy preferential rights upon dissolution of the Reorganized Debtor. Accordingly, despite the provision for dividends under the Certificate of Designations governing the shares of the New Senior Preferred Stock and the New Junior Preferred Stock, the Reorganized Debtor may not be able to make any such dividend payments.

The Debtor has not in the past paid any dividends on the shares of its common stock and does not anticipate that the Reorganized Debtor will pay dividends on the New Common Stock for the foreseeable future.  Any future decision to pay a dividend on the New Common Stock and the amount of any such dividend, will be made at the discretion of the Board.  As a result of the above and the anticipated financial results of the Reorganized Debtor for the foreseeable future, the Reorganized Debtor does not expect to pay dividends for the foreseeable future.

## ARTICLE VII

## FINANCIAL INFORMATION AND FEASIBILITY

### 7.1     Financial Information.

Attached as Exhibit G are the Projections prepared by Grant Thornton and Debtor's management, setting forth the *pro forma* projections of the intended business operations of the Reorganized Debtor, including forecasted revenues and expenses.

The Projections set forth in Exhibit G and the above summary reflect the Debtor's  best judgment as to the cash flow of the Reorganized Debtor based upon assumptions the Debtor believes are reasonable; however, there can be no assurance that any of the  assumptions on which they are based will prove to be accurate, that any of the forecasted expenses will not exceed assumptions or that the projected results will be realized.  Actual results will be effected by several factors, including, without limitation, commodity prices, general economic and business conditions, successful implementation of business plans, third-party contractual relationships, sufficiency of Debtor's working capital and sources of funding, as well as other conditions that affect the capital markets and the oil and natural gas industry, all of which can be materially adverse to the Reorganized Debtor.

### 7.2     Feasibility of the Plan.

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.  This is the so-called "feasibility" test.  The Reorganized Debtor will be recapitalized as set forth in the Plan and will have availability under the New Senior Secured Credit Facility to support ongoing operations.  Thus, it is the Debtor's best judgment that confirmation of the Plan is not likely to be followed by  liquidation or need for further reorganization and that the Debtor will have sufficient liquidity to enable it to fund its obligations in the ordinary course, including development drilling and other capital operations, so long as commodity prices continue to fluctuate within foreseeable bounds.  Debtor's management has carefully considered its development program, including drilling and exploration and believes that the Debtor will be able to meet or exceed the production projections shown by the Ralph E. Davis Associates, Inc. Report (as adjusted from June 30, 2009 to the date of confirmation) within foreseeable commodity price fluctuations, though there can be no assurance this actually will occur.  This conclusion of Debtor's management is supported by the Projections attached hereto prepared by Grant Thornton and the Debtor's management and the going concern analysis prepared by Grant Thornton.  Accordingly, the Debtor believes that the Plan complies with the standard of Section 1129(a)(11) of the Bankruptcy Code.  *See* Exhibits E and G for the Valuation Report and the Projections, respectively.

# ARTICLE VIII

# LIQUIDATION ANALYSIS

**8.1    Liquidation Analysis.**

To calculate the probable distribution to members of each impaired class of holders of claims or interests if the Debtor were liquidated under Chapter 7, a Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtor if this Chapter 11 Case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by the claims of secured creditors to the extent of the value of their collateral and by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 Case. Costs of a liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a Chapter 7 trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtor in the Chapter 11 Case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the Debtor during the pendency of the bankruptcy case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation would also prompt the rejection of executory contracts and unexpired leases and thereby create a significantly greater amount of unsecured claims.

Once the Bankruptcy Court ascertains the recoveries in liquidation of the secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the Debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

As shown in the Liquidation Analysis prepared by Grant Thornton and attached as <u>Exhibit E, Attachment 2</u> to this Disclosure Statement, the Debtor's management is of the view that each Class of Claims will receive under the Plan more than they would receive if the Debtor was liquidated in a Chapter 7 case. More specifically, a liquidation of the Debtor would significantly impair recoveries to all holders of Claims and clearly is not in the best interests of Stakeholders. For example, unsecured creditors are getting paid in full under the Plan, but unsecured creditors would receive no recovery in a liquidation. Accordingly, it is clear that holders of Claims will fare much better under the Plan than in a liquidation. Furthermore, in a liquidation, Interests Holders would not receive any distribution which is the same treatment provided to Class 8 under the Plan. The Plan therefore satisfies the best interests test.

## ARTICLE IX

## POST CONFIRMATION MANAGEMENT

**9.1     Officers and Directors.**

On the Effective Date, the officers and directors of the Reorganized Debtor are expected to be:

President, Chief Executive Officer and Director:        Robert P. Munn

Chief Financial Officer and  Secretary:        Carl A. Chase

Chief Operating Officer:        James B. Davis

Directors:        To Be Designated

**9.2     Board Observation.**

On the Effective Date, the Debtor and CIT shall enter into the Board Observation Agreement in substantially the form attached to the Disclosure Statement as <u>Exhibit R</u>.

## ARTICLE X

## DISTRIBUTIONS AND CLAIMS RESOLUTION

**10.1   Delivery of Distributions; Undeliverable or Unclaimed Distributions.**

**A.     Delivery of Distributions in General.**

The Reorganized Debtor shall make distributions to holders of an Allowed Claim and allowed Interest as provided in the Plan at the address reflected in the books and records of the Debtor, unless otherwise notified in writing by such holder sufficiently in advance of any distribution to allow the Debtor or Reorganized Debtor to reflect such change on its books and records.

**B.     Undeliverable and Unclaimed Distributions.**

Any undeliverable or unclaimed distribution under this Plan that does not become deliverable on or before the first anniversary of the Effective Date shall be deemed to have been forfeited and waived, and the Person otherwise entitled thereto shall be forever barred and enjoined from asserting its Claim therefor against, or seeking to recover its distribution from, the Debtor, its Estate, or the Reorganized Debtor.

**C.     Allocation of Plan Distributions Between Principal and Interest.**

To the extent that any Allowed Claim or Interest entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration

exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

### D.    Fractional Amounts.

The distributable amount of New Senior Preferred Stock and New Common Stock may create fractional amounts otherwise distributable to holders of Allowed Class 4(a) and 4(b) Claims, and allowed Class 11 Interests.  Notwithstanding such entitlement, all New Senior Preferred Stock and New Common Stock issued by the Reorganized Debtor pursuant to the Plan will be issued and distributed only in full dollar denominations.  To the extent any holder would be entitled to a fractional denomination of New Senior Preferred Stock and New Common Stock, but for this provision, the denomination of New Senior Preferred Stock, New Junior Preferred Stock and New Common Stock to be issued to such holder shall be rounded downward to eliminate any fractional amount.

### E.    Compliance with Applicable Laws.

In connection with this Plan and all distributions hereunder, the Debtor and Reorganized Debtor shall comply with all applicable tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to those requirements.  The Debtor and Reorganized Debtor shall be authorized to take all actions necessary or appropriate to comply with those withholding and reporting requirements.  Notwithstanding any other provision of this Plan, the holders of Interests in the Debtor shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution, and no distribution shall be made to or on behalf of such holder pursuant to this Plan unless and until such holder has made arrangements satisfactory to the Debtor and Reorganized Debtor for the payment and satisfaction of such tax obligations or has, to the Debtor's or  Reorganized Debtor's satisfaction, established an exemption therefrom.  Any distribution to be made pursuant to this Plan shall, pending the implementation of such arrangements, be treated as undeliverable pursuant to Article IV, Section A. hereof.

### F.    Tax Identification Numbers.

Prior to receiving any distributions under this Plan, each holder of an Allowed Claim or Allowed Interest shall provide the Debtor/Reorganized Debtor with written notification or confirmation of its federal tax identification number or social security number for the sole purpose of allowing the Debtor and the Reorganized Debtor to comply with the applicable tax laws and rules.

### G.    Setoffs.

The Debtor and/or Reorganized Debtor may, but shall not be required to, set off against any Claim, other than the Claims held by the CIT First Lien Lenders and CIT Second Lien Lenders, and the payments or other distributions to be made in respect of that Claim, claims of any nature whatsoever that the Debtor or Reorganized Debtor may have against the Claim's holder; but neither the failure to do so, nor the allowance of any Claim hereunder, shall constitute

a waiver or release by the Debtor or Reorganized Debtor of any claim that the Debtor or Reorganized Debtor may have against any Claim or Interest holder.

# ARTICLE XI

# FEDERAL INCOME TAX CONSEQUENCES

## 11.1    General.

The following discussion summarizes certain anticipated U.S. federal income tax consequences of the Plan to the Debtor and certain holders of Claims or Interests. This summary is provided for general information purposes only and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to any particular holder of a Claim or an Interest. This summary does not purport to be a complete analysis or listing of all potential tax considerations.

This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder (the "Regulations"), judicial authorities, current published administrative rulings and pronouncements of the Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect as of the date hereof. Legislative, judicial, or administrative changes or new interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences of the Plan. Any such changes or new interpretations could have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

This summary does not address all aspects of U.S. federal income taxation that may be relevant to a particular holder of a Claim or an Interest in light of its particular facts and circumstances or to certain types of holders of Claims subject to special treatment under the Tax Code (e.g., persons who are related to the Debtor within the meaning of the Tax Code, non-U.S. taxpayers, banks, mutual funds, financial institutions, broker-dealers, insurance companies, small business investment companies, tax-exempt organizations, real estate investment trusts, regulations investment companies, grantor trusts, persons holding a Claim as part of a "hedging," "integrated," or "constructive" sale or straddle transaction, persons holding Claims through a partnership or other pass-through entity, persons that have a "functional currency" other than the U.S. dollar, and holders of Claims or Interests who are themselves in bankruptcy). If a partnership (or other entity or arrangement taxed as a partnership) holds a Claim or an Interest, the tax treatment of a partner in the partnership generally will depend upon the status of the partner and upon the activities of the partnership. This summary does not address the tax considerations applicable to holders who obtained their Claims or Interests (or the rights underlying such Claims or Interests) in connection with the performance of services. This summary does not discuss any aspects of foreign, state, local, estate, or gift taxation, nor does it apply to any person that acquires any of the exchange consideration in the secondary market. This summary does not address the U.S. federal income tax consequences to holders of Claims or Interests that are not entitled to vote on the Plan, including holders whose Claims or Interests are entitled to reinstatement or payment in full in Cash under the Plan or holders whose Claims or Interests are otherwise not Impaired under the Plan. The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. In addition, a substantial amount of time may elapse between the date of this Disclosure Statement and the

receipt of a final distribution or transfer under the Plan.  Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated hereby.  Thus, there can be no assurance that the IRS will not take a contrary view with respect to one or more of the issues discussed below.  No ruling will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtor with respect thereto.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  In addition, a substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution or transfer under the Plan.  Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated hereby.  Thus, there can be no assurance that the IRS will not take a contrary view with respect to one or more of the issues discussed below.  No ruling will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtor with respect thereto.

This summary assumes that holders of Claims or Interests hold only Claims or Interests in a single Class.  Holders of multiple Classes of Claims or Interests should consult their own tax advisors as to the effect such ownership may have on the U.S. federal income tax consequences described below.  This summary also assumes that the various debt, equity, and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form.

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER OF A CLAIM OR AN INTEREST IS HEREBY NOTIFIED THAT (1) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER OF A CLAIM OR AN INTEREST FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER OF A CLAIM OR AN INTEREST UNDER THE TAX CODE; (2) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE CONFIRMATION OF THE PLAN TO WHICH THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT ARE ANCILLARY; AND (3) A HOLDER OF A CLAIM OR AN INTEREST SHOULD SEEK ADVICE BASED UPON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**THE DISCUSSION SET FORTH IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR GENERAL INFORMATION ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED ON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR AN INTEREST. EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL INCOME TAX CONSEQUENCES, AS WELL AS OTHER FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES, CONTEMPLATED UNDER OR IN CONNECTION WITH THE PLAN IN LIGHT OF ITS PARTICULAR CIRCUMSTANCES.**

**11.2    Tax Consequences to the Debtor.**

The Debtor expects to report consolidated net operating loss ("NOL") carryforwards for federal income tax purposes for its tax year ending December 31, 2009.  As discussed below, the amount of the Debtor's NOL carryforwards, and possibly certain other tax attributes, may be significantly reduced upon implementation of the Plan.  In addition, the Reorganized Debtor's subsequent utilization of any net built-in losses with respect to its assets and NOLs remaining, and possibly certain other tax attributes, may be restricted as a result of and upon the implementation of the Plan.

### A.    Cancellation of Debt Income.

Under the Tax Code, a U.S. taxpayer generally must include in gross income the amount of any cancellation of indebtedness ("COD") income recognized during the taxable year.  COD income generally equals the excess of the adjusted issue price of the indebtedness discharged over the sum of (i) the amount of cash, (ii) the issue price of any new debt, and (iii) the fair market value of any other property (including stock) transferred by the debtor in satisfaction of such discharged indebtedness.  COD income also includes any interest that has been previously accrued and deducted but remains unpaid at the time the indebtedness is discharged.

Section 108(a)(l)(A) of the Tax Code provides an exception to this rule, however, where a taxpayer is in bankruptcy and where the discharge is granted, or is effected pursuant to a plan approved by, the bankruptcy court.  In such a case, instead of recognizing income, the taxpayer is required, under Section 108(b) of the Tax Code, to reduce certain of its tax attributes by the amount of COD income.  The attributes of the taxpayer are to be reduced in the following order: current year NOLs and NOL carryforwards, general business and minimum tax credit carryforwards, capital loss carryforwards, the basis of the taxpayer's assets, and finally, foreign tax credit carryforwards (collectively, "Tax Attributes").  The reduction in Tax Attributes generally occurs after the calculation of a debtor's tax for the year in which the debt is discharged.  Section 108(b)(5) of the Tax Code permits a taxpayer to elect to first apply the reduction to the basis of the taxpayer's depreciable assets, with any remaining balance applied to the taxpayer's other Tax Attributes in the order stated above.  In addition to the foregoing, Section 108(e)(2) of the Tax Code provides a further exception to the realization of COD income upon the discharge of debt, providing that a taxpayer will not recognize COD income to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for federal income tax purposes.

The Debtor may realize COD income as a result of the Plan.  The amount of the COD income, if realized, would equal the excess of the Allowed Class 4(a) and 4(b) Claims canceled over the sum of (i) the issue price of the New Senior Secured Credit Facility and (ii) the aggregate fair market value of the New Senior Preferred Stock and the New Common Stock issued in exchange therefor.  The Debtor believes that the amount of debt satisfied will not substantially exceed the issue price of the New Senior Secured Credit Facility and the fair market value of the New Senior Preferred Stock and New Common Stock exchanged in satisfaction of the Allowed Class 4(a) and 4(b) Claims.  The ultimate amount of COD income realized by the Debtor is uncertain because, among other things, it will depend on the fair market value of all New Senior Preferred Stock and New Common Stock issued on the Effective Date.

Regardless of the amount of the Debtor's COD income, the Debtor will not be required to include COD income in gross income because the indebtedness will be discharged while the Debtor is under the jurisdiction of a court in a Title 11 case. Accordingly, the Debtor expects that there will be no U.S. federal income taxes payable by the Debtor as a result of the COD income. Instead, the Debtor will be required to reduce Tax Attributes by the amount of the COD income realized in the manner described above. The Debtor has not yet determined whether it would be beneficial to elect to reduce the basis of its depreciable property prior to any reduction of NOLs or other Tax Attributes. The extent to which NOLs and other Tax Attributes remain following Tax Attribute reduction will depend on the amount of the COD income.

A recently enacted amendment to the COD income rules, in Section 108(i) of the Tax Code, provides that taxpayers, including taxpayers operating under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code, that recognize COD income in 2009 or 2010 may elect to forego the COD income exclusion and attribute reduction rules described above and instead take the COD income into taxable income in equal installments in 2014 through 2018 (i.e., the taxpayer would report 20% of the COD income in each such year). The election to defer the taxable income, which may be made on an instrument-by-instrument basis, must be made on the taxpayer's tax return for the year which includes the transaction that creates the COD income (in this case, the year in which the Effective Date occurs). The Debtor has not yet determined if it will elect to defer COD income, in whole or in part, under this new provision or instead have the exclusion and attribute reduction rules apply.

### B.     NOLs and Other Attributes.

Following the Effective Date, the Debtor expects to have NOLs. As provided above, the Debtor currently expects to have NOLs, and the Debtor will generate NOLs on the Effective Date to the extent that the Debtor has generated deductions for U.S. federal income tax purposes that are not offset by income and/or gain and are not eliminated by the attribute reduction rules of Section 108(b) of the Tax Code discussed above. In addition, the Debtor may generate NOLs in future taxable years if and to the extent that future deductible expenses exceed their income and gain in those years.

### C.     Annual Limitation on Use of NOLs.

The amount of the Debtor's NOLs may be reduced as a result of the reduction of Tax Attributes described above in Section 11.2(A) "- Cancellation of Debt Income." Additionally, the Debtor's ability to utilize its NOLs allocable to periods prior to the Effective Date (the "Pre-Change Losses") may be subject to limitation pursuant to Section 382 of the Tax Code as a result of the change in ownership of the Debtor that will occur upon the emergence from bankruptcy, as described below.

### i.     General Section 382 Limitation.

In general, when a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the Bankruptcy Exception discussed below, Section 382 of the Tax Code limits the corporation's ability to utilize its Pre-Change Losses to offset future taxable income. Such limitation also may apply to certain losses or deductions that are "built-in" (i.e., economically accrued but unrecognized) as of the date of the ownership change and that are

subsequently recognized.  An "ownership change" generally is defined as a more than 50 percentage point aggregate increase in ownership of the value of the stock of a "loss corporation" (a corporation with NOLs) by one or more stockholders holding at least 5% of the outstanding equity of the corporation that takes place during a testing period (generally three years) ending on the date on which such change in ownership is tested.  It is anticipated that the Debtor will undergo an ownership change as a result of the Plan.

In general, unless the corporation is eligible for and does not elect out of the Bankruptcy Exception (defined below), when a corporation undergoes an ownership change pursuant to a bankruptcy plan, Section 382 of the Tax Code places an annual limitation on a corporation's use of Pre-Change Losses equal to the product of (i) the fair market value of the stock of the corporation immediately after the ownership change (with certain adjustments, and unless the fair market value of all of the corporation's assets immediately before the ownership change is less than the post-change stock value); and (ii) the highest of the adjusted federal "long-term tax-exempt rates" in effect for any month in the three-calendar-month period ending with the month in which the ownership change occurs (the "Annual Limitation").  In the case of an ownership change occurring not under the Bankruptcy Exception (defined below), the stock value used in determining the Annual Limitation is the value immediately before the ownership change.  For any taxable year ending after an ownership change, the NOLs that can be used in that year to offset taxable income of a corporation cannot exceed the amount of the Annual Limitation.  Any unused Annual Limitation may be carried forward, thereby increasing the Annual Limitation in the subsequent taxable years.  If the corporation does not continue its historic business or use a significant portion of its assets in a new business for two years after the ownership change, the Annual Limitation resulting from the ownership change is zero.

### ii.    Built-in Gain and Losses.

Under certain circumstances, Section 382 of the Tax Code also limits the deductibility of certain built-in losses that are recognized during the five years following the date of an ownership change.  In particular, subject to a de minimis exception, if a loss corporation has a net unrealized built-in loss at the time of an ownership change (taking into account the difference between the tax basis and value of its assets and its items of "built-in" income and deduction), then any built-in losses recognized during the following five years (up to the amount of the net unrealized built-in loss at the time of the ownership change) generally will be treated as a Pre-Change Loss and will be subject to the Annual Limitation.

Conversely, if the loss corporation has more than a de minimis net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the net unrealized built-in gain at the time of the ownership change) generally will increase the Annual Limitation in the year recognized, such that the loss corporation would be permitted to use its Pre-Change Losses against such built-in gain income in addition to its regular Annual Limitation.

### iii.    Bankruptcy Exception.

Section 382(l)(5) of the Tax Code provides an exception to the Annual Limitation for corporations under the jurisdiction of a court in a Title 11 case (the "Bankruptcy Exception") if shareholders of the debtor immediately before an ownership change and qualified (so-called

"historic") creditors of a debtor receive, in respect of their claims, stock with at least 50% of the vote and value of all the stock of the reorganized debtor pursuant to a confirmed bankruptcy plan of reorganization. For this purpose, a "historic creditor" is a creditor that (i) has held its indebtedness since the date that is at least eighteen months before the date on which the debtor filed its petition with the Bankruptcy Court; or (ii) whose indebtedness arose in the ordinary course of the business of the debtor and is held by the creditor who at all times was the beneficial owner of such claim. In determining whether the Bankruptcy Exception applies, certain holders of claims that own directly or indirectly less than 5% of the total fair market value of the debtor's stock immediately after the ownership change are presumed to have held their claims since the origination of such claims, other than in certain cases where the debtor has actual knowledge that the creditor has not owned the debt for the requisite period. The Bankruptcy Exception applies to a reorganized debtor if these requirements are satisfied unless the debtor files an election for the Bankruptcy Exception not to apply.

If a corporation is eligible for and applies the Bankruptcy Exception, its Pre-Change Losses will not be subject to the Annual Limitation. However, under the Bankruptcy Exception, the amount of the corporation's Pre-Change Losses and certain pre-change Tax Attributes that may be carried over to a post-change year must be reduced to the extent attributable to any interest paid or accrued during the taxable year of the ownership change (up to the date of the ownership change) and the three preceding taxable years in respect of certain indebtedness that was exchanged for stock pursuant to the bankruptcy reorganization. In addition, if the Bankruptcy Exception applies and there is another ownership change of the Debtor within two years after consummation of the bankruptcy plan of reorganization, an Annual Limitation of zero will be imposed on the use of NOLs and built-in losses that remain on the date of the second ownership change.

Even if the Debtor qualifies for the Bankruptcy Exception, it may nevertheless elect for such exception not to apply and instead remain subject to the Annual Limitation described above. This election would have to be made on the Debtor's U.S. federal income tax return for the taxable year in which the ownership change occurs. The determination of the application of the Bankruptcy Exception is fact specific. The Debtor has not yet determined whether it will be eligible for the Bankruptcy Exception, and if it were, whether it would make the election not to have the Bankruptcy Exception apply.

**D.    Accrued Interest.**

To the extent that the consideration issued to holders of Claims pursuant to the Plan is attributable to accrued but unpaid interest, the Debtor should be entitled to interest deductions in the amount of such accrued interest, but only to the extent the Debtor has not already deducted such amount. The Debtors should not have COD income from the discharge of any accrued but unpaid interest pursuant to the Plan to the extent that the payment of such interest would have given rise to a deduction pursuant to Section 108(e)(2) of the Tax Code.

**E.    Federal Alternative Minimum Tax.**

In general, a federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a rate of 20% to the extent that such tax exceeds the corporation's regular federal income tax for the year. A corporation's alternative minimum

taxable income generally is equal to its regular taxable income with certain adjustments.  In computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated.  In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular federal income tax purposes by applying NOL carryforwards, only 90% of the corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).  Accordingly, usage of the Debtor's NOLs by the Reorganized Debtor may be subject to limitations for AMT purposes in addition to any other limitations that may apply.

In addition, if a corporation undergoes an "ownership change" within the meaning of Section 382 of the Tax Code and has a net unrealized built-in loss on the date of the ownership change, the corporation's aggregate tax basis in its assets may be reduced for certain AMT purposes to reflect the fair market value of the assets on the ownership change date.  Accordingly, if the Debtor is in a net unrealized built-in loss position on the Effective Date, for AMT purposes the tax benefits attributable to basis in assets may be reduced.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future years when the corporation is no longer subject to the AMT.

**11.3    Tax Consequences to Holders of Allowed Class 4(a), 4(b), and 10 Claims.**

Pursuant to the Plan, each holder of an Allowed Class 4(a), 4(b), and 10 Claim will receive, in exchange for, and in full satisfaction and discharge of, its Allowed Class 4(a), 4(b), or 10 Claim, one or more of the following securities: New Senior Secured Credit Facility, New Senior Preferred Stock, New Junior Preferred Stock, and New Common Stock.

The U.S. federal income tax consequences of the Plan to the holders of Allowed Class 4(a), 4(b), and 10 Claims will depend upon, among other things, (a) the nature of the indebtedness owed to it; (b) whether the CIT First Lien Credit Agreement and CIT Second Lien Credit Agreement constitute "securities" for U.S. federal income tax purposes; (c) the type of consideration received by the holder of an Allowed Class 4(a), 4(b), and 10 Claim in exchange for the Claim and whether such consideration constitutes a "security" for U.S. federal income tax purposes; (d) whether the holder reports income on the accrual or cash basis; (e) whether the holder has previously taken a bad debt deduction or worthless security deduction with respect to the CIT First Lien Credit Agreement and CIT Second Lien Credit Agreement; and (f) whether the holder receives distributions under the Plan in more than one taxable year.

A.      **Definition of Securities.**

As stated above, the tax treatment of the exchange of Allowed Class 4(a) and 4(b) Claims for the New Senior Secured Credit Facility, New Senior Preferred Stock, and New Common Stock will depend in part upon whether the CIT First Lien Credit Agreement and CIT Second Lien Credit Agreement and the New Senior Secured Credit Facility constitute "securities" for U.S. federal income tax purposes.  The term "security" is not defined in the Tax Code or in the Regulations and has not been clearly defined by judicial decisions.  Whether an instrument constitutes a "security" for U.S. federal income tax purposes is determined based upon all the facts and circumstances.  Certain authorities have held that the length of the initial term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities generally have indicated that an initial term of less than five years is evidence that the instrument is not a security, whereas an initial term of ten years or more is evidence that it is a security.  There are numerous other factors that may be taken into account in determining whether a debt instrument is a security, including, but not limited to, the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, the convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

B.      **Consequences to Holders of Allowed Class 4(a) and 4(b) Claims if CIT First Lien Credit Agreement and CIT Second Lien Credit Agreement are Not Securities.**

If the CIT First Lien Credit Agreement or the CIT Second Lien Credit Agreement is not treated as a "security" for U.S. federal income tax purposes, a holder of such CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement would be treated as exchanging such CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement for the New Senior Secured Credit Facility, New Senior Preferred Stock, and New Common Stock, as applicable, in a fully taxable exchange.  If the CIT First Lien Credit Agreement is not treated as a "security," the CIT First Lien Lender would recognize gain or loss equal to the difference between (i) the sum of the issue price of New Senior Secured Credit Facility and the fair market value as of the Effective Date of New Senior Preferred Stock received by the lender in exchange for such CIT First Lien Credit Agreement (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the holder's basis in such CIT First Lien Credit Agreement exchanged therefor (other than tax basis attributable to accrued but unpaid interest previously included in the holder's taxable income).  If the CIT Second Lien Credit Agreement is not treated as a "security," the CIT Second Lien Lender would recognize gain or loss equal to the difference between (i) the sum of the fair market value as of the Effective Date of New Senior Preferred Stock and the fair market value as of the Effective Date of New Common Stock received by the lender in exchange for such CIT Second Lien Credit Agreement (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the holder's basis in such CIT Second Lien Credit Agreement exchanged therefor (other than tax basis attributable to accrued but unpaid interest previously included in the holder's taxable income).  The treatment of accrued but unpaid interest and amounts allocable thereto varies depending on the nature of the holder's Claim and is discussed below.

Any gain or loss recognized would be capital or ordinary, depending on the status of the CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement in the holder's hands, including whether the CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement constitutes a market discount bond in the holder's hands.  Generally, any gain or loss recognized by a holder of a CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement not constituting a security for U.S. federal income tax purposes would be a long-term capital gain or loss if the CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement is a capital asset in the hands of the holder and the holder has held the CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement for more than one year, unless the holder had previously claimed a bad debt deduction or the holder had accrued but untaxed market discount with respect to such CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement.  The deductibility of capital losses is subject to limitations.  To the extent that a portion of the New Senior Secured Credit Facility, New Senior Preferred Stock, and New Common Stock received in the exchange is allocable to accrued interest, the holder may recognize ordinary income.  A holder's tax basis in the New Senior Secured Credit Facility, New Senior Preferred Stock, and New Common Stock received would equal the fair market value of the New Senior Secured Credit Facility, New Senior Preferred Stock, and New Common Stock as of the Effective Date.  A holder's holding period for the New Senior Secured Credit Facility, New Senior Preferred Stock, and New Common Stock would begin on the day following the Effective Date.

C.      **Consequences to Holders of Allowed Class 4(a), 4(b), and 10 Claims if CIT First Lien Credit Agreement and CIT Second Lien Credit Agreement are Securities.**

i.      **Consequences to Holders of Allowed Class 4(a) Claims if New Senior Secured Credit Facility is a Security.**

If both the CIT First Lien Credit Agreement and the New Senior Secured Credit Facility are treated as "securities" for U.S. federal income tax consequences, the exchange of a holder's CIT First Lien Credit Agreement for the New Senior Secured Credit Facility and New Senior Preferred Stock would be treated as a recapitalization, and therefore a generally tax-free reorganization under the Tax Code.  In general, this means that a CIT First Lien Lender will not recognize gain or loss with respect to the exchange (except with respect to accrued but unpaid interest on the CIT First Lien Credit Agreement).  It should be noted that nonrecognition results only to the extent the principal amount of the New Senior Secured Credit Facility does not exceed the principal amount of the CIT First Lien Credit Agreement surrendered in exchange therefor.  A CIT First Lien Lender would obtain a tax basis in the New Senior Secured Credit Facility and New Senior Preferred Stock received equal to the tax basis of the CIT First Lien Credit Agreement exchanged therefor and would have a holding period for the New Senior Secured Credit Facility and New Senior Preferred Stock that includes the holding period for the CIT First Lien Credit Agreement; provided that the tax basis of any New Senior Secured Credit Facility or share of New Senior Preferred Stock treated as received in satisfaction of accrued but unpaid interest would equal the fair market value of such New Senior Secured Credit Facility or share of New Senior Preferred Stock, and the holding period for such New Senior Secured Credit Facility or share of New Senior Preferred Stock would begin on the day following the day of receipt.

      **ii.**      **Consequences to Holders of Allowed Class 4(a) Claims if New Senior Secured Credit Facility is Not a Security.**

If, for U.S. federal income tax consequences, the CIT First Lien Credit Agreement is treated as a "security" but the New Senior Secured Credit Facility is not treated as a "security," the exchange of a holder's CIT First Lien Credit Agreement for New Senior Secured Credit Facility and New Senior Preferred Stock would still be treated as a recapitalization, but the exchange would be taxable in part. In general, this means that, in addition to income with respect to accrued but unpaid interest on the CIT First Lien Credit Agreement, a holder will recognize gain (but not loss) with respect to the exchange in an amount not in excess of the fair market value of the New Senior Secured Credit Facility. A holder would obtain a tax basis in the New Senior Preferred Stock received equal to the tax basis of the CIT First Lien Credit Agreement, decreased by the amount of the fair market value of the New Senior Secured Credit Facility, and increased by the amount of gain recognized on the exchange. A holder would obtain a tax basis in the New Senior Secured Credit Facility received equal to the fair market value of the New Senior Secured Credit Facility. A holder would have a holding period for the New Senior Preferred Stock that includes the holding period for the CIT First Lien Credit Agreement and for the New Senior Secured Credit Facility beginning on the day following the day of receipt. However, the tax basis of any New Senior Secured Credit Facility or share of New Senior Preferred Stock treated as received in satisfaction of accrued but unpaid interest would equal the fair market value of such New Senior Secured Credit Facility or share of New Senior Preferred Stock, and the holding period for such New Senior Secured Credit Facility or share of New Senior Preferred Stock would begin on the day following the day of receipt.

      **iii.**      **Consequences to Holders of Allowed Class 4(b) Claims.**

If the CIT Second Lien Credit Agreement is treated as a "security" for U.S. federal income tax consequences, the exchange of a holder's CIT Second Lien Credit Agreement for New Senior Preferred Stock and New Common Stock would be treated as a recapitalization, and therefore a generally tax-free reorganization under the Tax Code. In general, this means that a CIT Second Lien Lender will not recognize gain or loss with respect to the exchange (except with respect to accrued but unpaid interest on the CIT Second Lien Credit Agreement). A CIT Second Lien Lender would obtain a tax basis in the New Senior Preferred Stock and New Common Stock received equal to the tax basis of the CIT Second Lien Credit Agreement exchanged therefor and would have a holding period for the New Senior Preferred Stock and New Common Stock that includes the holding period for the CIT Second Lien Credit Agreement; provided that the tax basis of any share of New Senior Preferred Stock or New Common Stock treated as received in satisfaction of accrued but unpaid interest would equal the fair market value of such share of New Senior Preferred Stock or New Common Stock, and the holding period for such share of New Senior Preferred Stock would begin on the day following the day of receipt.

      **iv.**      **Consequences to Holders of Allowed Class 10 Claims.**

The exchange of a holder's Class C Preferred Stock Interest for New Junior Preferred Stock will be treated as a recapitalization, and therefore a generally tax-free reorganization under the Tax Code. In general, this means that a holder of a Class C Preferred Stock Interest will not recognize gain or loss with respect to the exchange (except with respect to dividend arrearages

**DISCLOSURE STATEMENT WITH RESPECT TO PREPACKAGED PLAN OF REORGANIZATION OF CROSS CANYON ENERGY CORP. PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE – PAGE 59**

513854 000004 DALLAS 2563267.8

on the Class C Preferred Stock Interest).  A holder of a Class C Preferred Stock Interest would obtain a tax basis in the New Junior Preferred Stock received equal to the tax basis of the Class C Preferred Stock Interest exchanged therefor and would have a holding period for the New Junior Preferred Stock that includes the holding period for the Class C Preferred Stock Interest; provided that the New Junior Preferred Stock received in satisfaction of any dividend arrearages would be treated in the same manner described below in Section 11.5(A)(ii) "Tax Consequences of Holdings New Senior Preferred Stock, New Junior Preferred Stock, and New Common Stock - Dividends in the Form of Additional Stock."

### D.      Accrued but Unpaid Interest.

Whether or not the CIT First Lien Credit Agreement and CIT Second Lien Credit Agreement are treated as "securities" for U.S. federal income tax purposes, any amount received by a CIT First Lien Lender or CIT Second Lien Lender that is attributable to accrued interest not theretofore included in income would be taxable to the lender as interest income. Conversely, a CIT First Lien Lender or CIT Second Lien Lender may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement was previously included in the lender's gross income but was not paid in full by the Debtor.  Such loss may be ordinary, but the tax law is unclear on this point.

Although the manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law, the consideration paid pursuant to the Plan with respect to a CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement shall be allocated first to the principal amount of such CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement as determined for U.S. federal income tax purposes and then to accrued interest, if any, with respect to such CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement.  Accordingly, in cases where a CIT First Lien Lender or CIT Second Lien Lender receives distributions under the Plan having a value less than the principal amount of its CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement, the Debtor allocates the full amount of consideration transferred to such holder to the principal amount of such obligation and does not treat any amount of the consideration to be received by such holder as attributable to accrued interest.  CIT First Lien Lenders and CIT Second Lien Lenders should be aware, however, that the IRS may take a different position with respect to the proper allocation.

### E.      Market Discount.

Under the "market discount" provisions of Sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a holder of a CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement who exchanges such CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement for the New Senior Secured Credit Facility, New Senior Preferred Stock, or New Common Stock on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement.  In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or (ii) in the case of a debt instrument issued with original

**DISCLOSURE STATEMENT WITH RESPECT TO PREPACKAGED PLAN OF REORGANIZATION OF CROSS CANYON ENERGY CORP. PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE – PAGE 60**

513854 000004 DALLAS 2563267.8

issue discount, its adjusted issue price by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a holder of an Allowed Class 4(a) or 4(b) Claim on the taxable disposition of CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement that had been acquired with market discount would be treated as ordinary income to the extent of the market discount that accrued thereon while such CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement were considered to be held by such holder (unless such holder elected to include market discount in income as it accrued). To the extent that the surrendered CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement that had been acquired with market discount is deemed to be exchanged for the New Senior Secured Credit Facility or shares of New Senior Preferred Stock or New Common Stock in a tax-free reorganization, any market discount that accrued on such debts but was not recognized by the holder may cause any gain recognized on the subsequent sale, exchange, redemption or other disposition of the New Senior Secured Credit Facility or shares of New Senior Preferred Stock or New Common Stock to be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement.

### F.    Bad Debt or Worthless Securities Deduction.

To the extent that the CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement is construed not to be a "security" for U.S. federal income tax purposes, a holder who, under the Plan, receives in respect of such CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement an amount less than the holder's tax basis in such CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement may be entitled to a bad debt deduction in some amount under Section 166(a) of the Tax Code or a worthless securities deduction under Section 165 of the Tax Code. The rules governing the character, timing, and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed and are subject to the exchange provisions of Section 1271 of the Tax Code. CIT First Lien Lenders and CIT Second Lien Lenders, therefore, should consult their tax advisors with respect to their ability to take such a deduction.

### G.    Post-Effective Date Distributions.

CIT First Lien Lenders and CIT Second Lien Lenders may receive distributions subsequent to the Effective Date. The imputed interest provisions of the Tax Code may apply to treat a portion of any post-Effective Date distribution as imputed interest. Imputed interest may, with respect to certain lenders, accrue over time using the constant interest method, in which event the lender may, under some circumstances, be required to include imputed interest in income prior to receipt of a distribution.

**11.4    Tax Consequences of Holding New Senior Secured Credit Facility.**

    **A.    Original Issue Discount**

    If New Senior Secured Credit Facility will provide that, at its option, the Reorganized Debtor may pay a portion of the interest on the New Senior Secured Credit Facility by issuing additional debt instruments, the New Senior Secured Credit Facility will have original issue discount for U.S. federal income tax purposes.  Further, if the issue price of the New Senior Secured Credit Facility is less than the "stated redemption price at maturity" of such New Senior Secured Credit Facility by more than a de minimis amount, the New Senior Secured Credit Facility Lenders will be considered to have purchased such New Senior Secured Credit Facility with original issue discount.  Consequently, the New Senior Secured Credit Facility Lenders will be required to include original issue discount in ordinary income for one or both reasons over the period that they hold the New Senior Secured Credit Facility in accordance with a constant yield to maturity method.  As a result, the New Senior Secured Credit Facility Lenders may have taxable interest income in excess of the amount of cash they receive in a taxable year.

    In general, a New Senior Secured Credit Facility Lender, whether such lender uses the cash or the accrual method of tax accounting, will be required to include as ordinary income the sum of the "daily portions" of original issue discount on such New Senior Secured Credit Facility for all days during the taxable year that the lender owns such New Senior Secured Credit Facility.  The daily portions of original issue discount are determined by allocating to each day in any accrual period a ratable portion of the original issue discount allocable to that accrual period.  Accrual periods may be of any length and may vary in length over the term of the New Senior Secured Credit Facility, provided that no accrual period is longer than one year and each scheduled payment of principal or interest occurs on either the final day or the first day of an accrual period.  The amount of original issue discount on the New Senior Secured Credit Facility allocable to each accrual period equals the product of the "adjusted issue price" of such New Senior Secured Credit Facility at the beginning of the accrual period and the yield to maturity of such New Senior Secured Credit Facility, less the amount of any qualified stated interest allocable to the accrual period.  The adjusted issue price of the New Senior Secured Credit Facility at the beginning of any accrual period generally will be the sum of its issue price and the amount of original issue discount allocable to all prior accrual periods, reduced by the amount of all cash payments made with respect to such New Senior Secured Credit Facility, other than payments of qualified stated interest, in all prior accrual periods.  The yield to maturity of the New Senior Secured Credit Facility is the discount rate that causes the present value of all principal and interest payments on such New Senior Secured Credit Facility as of its issue date to equal the issue price of such New Senior Secured Credit Facility.

    For purposes of determining the yield to maturity, if the issue price of the New Senior Secured Credit Facility is equal to or greater than the stated principal amount, a New Senior Secured Credit Facility Lender must assume that the Reorganized Debtor will not exercise the option (if any) to issue additional debt, except in respect of any period in which the Reorganized Debtor has actually elected to pay a portion of the interest by issuing additional debt.  If that assumption applies and, for any interest payment period, the Reorganized Debtor pays the interest entirely in cash on the New Senior Secured Credit Facility, then a New Senior Secured Credit Facility Lender will not be required to adjust its original issue discount inclusions.  If that assumption applies but, for any interest payment period, the Reorganized Debtor exercises its

option (if any) to pay a portion of the interest by issuing additional debt, then a New Senior Secured Credit Facility Lender will be required to adjust its calculation for determining the amount of original issue discount it must include in gross income during future periods by treating such New Senior Secured Credit Facility as if, on the date of such exercise, such New Senior Secured Credit Facility had been retired and then reissued for an amount equal to its adjusted issue price on such date, and by recalculating the yield to maturity of the reissued New Senior Secured Credit Facility by treating the amount of interest paid in kind that increased the principal amount of such New Senior Secured Credit Facility (and of any prior interest paid in kind that increased the principal amount of such New Senior Secured Credit Facility) as a payment that will be made on the maturity date of such reissued New Senior Secured Credit Facility.

For purposes of determining the yield to maturity, if the issue price of the New Senior Secured Credit Facility is less than the stated principal amount, the Reorganized Debtor is deemed to exercise whichever option (payment of interest in cash or in kind, if any such option exists) minimizes the yield on the New Senior Secured Credit Facility. If payment of a portion of the interest in kind minimizes the yield on the New Senior Secured Credit Facility, the Reorganized Debtor is presumed to do so. If payment of interest in cash reduces the yield on the New Senior Secured Credit Facility, the Reorganized Debtor is presumed to do so.

If for any interest payment period the Reorganized Debtor is presumed to pay interest in cash but instead it exercises any option to pay a portion of the interest in kind, a New Senior Secured Credit Facility Lender will be required to adjust its calculation for determining the amount of original issue discount it must include in gross income during future periods by treating such New Senior Secured Credit Facility as if, on the date of such exercise, such New Senior Secured Credit Facility had been retired and then reissued for an amount equal to its adjusted issue price on such date, and by recalculating the yield to maturity of the reissued New Senior Secured Credit Facility by treating the amount of interest paid in kind that increased the principal amount of such New Senior Secured Credit Facility (and of any prior interest paid in kind that increased the principal amount of such New Senior Secured Credit Facility) as a payment that will be made on the maturity date of such reissued New Senior Secured Credit Facility. Following the interest payment, the New Senior Secured Credit Facility would need to be retested to determine whether the yield would still be minimized by the Reorganized Debtor paying interest in cash in accordance with the presumption.

If for any interest payment period the Reorganized Debtor is presumed to pay a portion of the interest in kind but instead it pays the interest in cash, to the extent the interest payable in kind is paid in cash by the Reorganized Debtor, the New Senior Secured Credit Facility is treated as if the Reorganized Debtor made a pro rata prepayment, which reduces the amount of each payment remaining on the New Senior Secured Credit Facility. The New Senior Secured Credit Facility would be treated as consisting of two debt instruments, one that is retired on the interest payment date and one that remains outstanding after the interest payment date. The adjusted issue price, adjusted basis in the hands of the holder, and accrued original issue discount of the original New Senior Secured Credit Facility would be allocated between the two instruments based on the portion of the original New Senior Secured Credit Facility treated as retired. The pro rata prepayment and deemed retirement of a portion of the New Senior Secured Credit Facility may result in gain or loss to a holder of the New Senior Secured Credit Facility. Following the interest payment, the New Senior Secured Credit Facility would need to be

retested to determine whether yield would still be minimized by the Reorganized Debtor paying interest in kind in accordance with the presumption.

Each payment made in cash on a New Senior Secured Credit Facility, other than a payment of qualified stated interest, will be treated first as a payment of any accrued original issue discount that has not been allocated to prior payments and second as a payment of principal (which is not includible in income), and no portion of such payments will be treated as prepaid interest. A New Senior Secured Credit Facility Lender generally is not required to include separately in income cash payments received on such note to the extent such payments constitute payments of previously accrued original issue discount.

If a New Senior Secured Credit Facility Lender's initial tax basis in the New Senior Secured Credit Facility is greater than the issue price of such New Senior Secured Credit Facility but less than the stated redemption price at maturity, such holder generally will be considered to have "acquisition premium" with respect to the New Senior Secured Credit Facility, which may reduce the amount of original issue discount that the holder is required to include in taxable income. The stated redemption price at maturity generally will include all payments of principal and interest under the New Senior Secured Credit Facility, other than payments of qualified stated interest. Furthermore, if, immediately after the Effective Date, a New Senior Secured Credit Facility Lender's initial tax basis in its New Senior Secured Credit Facility exceeds the stated redemption price at maturity, the New Senior Secured Credit Facility would be treated as issued with bond premium, and no original issue discount would be required to be included in the gross income of the holder in respect of such New Senior Secured Credit Facility. In addition, a New Senior Secured Credit Facility Lender may elect to amortize the bond premium. Any election to amortize bond premium applies to all taxable debt obligations held at the beginning of the first taxable year to which the election applies or acquired thereafter, and may not be revoked without the consent of the IRS.

The Reorganized Debtor will report annually to the IRS and to record holders information with respect to the amount of original issue discount accruing during the calendar year.

### B. Sale, Exchange, or Other Taxable Disposition of New Senior Secured Credit Facility.

A New Senior Secured Credit Facility Lender generally will recognize capital gain or loss upon the sale, exchange, or other taxable disposition of the New Senior Secured Credit Facility in an amount equal to the difference between (x) the amount realized by such lender (less any amount attributable to accrued and unpaid interest not previously included in income, which will be treated as ordinary interest income) and (y) such lender's adjusted tax basis in the New Senior Secured Credit Facility. Any such gain or loss will be long-term if the New Senior Secured Credit Facility has been held for more than one year. The deductibility of capital losses is subject to limitations.

In addition, under Section 108(e)(7) of the Tax Code, any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the New Senior Secured Credit Facility or shares of New Senior Preferred Stock or New Common Stock will be treated as ordinary income to the extent the CIT First Lien Credit Agreement Lender or CIT Second Lien

**DISCLOSURE STATEMENT WITH RESPECT TO PREPACKAGED PLAN OF REORGANIZATION OF CROSS CANYON ENERGY CORP. PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE – PAGE 64**

513854 000004 DALLAS 2563267.8

Credit Agreement Lender previously claimed ordinary loss deductions with respect to the surrendered CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement.

**11.5    Tax Consequences of Holding New Senior Preferred Stock, New Junior Preferred Stock, and New Common Stock.**

        **A.    Distributions.**

                **i.    In General.**

Distributions with respect to the New Senior Preferred Stock, New Junior Preferred Stock, and New Common Stock generally will be taxable as dividend income when paid to the extent of the Reorganized Debtor's current and accumulated earnings and profits as determined for U.S. federal income tax purposes.  To the extent that the amount of any distributions exceeds the Reorganized Debtor's earnings and profits with respect to such distribution, the excess will be applied against and will reduce the holder's adjusted tax basis in respect of the stock as to which the distribution was made (but not below zero).  Any remaining excess will be treated as gain or loss from the sale or exchange of such stock, with the consequences discussed below in <u>Section 11.5(C) </u>"- Sale or Other Disposition" of this Disclosure Statement.

                **ii.    Dividends in the Form of Additional Stock.**

Distributions on the New Senior Preferred Stock and New Junior Preferred Stock will be paid in the form of additional shares of such stock. The general rule under Section 305 of the Tax Code is that such a stock distribution is tax-free, unless one or more of the following exceptions apply: (a) at the election of any shareholder, the dividend can be paid in property instead of stock; (b) the result of the distribution is that some shareholders receive property while other shareholders increase their interest in the earnings or assets of the corporation; (c) as a result of the distribution, some common shareholders receive common stock and other common shareholders receive preferred stock; (d) the dividend is a distribution on preferred stock; or (e) the dividend is payable in convertible preferred stock, unless it can be established that the dividend will not have the effect listed in (b).  Taxability under exception (d), for distributions on preferred stock, applies if the stock does not participate in corporate growth to any significant extent (disregarding conversion privileges).  A right to participate in corporate growth that lacks substance (i.e., as to which it is reasonable to anticipate at the time of the distribution that there is little or no likelihood of participating beyond a fixed preferential return) will not be respected.

Although not free from doubt, the Debtor believes that the New Senior Preferred Stock and New Junior Preferred Stock should not qualify as participating preferred stock because neither the New Senior Preferred Stock nor the New Junior Preferred Stock is convertible into common stock, is entitled to participate, over and above its dividend and liquidation priority, with another less privileged class of stock in earnings and profits and upon liquidation, or is entitled to be redeemed at a significant redemption premium.  Thus, any dividends made in the form of additional shares of the New Senior Preferred Stock or New Junior Preferred Stock should be taxable in the same manner described above in <u>Section 11.5(A)(i)</u> "- Distribution – In General" of this Disclosure Statement.  The amount of such distributions will be equal to the fair market value of the additional shares of New Senior Preferred Stock or New Junior Preferred Stock on the date of the distribution.  A holder's tax basis in such additional shares of New

**DISCLOSURE STATEMENT WITH RESPECT TO PREPACKAGED PLAN OF REORGANIZATION OF CROSS CANYON ENERGY CORP. PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE – PAGE 65**

513854 000004 DALLAS 2563267.8

Senior Preferred Stock or New Junior Preferred Stock will equal the fair market value of the additional stock on the distribution date, and such holder's holding period for such additional stock will begin on the day following the distribution date.

### iii.     Dividends to Non-Corporate Shareholders.

Dividends generally are taxed as ordinary income.  However, dividends received by non-corporate holders in taxable years beginning on or before December 31, 2010 may qualify for taxation at lower rates applicable to long-term capital gains, provided certain holding period and other requirements are satisfied.  Non-corporate holders should consult their own tax advisors regarding the applicability of such lower rates under their particular factual situation.

### iv.     Dividends to Corporate Shareholders.

In general, a distribution to a corporate shareholder that is treated as a dividend for U.S. federal income tax purposes will qualify for the 70% dividends received deduction that is available to corporate shareholders that own less than 20% of the voting power or value of the outstanding stock of the distributing corporation (other than certain preferred stock).  A corporate shareholder holding 20% or more of the distributing corporation may be eligible for an 80% dividends received deduction.  No assurance can be given that the Reorganized Debtor will have sufficient earnings and profits (as determined for U.S. federal income tax purposes) to cause distributions to be eligible for a dividends received deduction.  Dividend income that is not subject to regular U.S. federal income tax as a consequence of the dividends received deduction may be subject to the U.S. federal alternative minimum tax.

The dividends received deduction is only available if certain holding period and taxable income requirements are satisfied.  The length of time that a shareholder has held stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.  Finally, the tax consequences of the receipt of a dividend by a corporate shareholder may be different if the dividend were treated as an "extraordinary dividend" under applicable rules.

### B.     Constructive Dividend Potential.

Under Section 305 of the Tax Code, a holder of New Senior Preferred Stock or New Junior Preferred Stock may be treated as receiving constructive distributions over the term of such stock based on the excess, if any, of the stock's liquidation preference over the stock's fair market value on the Effective Date (subject to a de minimis exception)—sometimes referred to as "preferred original issue discount" or "preferred OID."  These "preferred OID" rules apply to stock that does not participate in corporate growth to any significant extent (disregarding conversion privileges).  A right to participate in corporate growth that lacks substance (i.e., as to which it is reasonable to anticipate at the time of the distribution that there is little or no likelihood of participating beyond a fixed preferential return) will not be respected.

As discussed above in <u>Section 11.5(A)(ii)</u> of this Disclosure Statement, the Debtor believes that the New Senior Preferred Stock and New Junior Preferred Stock should not qualify as participating preferred stock and, thus, should be subject to the preferred OID rules.  In general, each holder is bound by the Reorganized Debtor's determination as to whether there is accruable preferred OID, unless the holder explicitly discloses that it is taking a contrary position in a statement attached to its timely filed U.S. federal income tax return for the taxable year in which it acquires the stock.

       **C.**        **Sale or Other Disposition.**

Subject to the discussion below, any gain or loss recognized by a holder on the sale, exchange, or other disposition of the New Senior Preferred Stock, New Junior Preferred Stock, or New Common Stock generally should be capital gain or loss in an amount equal to the difference, if any, between (x) the amount realized by the holder and (y) the holder's adjusted tax basis in the New Senior Preferred Stock, New Junior Preferred Stock, or New Common Stock immediately before the sale, exchange, or other disposition.  Any such capital gain or loss generally should be long-term capital gain or loss if the holder's holding period for its stock is more than one year at that time.  The use of capital losses is subject to limitations.

In the case of redemption of New Senior Preferred Stock, New Junior Preferred Stock, or New Common Stock for cash or property, the U.S. federal income tax treatment depends on the particular facts relating to such holder at the time of the redemption.  If the redemption of such New Senior Preferred Stock, New Junior Preferred Stock, or New Common Stock (i) is "not essentially equivalent to a dividend" with respect to the holder, (ii) is "substantially disproportionate" with respect to the holder (as defined generally as greater than 20% reduction in a shareholder's relative voting stock and common stock of a corporation where such shareholder owns less than 50% of the voting stock of the corporation immediately following the redemption), or (iii) results in a "complete termination" of all of such holder's equity interest in the corporation, then the receipt of cash or property by such holder will be treated as a sale or exchange of such New Senior Preferred Stock,  New Junior Preferred Stock, or New Common Stock whatever the case may be, and taxed accordingly.  In applying these tests, certain constructive ownership rules apply to determine stock ownership.  If the redemption does not qualify for sale or exchange treatment, the holder instead will be treated as having a distribution on such stock (in an amount that generally will be equal to the amount of cash and fair market value of property received in the redemption) with the general consequences described above in <u>Section 11.5(A)</u> "- Distributions"  of this Disclosure Statement, and the holder's basis in the stock redeemed will shift to the other shares actually owned by such holder.  If the holder does not retain any actual stock ownership in the company following such redemption, the holder may lose its tax basis completely.  If such distribution is taxable as a dividend to a corporate shareholder, it may be subject to the "extraordinary dividend" provisions of the Tax Code.

As discussed above in <u>Section 11.3(F)</u> "- Bad Debt or Worthless Securities Deduction" of this Disclosure Statement, in the case of any exchange of the CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement that qualifies as a recapitalization for U.S. federal income tax consequences, the Tax Code indicates that any accrued market discount in respect of such CIT First Lien Credit Agreement or CIT Second Lien Credit Agreement in excess of the gain realized in the exchange should not be currently includible in income.  However, such accrued market discount would carry over to any non-recognition property received in exchange therefor

(presumably in accordance with the relative fair market values of such property), such that any gain recognized by the holder upon a subsequent disposition of the stock should be treated as ordinary income to the extent of any carryover of accrued market discount to the stock not previously included in income.  To date, specific Regulations implementing this rule have not been issued.

In addition, any gain recognized by the holder upon a subsequent taxable disposition of the New Senior Preferred Stock or New Common Stock received in respect of its Allowed Class 4(a) or 4(b) Claim (or any stock or property received for such New Senior Preferred Stock or New Common Stock in a later tax-free exchange) would be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any bad debt deductions (or additions to a bad debt reserve) claimed with respect to the Allowed Class 4(a) or 4(b) Claim for which the New Senior Preferred Stock or New Common Stock was received and any ordinary loss deductions incurred upon satisfaction of the Allowed Class 4(a) or 4(b) Claim, less any income (other than interest income) recognized by the holder upon satisfaction of the Allowed Class 4(a) or 4(b) Claim, and (ii) with respect to a cash basis holder, also any amounts that would have been included in its gross income if the holder's Allowed Class 4(a) or 4(b) Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

## 11.6    Information Reporting and Backup Withholding.

Certain payments, including the payments with respect to Claims pursuant to the Plan, may be subject to information reporting by the Debtor to the IRS.  Moreover, such reportable payments may be subject to backup withholding (currently at a rate of 28%) under certain circumstances.  Backup withholding is not an additional tax.  Rather, amounts withheld under the backup withholding rules may be credited against a holder's federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally a U.S. federal income tax return).  The Debtor intends to comply with all applicable reporting withholding requirements of the Tax Code.

Holders should consult their tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

The Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds.  Holders should consult their tax advisors regarding these Regulations and whether the exchanges contemplated by the Plan would be subject to these Regulations and require disclosure on the holders' tax returns.

## 11.7    Importance of Obtaining Professional Tax Assistance.

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT THEIR TAX

ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX
CONSEQUENCES APPLICABLE UNDER THE PLAN.

<h1 style="text-align:center">ARTICLE XII<br>REQUIREMENTS FOR CONFIRMATION</h1>

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11, including, among other things, that (a) the Debtor's prepetition solicitation of votes complies with the requirements of Bankruptcy Rule 3018(b), (b) the Plan was transmitted to substantially all creditors and equity holders in the same class, (c) the solicitation was in compliance with Section 1126(b) of the Bankruptcy Code, (d) the Debtor did not prescribe an "unreasonably short" time for creditors and equity holders to accept or reject the Plan, (e) the Plan properly classifies Claims and Interests, (f) the Plan complies with applicable provisions of the Bankruptcy Code, (g) the Debtor has complied with applicable provisions of the Bankruptcy Code, (h) the Debtor has proposed the Plan in good faith and not by any means forbidden by law, (i) disclosure of "adequate information" as required by Section 1125 of the Bankruptcy Code has been made, (j) the Plan has been accepted by the requisite votes of creditors (except to the extent that "cramdown" is exercised under Section 1129(b) of the Bankruptcy Code), (k) the Plan is in the "best interests" of all holders of Claims or Interests in each Impaired Class, (l) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date, and (m) the Plan provides for the continuation after the Effective Date of all retiree benefits, as defined in Section 1114 of the Bankruptcy Code, at the level established at any time before Confirmation in accordance with Sections 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code, for the duration of the period that the Debtor has obligated itself to provide such benefits.

**12.1    Solicitation and Voting Requirements.**

Bankruptcy Rule 3018(b) requires that the same reorganization plan be transmitted to substantially all creditors and equity holders in the same class. The Debtor caused the Solicitation Materials to be transmitted to each holder of a Class 4(a) and 4(b) Claim and a Class 10 Interest. Bankruptcy Rule 3018(b) further requires that the Debtor not fix an "unreasonably short time" for the holders of a Class 4(a) and 4(b) Claim and a Class 10 Interest to accept or reject the Plan. The Debtor ensured that all holders of Class 4(a) and Class 4(b) Claims and Class 10 Interests (the only Classes entitled to elect to accept or reject the Plan) received the Solicitation Materials with sufficient time to respond. See Paragraph 2.2 of Article II above for a discussion of Solicitation and Voting.

The only classes Impaired under the Plan and entitled to vote to accept or reject the Plan that have been Solicited are Classes 4(a), 4(b) and 10. Holders of Claims in Classes 4(a) and 4(b) and Interests in Class 10 are entitled to vote to accept or reject the Plan. Interests in the Debtor in Classes 11 and 12 are deemed to have rejected the Plan. Thus, their votes will not be solicited. All other Classes of Claims and Interests are not Impaired under the Plan. Thus, such Classes are deemed to have accepted the Plan and a solicitation of their votes is not required.

**12.2    Best Interests Test.**

Even if the Plan is accepted by each class of holders of Claims and Interests, the Bankruptcy Code requires a Bankruptcy Court to find that the Plan is in the "best interests" of all holders of Claims or Interests impaired by the Plan and that have not voted to accept the Plan.  The "best interests" test, as set forth in Section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that (a) all members of an impaired class of claims or interests have accepted the plan or (b) the plan will provide a dissenting Class member with a recovery of property of a value, as of the effective date of plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  As described in Section 4.3 "-Liquidation Analysis," the liquidation values in the Valuation Report demonstrate that holders of Claims in Classes 4(a) and 4(b) Claims would recover a smaller percentage on account of its Allowed Claim if the Debtor were to be liquidated than they would recover under the Plan and that no other classes of claims or interests would receive a distribution.

**12.3    Confirmation Without Acceptance of All Impaired Classes - "Cramdown."**

The Debtor shall request Confirmation of the Plan, as it may be modified from time to time, under Section 1129(b) of the Bankruptcy Code, and it reserves the right to modify the Plan to the extent acceptable to the New Senior Secured Credit Facility Lenders and to the extent Confirmation in accordance with Section 1129(b) of the Bankruptcy Code requires modification. Under Section 1129(b) of the Bankruptcy Code, a bankruptcy court may confirm a plan over the negative vote of a rejecting class, if, among other things, (a) at least one impaired class of claims has accepted the plan (not counting the votes of any disqualified parties) and (b) if the plan "does not discriminate unfairly" against and is "fair and equitable" to each rejecting class.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a rejecting impaired class is treated equally with respect to other classes of equal rank.  A plan is fair and equitable as to a class of secured claims that rejects the plan if, among other things, the plan provides (a) (i) that the holders of claims in the rejecting class retain the liens securing those claims (whether the property subject to those liens is retained by the debtor or transferred to another entity) to the extent of the allowed amount of such claims and (ii) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (b) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (a) or (c) of this paragraph; or (c) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan, if, among other things, the plan provides that (a) each holder of a claim in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of the claim; or (b) no holder of a claim or interest that is junior to the claims of the rejecting class will receive or retain under the plan any property on account of such junior claim or interest.

A plan is fair and equitable as to a class of interests that rejects the plan if the plan provides, among other things that (a) each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) that no holder of an interest that is junior to the interests of such class will receive or retain under the plan any property on account of such junior interest.

As explained above, the only Impaired Classes solicited by the Debtor to vote on the Plan are Classes 4(a), 4(b) and 10, which are comprised of holders of the CIT Lenders' claims and the Class C Preferred Stock Interest Holder.  Classes 1, 2, 3, 5, 6, 7, 8 and 9 are not impaired and are deemed to have accepted the Plan.  Classes 11 and 12 are deemed, either by the Debtor or as a matter of law, to have rejected the Plan.  Thus, the Debtor intends to pursue "cramdown" of those Classes.

Classes 4(a) and 4(b) have entered into a Plan Support Agreement with the Debtor pursuant to which they agreed to vote to accept the Plan, subject to the terms and conditions of the Plan Support Agreement.  If Classes 4(a) and 4(b) accept the Plan, the Debtor will have at least one Impaired Class of Claims voting to accept the Plan and will seek confirmation of the Plan under the "cramdown" provision.

## ARTICLE XIII

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor believes the Plan affords the best alternative for maximizing the prospects of a successful turnaround and value for all Stakeholders and, therefore, is in the best interests of all constituencies.  If the Plan is not confirmed, theoretical alternatives under Chapter 11 include: (a) continuation of the pending Chapter 11 Case, and (b) formulation of an alternative plan or plans of reorganization.  The Debtor does not believe that either of these theoretical alternatives is viable or realistic and that the only practical alternative to the prompt confirmation of the Plan is the immediate liquidation of the Debtor.

As explained above, the Debtor's management does not believe that a lengthy chapter 11 process under which a plan is developed and proposed post-petition is viable in this case given the Debtor's lack of liquidity and the administrative costs of a protracted stay in Chapter 11.  The Debtor's business simply will not withstand the uncertainty, doubt and cost engendered by such a process.

While a lengthy chapter 11 is not a realistic alternative, the Debtor and its advisors did consider the possibility of a sale of their assets or other transaction under Section 363 of the Bankruptcy Code and alternative structures that theoretically would allow an infusion of cash from an outside source.  However, this alternative is also not a realistic or value-maximizing proposition alternative at this time given the exigencies of the Debtor's cash situation and the current economic climate.

After much analysis of available alternatives and consideration of various options, the Debtor and its management concluded that the prepackaged Chapter 11 Case was the best option.

Absent prompt confirmation, Debtor's management believes there is a substantial likelihood that Debtor's creditors will not be paid in full.  In a liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants and other professionals to assist such trustee would cause a substantial diminution in the value of the assets available for distribution to creditors.  Additionally, in a liquidation, additional Claims would likely be created by the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value.

As evidenced by the liquidation analysis prepared by Grant Thornton, attached as <u>Exhibit E</u> to this Disclosure Statement, the holders of Claims against the Debtor will receive more under this prepackaged Chapter 11 Case than they would in a chapter 7 case.  Additionally, Interests holders in classes 10 and 11 are to receive a distribution under the Plan that will be unavailable in virtually any other foreseeable scenario.

THE DEBTOR'S MANAGEMENT THEREFORE BELIEVES THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER BENEFITS TO HOLDERS OF CLAIMS AND INTERESTS THAN WOULD ANY OTHER ALTERNATIVE AND THAT THE PLAN SHOULD BE CONFIRMED PROMPTLY.

## ARTICLE XIV

## OTHER MATTERS

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, or any exhibits to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rules 3017(d)), please contact the counsel for the Debtor.

DATED:  January 28, 2010.

**CROSS CANYON ENERGY CORP.**


By:   */s/ Carl A. Chase*
          Carl A. Chase
          Chief Financial Officer